# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MATTHEW EDLIN, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-00946 |
| *Plaintiff,* | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CAL-MAINE FOODS, INC., ROSE ACRE FARMS, INC., VERSOVA HOLDINGS, LLC, HILLANDALE FARMS OF PA., INC., HILLANDALE-GETTYSBURG, LLC, HILLANDALE FARMS EAST, INC., HILLANDALE FARMS, INC., DAYBREAK FOODS, INC., URNER BARRY PUBLICATIONS, INC., EGG CLEARINGHOUSE, INC., UNITED EGG PRODUCERS, and JOHN DOES 1-10, | |
| *Defendants.* | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PARTIES .................................................................................................................................4

I.      PLAINTIFF ...............................................................................................................4

II.     DEFENDANTS ..........................................................................................................4

        A.      Cal-Maine ......................................................................................................4

        B.      Rose Acre .......................................................................................................5

        C.      Versova ..........................................................................................................6

        D.      Hillandale Farms............................................................................................6

        E.      Daybreak Foods .............................................................................................7

        F.      Urner Barry ....................................................................................................7

        G.      Egg Clearinghouse.........................................................................................8

        H.      United Egg Producers ....................................................................................9

        I.      Doe Defendants .............................................................................................9

AGENTS AND COCONSPIRATORS ..................................................................................9

JURISDICTION AND VENUE ...........................................................................................10

FACTS ...................................................................................................................................12

I.      U.S. EGG PRODUCTION .......................................................................................12

II.     CONSOLIDATION IN THE EGG INDUSTRY .....................................................15

III.    DEFENDANTS' ANTICOMPETITIVE CONDUCT .............................................19

        A.      Urner Barry and ECI Provide Egg Price Benchmarks .................................20

        B.      Egg Producers Conspired to Artificially Increase the Price of Eggs Using The
                Urner Barry Quote ........................................................................................22

        C.      Egg Price Increases Cannot be Explained by an Increase in the Price of Inputs ..28

        D.      U.S. Department of Justice and New York Attorney General Investigations .......28

        E.      Defendants' Prior Anticompetitive Actions and Unfair Business Practices .........31

        F.      Defendants' Systematic Exchange of Competitively Sensitive Information via
                Urner Barry Violates Antitrust Laws............................................................32

        G.      "Plus Factors" in the Egg Production Industry Provide Additional Evidence of
                Defendants' Conspiracy ................................................................................36

IV.     ANTICOMPETITIVE EFFECTS .............................................................................41

V.      MARKET ALLEGATIONS......................................................................................41

        A.      The Conventional Shell Egg Market is the Relevant Product Market ..................42

        B.      The United States Is a Relevant Geographic Market..............................................43

LIMITATIONS AND TOLLING .........................................................................................44

CLASS ACTION ALLEGATIONS ........................................................................................ 44

COUNT I ............................................................................................................................... 51

COUNT II .............................................................................................................................. 52

COUNT III ............................................................................................................................ 53

## INTRODUCTION

1.    Plaintiff Matthew Edlin ("Plaintiff") on behalf of himself and classes of similarly situated consumer indirect purchasers of conventional fresh shell eggs, brings this class action complaint against Defendants Cal-Maine Foods, Inc. ("Cal-Maine"); Rose Acre Farms, Inc. ("Rose Acre"); Versova Holdings, LLC ("Versova"); Hillandale Farms, which is comprised of Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., and Hillandale Farms, Inc. (together, "Hillandale Farms"); Daybreak Foods, Inc. ("Daybreak Foods"); Expana, which is comprised of Urner Barry Publications, Inc. and Mintec, Inc. (collectively, "Urner Barry" or "Expana"); Egg Clearinghouse, Inc. ("ECI"); United Egg Producers ("UEP"); and John Does 1-10 (collectively  "Defendants") for violations of federal antitrust law and state antitrust and consumer protection laws.

2.    This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for conventional fresh shell eggs (referred to here as "Conventional Eggs" or simply "eggs") from at least as early as January 1, 2022, until Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

3.    Conventional Eggs make up the majority of shell eggs sold in the United States. In 2024, Conventional Eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

4.    Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak (together referred to as "Egg Producer Defendants") are the five biggest egg producers in the United States. Together they own almost half of all egg-laying commercial hens.

5.    Defendant Urner Barry is a publisher that collects, analyzes, and disseminates detailed and current information to its customers in the egg, poultry, meat, seafood, plant protein,

1

and related segments of the food industry. Urner Barry provides actionable competitive intelligence related to the egg market to egg producers, including the Egg Producer Defendants.

6.      As part of their unlawful agreement, Egg Producer Defendants reported inflated "assessment" of egg prices to Urner Barry. Urner Barry then published price quotes using the subjective information provided by its subscribers, including Egg Producer Defendants. It also incorporated transaction prices from an online spot market provided by Defendant ECI—a private, members-only spot market for buying and selling eggs.

7.      The relatively small number of transactions on the ECI, combined with Defendants' large size, enables Egg Producer Defendants to easily influence volume and pricing on the ECI platform—which are then incorporated into Urner Barry quotes.

8.      Urner Barry's price quotes serve as a benchmark for the pricing of Defendants' sales of Conventional Eggs.

9.      In this way, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent competitive decisionmaking by others.

10.     The Egg Producer Defendants' manipulation of the Urner Barry quotes allowed them to sustain ever-increasing price hikes on their customers.

11.     Defendants have repeatedly blamed higher prices during the Class Period on Highly Pathogenic Avian Influenza H5N1, which led to the culling of millions of layer hens beginning in late 2021 ("2021 HPAI").

12.     In reality, however, the impact of the 2021 HPAI outbreak does not account for the unprecedented surge in egg prices during the Class Period. Rather, Egg Producer Defendants have used the 2021 HPAI outbreak as a pretext to dramatically increase egg prices to the detriment of Plaintiff and the Classes.

13.     Nor do input costs explain egg prices during the Class Period. Economic research shows that key inputs to egg production fell while egg prices continued to increase.

14.     The Egg Producer Defendants were able to implement price increases and collectively raise prices because their industry is structurally susceptible to collusion. Among other things, the U.S. Conventional Egg market features a commodity product, highly concentrated and vertically integrated producers, high entry barriers, inelastic demand, and numerous opportunities to collude.

15.     Prices for Conventional Eggs only fell after Defendants' unlawful behavior came to light in March 2025. At that time, it was revealed that the United States Department of Justice, Antitrust Division, was investigating the egg industry for price fixing. According to news reports, several defendants including Cal-Maine, Rose Acre, and Urner Barry are under investigation. The New York Attorney General is also investigating anticompetitive conduct and high prices in the egg industry.

16.     Plaintiff is a consumer, non-commercial purchaser of eggs indirectly from Defendants. Like millions of other American consumers who buy eggs from the grocery store or the corner market, Plaintiff was overcharged for his non-commercial egg purchases by reasons of Defendants' conduct set forth in this Complaint. Defendants' conspiracy has been to the detriment of Plaintiff and members of the Consumer Indirect Purchaser Classes (defined later in this Complaint), and it has caused these consumers to pay supracompetitive prices for Conventional Eggs during the Class Period.

17.     Plaintiff, on behalf of himself and all other consumer indirect purchasers of conventional shell eggs during the Class Period, brings this class action complaint against

Defendants for violations of Section 1 of the Sherman Antitrust Act, as well as various state consumer protection and antitrust laws.

**PARTIES**

### I.   PLAINTIFF

18.     Plaintiff Matthew Edlin is a resident of Irvine, California. During the Class Period, Plaintiff purchased Conventional Eggs indirectly in California for non-commercial use/consumption from one or more Egg Producer Defendants. Plaintiff paid prices for Conventional Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint in the United States Market for Conventional Eggs—a market in which Plaintiff is an active consumer.

19.     Defendants' anticompetitive conduct remains in place and, absent an injunction, will continue to harm competition in the United States Market for Conventional Eggs, including by increasing prices, preventing price competition, and strengthening barriers to entry.

### II.   DEFENDANTS

#### A.   Cal-Maine

20.     Defendant Cal-Maine Foods, Inc. is a public company incorporated in Delaware with its principal place of business in Ridgeland, Mississippi.

21.     Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Over the years, Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024 alone, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

4

22.     Today, Cal-Maine is the largest producer of eggs in the United States. As of 2024, Cal-Maine had nearly 45 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is also a fully-integrated company with its operations consisting of hatching chicks; growing and maintaining chicken flocks; manufacturing feed; and producing, processing, packaging and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozens of eggs sold.

23.     Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

24.     Upon information and belief, Cal-Maine subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

25.     During the Class Period, Cal-Maine sold Conventional Eggs to purchasers in the United States, including members of the Classes.

**B.     Rose Acre**

26.     Rose Acre Farms, Inc. is a private company incorporated in Indiana with its principal place of business in Seymour, Indiana.

27.     Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

28.     Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

29.     Upon information and belief, Rose Acre subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

30.     During the Class Period, Rose Acre sold Conventional Eggs to purchasers in the United States, including members of the Classes.

### C.    Versova

31.    Versova Holdings, LLC is a private company incorporated in Delaware with its principal place of business in Sioux Center, Iowa.

32.    Versova is one of the largest egg producers in the United States. As of 2024, it had over 18 million egg-laying hens.

33.    Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon.

34.    Upon information and belief, Versova subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

35.    During the Class Period, Versova sold Conventional Eggs to purchasers in the United States, including members of the Classes.

### D.    Hillandale Farms

36.    Defendant Hillandale Farms is comprised of several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio. Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

37.    Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million eggs per month. As of 2024, it had nearly 19 million egg-laying hens.

38.    Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

39.    Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

40.     Upon information and belief, Hillandale Farms subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

41.     During the Class Period, Hillandale Farms sold Conventional Eggs to purchasers in the United States, including members of the Classes.

**E.    Daybreak Foods**

42.     Daybreak Foods, Inc. is a private company incorporated in Wisconsin with its principal place of business in Lake Mills, Wisconsin—within this judicial district.

43.     Daybreak Foods is one of the largest egg producers in the United States. It produces approximately 16 million eggs per day. As of 2024, it had over 20 million egg-laying hens.

44.     Daybreak Foods has several egg production facilities in the United States, including in Wisconsin, Minnesota, Michigan, Iowa, Illinois, and Ohio.

45.     Upon information and belief, Daybreak Foods subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

46.     During the Class Period, Daybreak Foods sold Conventional Eggs to purchasers in the United States, including members of the Classes.

**F.    Urner Barry**

47.     Urner Barry Publications, Inc. is a private company incorporated in New Jersey with its principal place of business in Toms River, New Jersey. For decades Urner Barry has published egg prices to industry participants, including Egg Producer Defendants.

48.     Urner Barry began around 1858, when New York City-based printer Benjamin Urner began publishing a single, objective market report providing pricing on various agricultural goods shipping in and out of New York. Initially, Urner Barry called the report the "Producers' Price Current," but later it became known as the "Urner Barry's Price-Current." By the 1880s, this report was a four-page weekly report on market conditions and quotes but it then became a daily

circular.  The Price-Current was successful and recognized to be the best source on New York market prices and conditions. This original entry merged with another publishing firm, L. Frank Barry and Sons, in the 1890s to become the Urner Barry Company.

49.    Urner Barry continued providing daily market reports throughout the decades. In the 1960s, it changed its name to Urner Barry Publications and moved its headquarters to New Jersey.

50.    Beginning in the mid-1970s, Urner Barry expanded to new publications and services covering new markets such as seafood, beef, pork, lamb, and veal. It also hosted the first Executive Conference in New Jersey, which would eventually grow to become the most widely attended and recognized marketing event in the poultry and egg industries.

51.    Urner Barry's offerings have been updated as technology has changed as well. It expanded to the internet, including with the introduction of Comtell On-Line ("Comtell"). Urner Barry promotes Comtell as "the most accessible, accurate and timely source for news, quotes and research in the meat, poultry, egg, pork, veal and seafood industries." Comtell subscribers "are updated several times a day on the most impactful market conditions." Urner Barry also provides egg industry updates to its customers through newsletters, directories, and wall charts.

52.    Urner Barry has been part of United Kingdom-based Mintec Group since 2023, when Mintec acquired Urner Barry's parent company, AgriBriefing Limited. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations, including Urner Barry, under a single brand name: Expana.

**G.    Egg Clearinghouse**

53.    Defendant Egg Clearinghouse, Inc. is a Delaware corporation with its offices and principal place of business in Dover, New Hampshire.

54.    During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and to see the results of trades.

55.    Only ECI members (*i.e.*, farmers and egg buyers) are allowed to trade on the ECI marketplace.

56.    In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

57.    ECI represents just 5% of the shell egg market, yet plays an outsized role in how eggs are priced nationwide.

**H.    United Egg Producers**

58.    Defendant United Egg Producers d/b/a Egg Farmers of America is a Maine corporation with its offices and principal place of business located in Johns Creek, Georgia.

59.    UEP is a national cooperative of egg farmers representing the ownership of approximately 85% of the nation's egg-laying hens and more than 90% of eggs produced in the United States.

60.    The United Egg Association ("UEA") is a trade association affiliate with UEP. UEP formed the UEA in 1983. Expanded in 1995, UEA serves as a national trade association representing three distinct segments of the U.S. egg industry—further processors, allied members, and producers and packers.

**I.    Doe Defendants**

61.    Other persons, firms, and corporations not named as Defendants have participated as coconspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this Complaint: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed coconspirators.

**AGENTS AND COCONSPIRATORS**

62.     Defendants' agents, officers, employees, or representatives authorized, ordered, or performed Defendants' unlawful and anticompetitive acts, while managing, directing, or controlling Defendants' affairs or businesses. Defendants are also liable for acts done in furtherance of the alleged conspiracy by their subsidiaries and companies they acquired through mergers or acquisitions.

63.     Each Defendant's agents operated under the authority and apparent authority of its respective principals.

64.     Each Defendant, through its respective affiliates, agents, and subsidiaries, operated as a single unified entity.

65.     Other persons or entities not named as Defendants may have participated as co-conspirators in the alleged violations. These other persons and entities may also have performed acts and made statements in furtherance of these alleged violations.

66.     Each Defendant was the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

67.     References to a corporate family or companies by a single name in conspiracy allegations constitute allegations that one or more employees or agents of entities within the corporate family undertook conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know their counterparts' corporate affiliations, nor did they recognize distinctions between entities within a corporate family. Thus, all Defendant entities within the corporate families were knowing and active participants in the conspiracy to maintain supracompetitive prices of Conventional Eggs.

## JURISDICTION AND VENUE

10

68.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367. The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

69.     This Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction, which is home to one of the principal Egg Producer Defendants, Daybreak Foods, and is a locus of the United States Conventional Egg Market and the conspiracy to inflate prices within that market. The Defendants had substantial contacts with this jurisdiction, including through the presence of Daybreak Foods here and through the substantial and continuous contacts with this jurisdiction in connection with the U.S. Conventional Egg Market. Plaintiff's claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction.

70.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period, Defendants transacted business in this district, and a substantial portion of the activity at issue in this case occurred in this District. Daybreak Foods at all relevant times maintained a principal place of business in this division in Lake Mills, Wisconsin where it also conducts business relating to the events alleged.

71.     Defendants' conduct alleged here occurred within the flow of interstate commerce, including in this district, and was intended to and did have a direct and substantial effect upon such commerce

72.     During the Class Period, Defendants manufactured, sold, and shipped Conventional Eggs in a continuous and uninterrupted flow of interstate commerce, which included sales of eggs in this district, advertisement of eggs in media in this District, and employment of personnel in

this district. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

73.    This judicial district is not just a proper, but a convenient and indeed ideal venue for adjudicating Plaintiffs' and the Class Members' claims against the Defendants. One of the five Egg Producer Defendants, Daybreak Foods, is headquartered here, and two others—Versova and Rose Acre—are respectively headquartered in adjoining (Iowa) or near-adjoining (Indiana) states. The remaining Defendants are headquartered in disparate locales—Mississippi, Pennsylvania, New Jersey, New Hampshire, and Georgia—for which this district serves as a relatively convenient central hub. Further, the courts in this district are relatively familiar with both federal antitrust claims, including class actions, and state laws permitting indirect purchaser actions— including Wisconsin's Antitrust Act, which permits indirect purchaser claims for damages through legislative override of the Supreme Court's *Illinois Brick* decision.[1]

## FACTS

## I.    U.S. EGG PRODUCTION

74.    Eggs are a staple food in the United States. They are not only an integral part of a traditional American breakfast, but are also a commonly used ingredient in a wide range of recipes from baked goods and pastas to sauces and cocktails.

75.    The egg industry in the United States is massive. On average, America produces about 100 billion eggs per year. In 2023, Americans ate an average of over 280 eggs per person.

76.    The egg market is part of the broader market for poultry products. Poultry production begins with primary breeders. Primary breeder flocks consist of elite (sometimes called pedigree or foundation) birds, great-grandparent birds, and grandparent birds. Grandparent flocks

---

[1] *See* WIS. STAT. § 133.18(1)(a).

produce the final generation of breeding birds (multiplier/parent flocks). Eggs from multiplier flocks hatch to become production birds—either broilers (chickens for human consumption) or egg-laying hens (also called "layers" or "layer hens"). Broilers are shipped to production farms within a day of hatching, where they are raised for meat. On multiplier farms for egg production, chicks are sent to be raised on pullet farms until they reach egg-laying age (about 19 weeks old), then are transported to egg production farms, while male chicks are culled shortly after hatching.

77.     Typically, the egg production cycle is not volatile or subject to sudden, unmanageable shifts and egg output can be forecasted and adjusted with great precision barring any catastrophic events.

78.     This makes it possible for producers to intentionally reduce supply, delay new flocks, or retire hens early. If these actions were taken collectively by egg producers, it can artificially constrain the supply of eggs and increase prices.

79.     Egg producers maintain cold storage capacity as well, which allows for inventory management that can further distort apparent supply levels in the market. Producers have the ability to withhold eggs from the market during times of low prices or release excess inventory when market prices are favorable.

80.     The predictability and the long lead times for production decisions in the egg market create conditions ripe for anticompetitive coordination.

81.     The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a comprehensive and detailed system of grading and sizing standards that ensures uniformity across the shell egg market.

82.     Specifically, USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by

weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standard strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer.

83.     The United States egg industry produces eggs for two primary uses: (a) whole shell eggs sold primarily to retail consumers (the "shell egg" or "table egg" market) and (b) broken, pasteurized eggs sold in liquid or dried form primarily to restaurants, cafeterias, and food manufacturers (the "breaker" market). Historically, about 70% of layer hens produced eggs for the shell egg market, while the remaining 30% of layers produced eggs for the breaker market. A smaller but growing segment of the shell egg market involves "quality-differentiated" products—such as cage-free or organic eggs—that command retail premiums over Conventional Eggs.

84.     Egg production is spread across the United States, with significant production numbers in almost every state, including Wisconsin.



*USDA Egg Production Chart, 2024*[2]

85.    Production is concentrated in the Midwest. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented nearly half of all laying hens in the United States in 2024. Wisconsin produced over 2,400 million eggs in 2024.

## II.    CONSOLIDATION IN THE EGG INDUSTRY

86.    Throughout most of the twentieth century the egg industry had a highly fragmented production structure that included thousands of independent farms.

87.    In 1978, a company called Watt Publishing Company began conducting industry surveys to provide data about the United States egg industry. The initial survey identified only 34 companies with flocks of one million or more hens, accounting for just 27 percent of the nation's laying hens at the time.

88.    This changed significantly in the decades that followed, when an aggressive wave of mergers and acquisitions transformed the industry from a decentralized network of family operations into a tightly concentrated oligopoly. Between 1900 and 1999, the number of farms in the United States producing eggs dropped from 5 million to under 1000. By 2000, Watt's survey listed 63 companies with one million or more hens, representing 78% of the nation's total flock.

89.    Today Egg Producer Defendants—Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (sometimes referred to as the "Big Five")—collectively control nearly 50% of all U.S. laying hens. Control of laying hens is often used in the egg industry as a proxy for egg sales.

90.    Cal-Maine alone had nearly 45 million egg-laying hens in 2024, and it controlled approximately 20% of national egg sales.

---

[2] https://perma.cc/3XGD-R94J.

91.   The remainder of the shell egg market outside of the top producers is mostly made up of small producers.

92.   Regional concentration can be far more acute; in California, for example, the four largest producers control approximately two-thirds of the state's hen inventory.

93.   The Big Five cohort rose to power in the egg market due to their acquisitions of their mid-sized rivals wherein they both eliminated competitors and absorbed their production capacity.

94.   For example, in 1988, Cal-Maine tripled its flock overnight when it purchased Cargill's entire egg division. It has been the largest producer in the egg industry since. In addition to Cargill, Cal-Maine has made at least twenty-five other acquisitions including:

- **1999:** Hudson Brothers, Inc., which added approximately 1.2 million laying hens;

- **2008:** Tampa Farm Service, Inc. and Zephyr Egg Company, which added approximately 6 million laying hens;

- **2012:** Pilgrims' Pride and Maxim Production Co., which added approximately 4.9 million laying hens.

- **2016:** Foodonics International, which added approximately 3.1 million laying hens.

- **2019:** Mahard Egg Farm, which added approximately 3.9 million laying hens.

- **2022:** Red River Valley Egg Farm, which added 1.7 million laying hens.

- **2024:** Fassio Egg Farms, Inc. and ISE America, Inc., which added approximately 5.9 million laying hens

95.   Other Egg Producer Defendants employed the same strategy as Cal-Maine to become dominant in the egg industry through a series of mergers and acquisitions.

96.   For example, in 2020, Rose Acre announced it entered a joint venture with Weaver Brothers Inc. to purchase Opal Foods. At the end of 2019, Opal Foods had nearly 8 million laying hens.

16

97.    In 2016, Versova grew its capacity by acquiring Willamette Egg Farms—adding over 3 million laying hens—and Rembrandt Foods (now known as Ovation Farms) in 2021.

98.    In 2023, Daybreak Foods acquired Hen Haven, LLC and Schipper Eggs, LLC which brought its operation to over 19 million laying hens. It further expanded in 2022 when it acquired Konos, Inc. (d/b/a Vande Bunte Eggs).

99.    This year, Hillandale Farms was acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs operates large egg producers around the world and has combined revenues of over $2 billion.

100.    Egg Producer Defendants, like much of the poultry industry,  are also vertically integrated in that they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

101.    For example, in addition to its 45 million laying hens and 49 egg production facilities, Cal-Maine also hatches the majority of its chicks on its own multiplier farms and grows them in its own pullet farms. When the chickens reach egg-laying age (19 weeks old), Cal-Maine then transports about 90% of the hens to its own production farms while about 10% are delivered to contracted farms. At both kinds of farms, the hens are fed from Cal-Maine's 30 feed mills. After the hens lay eggs, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as broken egg products. Finally, Cal-Maine prepares its table-eggs and broken egg products to be picked up by customers, or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

102.    Cal-Maine is even further integrated and maintains two breeding facilities with over 10 million birds.



*Cal-Maine Investor Presentation*[3]

103.    This gives Cal-Maine leverage over the replenishment stock that rivals who do not have the same amount of breeding capacity need. In a presentation to investors, Cal-Maine stated that it has the capacity of producing about 8.1 million eggs per hour.

104.    Rose Acre similarly has a breeder flock. Egg producers without breeder flocks must source replacement hens for their egg production either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW Group—further narrowing their options.

105.    Hendrix Genetics and EW Group are two companies which control the "parent flock" which produces almost the entire supply of young hens (also known as pullets) sold downstream to egg producers.

106.    This duopoly at the top of the egg production supply chain functions as a structural bottleneck in the egg market which helps facilitate the producer-level conspiracy. The genetics firms, acting in their own independent, profit-maximizing interest (i.e., restricting pullet supply to keep pullet prices high), have the effect of protecting the Egg Producers downstream collusive arrangement. Their actions, whether coordinated with producers or not, create a risk of input

---

[3] https://perma.cc/WC5U-5ZDJ.

foreclosure, preventing other producers from easily expanding supply and stopping new entrants from competing away the supracompetitive egg prices.

107.    Input foreclosure is an anti-competitive practice where a vertically integrated company, withholds, raises the price of, or degrades the quality of a critical input to harm its rivals in the downstream market.

108.    Beyond these risks, the smaller companies also do not have equal access to pullets to rebuild their flocks as quickly as the most dominant firms with breeding programs.

## III.    DEFENDANTS' ANTICOMPETITIVE CONDUCT

109.    For years, the U.S. egg industry has had relatively stable prices which only fluctuated in a narrow range for most of the 20th century. However, since the industry's rapid consolidation in the 1980s and 1990s, the industry has been increasingly characterized by production rigidity, both in the face of rising prices and in the face of declining prices. Following the supply shocks during the COVID-19 pandemic, Defendants hatched their conspiracy to fully break the cycle and raise egg prices to the highest level on record.

110.    In March 2025, in the midst of Defendants' conspiracy, the average price of grade A egg prices broke historical records when they went as high as $6.23 per dozen.

111.    While Egg Producer Defendants have attributed these price increases to supply disruptions caused by HPAI outbreaks beginning in late 2021, but the price spikes exceeded what the flock losses explain.

112.    However, Defendants' conspiracy has caused the massive price increases. Specifically, egg producers, including Egg Producer Defendants, coordinated with each other to systematically increase the price of eggs by manipulating egg pricing benchmarks such as those published by Urner Barry and ECI.

## A.    Urner Barry and ECI Provide Egg Price Benchmarks

113.    Most other agricultural commodities like soy, coffee, and sugar are traded on transparent public exchanges. In contrast, eggs lack a regulated exchange and price discovery has effectively been delegated to (i) Urner Barry, which issues egg quotations ("UB quotes" or "Urner Barry quote") which serves as a de facto pricing benchmark for eggs nationwide; and (ii) to ECI, a members-only platform which publishes trading-based prices among producers and serves as an information exchange and contract-setting tool for large-scale transactions.

114.    Most egg pricing is anchored to the daily wholesale quotations published by Urner Barry in its Price-Current report, a trade publication that serves as the bellwether for egg contracts nationwide. Urner Barry also publishes benchmarks or indexes that condense its reported quotations into numeric benchmarks used in commercial contracts. UB quotes have been the industry's benchmark for over a century.

115.    Defendants and their co-conspirators were well aware that Urner Barry's Price-Current reports and indexes served as the de facto bellwether for egg pricing nationwide.

116.    A majority of wholesale egg contracts are based on UB quotes as the reference price, meaning even small increases in reported values immediately translate into higher prices for purchasers.

117.    Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of conventional shell eggs sold in the U.S. in the retail and foodservice channels are sold at prices that take into account, . . . quoted wholesale market prices, such as those published by Urner Barry."

118.    Urner Barry compiles its daily reports by soliciting information from producers, distributors, brokers, and buyers—including Egg Producer Defendants—regarding transaction prices, bids, and offers. Urner Barry also takes into account prices gleaned from the Egg

Clearinghouse, but as Karyn Rispoli, a managing editor at Urner Barry, said on a 2024 podcast, "[Egg Clearinghouse] rarely paints the entire picture, and that's where we [Urner Barry] come in."

119.    Urner Barry's reporters collect data by telephone, e-mail, text message, and instant messaging from 8:45 a.m. to 5:00 p.m. Eastern each business day.

120.    Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation cause the near-instant repricing of billions of eggs in the pipeline. Urner Barry's centralization of this data and near instant access to it due to technological advances in the internet age give Defendants a powerful incentive to influence the benchmark prices.

121.    Urner Barry claims to follow an "IOSCO-compliant" methodology that is supposed to prioritize reliable, impartial pricing data. IOSCO is an international body that regulates security markets. An Urner Barry spokesperson stated that "We [Urner Barry] guard against the risk of manipulation by adhering to the IOSCO methodology."

122.    Urner Barry is audited every year by the accounting firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims that it has "passed every audit," recent reports suggest that BDO is not a reliable accounting firm. In 2023, BDO was sanctioned by the Public Company Accounting Oversight Board ("PCAOB") for violations of PCAOB rules and audit standards.[4] On top of that, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."[5]

123.    In addition to its daily market quotations, Urner Barry also publishes forward-looking egg market forecasts. These forecasts provide outlooks on future supply, demand, and

---

[4] https://bit.ly/47NCIoQ.
[5] https://bit.ly/4pc3PkL.

pricing trends, drawing on predictive inputs such as eggs in incubators, chicks hatched, intended placements, rate of lay, along with other factors. Urner Barry advertises these reports as tools that allow subscribers to "identify trends before they happen" and "create sound business strategies."[6]

124.    Urner Barry incorporates transaction prices from ECI's spot market into its price quotes. So while less than 5% of egg transactions occur there, ECI prices play an outside role in Conventional Egg pricing.

125.    The relatively small number of transactions on the ECI, combined with Defendants' dominant market position with respect to smaller producers, have enabled Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms did not need to coordinate with hundreds of fringe producers; they only needed to coordinate among themselves in a way that artificially inflated the ECI prices.

126.    Defendants' collusion is further supported because the ECI is a member-only platform comprised of farmers and ECI's egg buyers' board. Historically, the board included industry executives (including Cal-Maine's founder), underscoring close producer involvement in the information channel that feeds benchmarks.

127.    Urner Barry and ECI amplify price swings led by the largest-volume producers— including Egg Producer Defendants—and prevent independent, competitive decision-making by others.

### B.   Egg Producers Conspired to Artificially Increase the Price of Eggs Using The Urner Barry Quote

128.    Egg pricing is anchored to the daily wholesale pricing published by Urner Barry called the UB quote.

---

[6] https://bit.ly/4p5lSca.

129.    This ensures that any increase in the UB quote is rapidly transmitted throughout the entire industry. Over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5% of eggs are sold on the ECI spot market (which Urner Barry also takes into account). Cal-Maine, for instance, acknowledged in a press release that "a majority of [its] conventional eggs are sold based on market quotes published by Urner Barry."[7] As a result, even modest increases in reported prices cause higher prices for nearly every downstream transaction.

130.    Because Urner Barry's pricing is based in substantial part on self-reported transaction data from dominant firms, it is inherently susceptible to manipulation. By submitting elevated prices, Egg Producer Defendants can push Urner Barry's benchmark upward, knowing that the new higher price will be automatically applied to future contract deliveries.

131.    This creates a self-reinforcing feedback loop and upward pressure on prices. The elevated UB quotes increase the revenue Egg Producer Defendants receive on each sale, which in turn increases the baseline for the next round of reporting. The system amplifies any upward movement and resists downward price corrections, particularly because the market is concentrated as the largest players account for almost 50% of all production.

132.    Most eggs sold in the United States are Conventional Eggs, whose prices are almost universally tied to UB quotes, increasing opportunities for manipulation. In contrast, the prices of specialty and cage-free eggs are more often linked to actual production costs under long-term contracts and thus they did not experience nearly the same magnitude of price spikes during the conspiracy period.

---

[7] https://bit.ly/43uVCja.

133.    For example, in the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than Conventional Egg, reflecting higher production costs. By 2022, however, Conventional Egg prices—driven by UB quotes—rose so sharply that they exceeded cage-free prices by $0.33 on average. In 2023 and 2024, cage-free eggs were only 17% and 2% higher than Conventional Egg, respectively.[8] This inversion is inexplicable absent coordinated conduct in the Conventional Egg Market.



134.    This was not the first time the egg industry had been hit by a significant bird flu outbreak. Following the 2021 HPAI outbreak, the monthly reduction in the egg-laying flock size since 2022 has been similar to that in 2015, when the avian flu killed 43 million egg-laying hens ("2015 HPAI"). Nevertheless, prices since 2022 have risen more than three times more per lost hen than they did during the earlier outbreak.

135.    Historical precedent underscores the risks inherent in using price reporting agencies to set prices. In the poultry and other meat industries, companies have been accused of using price reporting agencies like Urner Barry to facilitate anticompetitive information sharing.

---

[8] https://bit.ly/47JrYcB.

136.    These same vulnerabilities exist in the Conventional Egg Market. Urner Barry's methodology allows for selective reporting, and Urner Barry does not verify every transaction reported by Conventional Egg industry participants. Instead, it aggregates and "scrutinizes" the information according to its own proprietary methods, the details of which are not subject to public oversight.

137.    This opaque process invites abuse in a market dominated by a handful of vertically integrated producers. Egg Producer Defendants can monitor each other's reported prices, verify adherence to coordinated price levels, and punish deviations by reverting to benchmark linked pricing in subsequent transactions.

138.    Both analysts and consumer advocates have noted that the losses of hens from the bird flu in recent years have been insufficient to explain the magnitude of the price spikes. For example, Hunterbrook Media ("Hunterbrook") an investigative reporting outlet, analyzed USDA data and found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023 (a 17% increase in price per 1% decrease in supply), and 127.7% in 2024 (a 25% increase in price per 1% decrease in supply).[9]

139.    From 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 HPAI outbreak—a disparity that cannot be explained by legitimate cost or demand changes.

140.    Moreover, Egg Producer Defendants were able to repopulate quickly relative to the 2015 outbreak due to their large size and vertical integration. For example, Cal-Maine lost a total

---

[9] Jenny Ahn, Julia Case-Levine, & Vibhor Mathur, *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up*, HUNTERBROOK (Mar. 6, 2025), https://bit.ly/4hZ97xH.

of 3.7 million chickens to avian flu in two of its facilities in Kansas and Texas in December 2023 and April 2024, but by early November had added 8 million hens to its flock, more than recovering from its losses in just six months. In fact, Cal-Maine's total flock was actually 15% higher than it was before 2022.[10]

141.    A key distinction between the 2021 HPAI outbreak and the 2015 HPAI one is the unusually slow recovery of the layer flock. This slow response may be explained by structural constraints in the pullet pipeline originating from the upstream genetics duopoly. During the 2022-2024 HPAI "crisis," the parent flock—which produces replacement layer hens—was itself dramatically reduced, from 3.1 million in 2021 to 2.5 million in 2025.

142.    Because there was an upstream bottleneck, the Egg Producer-led conspiracy remained durable. This "managed scarcity" prevented normal market correction (*i.e.*, new entry or expansion) that would have otherwise competed away supracompetitive prices.

143.    In addition, the actual domestic Conventional Egg supply fell even less than the flock size, due to a significant reduction in egg exports and an unprecedented increase in laying rate per hen due to improved genetics.

144.    The U.S. egg price spike is even more puzzling when compared to Europe, which also saw a massive supply shortage in 2022 after 50 million layers were depopulated — compared to 43 million in the U.S. And yet, prices only rose about 30% in Europe from January 2022 to January 2023, compared to nearly 170% in the U.S.

145.    The correlation between UB quotes and Conventional Egg price spikes, combined with the absence of competitive market discipline, supports a strong inference that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

---

[10] *Id.*

146.    Urner Barry served as both the hub for exchanging competitively sensitive pricing information and the enforcement mechanism for maintaining elevated price levels. Urner Barry's dual role magnified the anticompetitive harm, depriving the marketplace of independent price setting and ensuring that the benefits of inflated prices accrued to all Egg Producer Defendants.

147.    Egg Producer Defendants' vertical integration further strengthened the effectiveness of the conspiracy. Because Egg Producer Defendants held control over breeding, production, processing, and distribution, these firms could maintain tight supply discipline while ensuring that all their sales—across all stages—reflected Urner Barry's elevated benchmarks.

148.    Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. If a firm discounted, its short-term gains would be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

149.    Defendants' conspiracy has resulted in price increases that generated extraordinary profits for Egg Producer Defendants. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and in some quarters its profits increased by nearly 950% compared to pre-2022 levels.

150.    These profits came directly at the expense of consumers who purchaser Conventional Eggs, including Plaintiff and members of the Classes who paid vastly more for Conventional Eggs than they would have in a competitive market.

151.    The conduct described herein is inconsistent with unilateral, competitive behavior. It is instead indicative of a coordinated strategy, implemented through a centralized price reporting system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act and various state antitrust and consumer protection laws.

C.     **Egg Price Increases Cannot be Explained by an Increase in the Price of Inputs**

152.    Chickens primarily eat corn and soybean meal. This feed is the major input cost component in the production of shell eggs, accounting for more than half of farm production costs.

153.    Fuel costs are another input to poultry farming. These costs are typically either for propane or natural gas.

154.    Data from the U.S. Bureau of Labor Statistics show that these cost inputs have decreased since 2022.

155.    Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed during the conspiracy period.

156.    Under competition, one would expect prices to track costs and supply shocks. That has not been the case in the Conventional Egg market. Instead, prices and costs have diverged, to the profit of Conventional Egg producers.

D.     **U.S. Department of Justice and New York Attorney General Investigations**

157.    On March 6, 2025, various news outlets, including The Capitol Forum and The Wall Street Journal, reported that the DOJ was investigating whether egg producers—including Cal-Maine and Rose Acre—had conspired to raise prices of Conventional Eggs. According to the reporting, the DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry."[11]

158.    Cal-Maine confirmed in its April 8, 2025 10-Q SEC filing that it was under investigation by the DOJ. It stated that it received a civil investigative demand from the DOJ in March 2025.

---

[11] Dave Michaels, "Justice Department Opens Probe of Sharp Surge in Egg Prices," *The Wall Street Journal* (March 7, 2025).

159.     After the DOJ's investigation became public, egg prices dropped rapidly. As shown below,[12] on March 5, 2025 before the investigation was announced, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, 2025, about two weeks after the DOJ's investigation became public, the same eggs cost $3.03—a 62.7 percent decrease. Conventional Egg prices at retail also dropped around this time (as also shown below). The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.



*Graph of Wholesale Egg Prices*[13]

---

[12] *See* https://bit.ly/49VfTCr.
[13] *Id.*



*Graph of Retail Egg Prices*[14]

160.    On May 8, 2025, Senators Elizabeth Warren (D-Mass.) and Jim Banks (R-Ind.) released a letter in support of the DOJ's investigation. In their letter, the senators expressed skepticism about the claims of egg producers and trade associations that 2021 HPAI outbreaks were the sole cause of high prices. The letter stated that the senators "are concerned that record high egg prices reflect noncompetitive behavior among large producers." Additionally, the senators urged the DOJ "to consider whether a precipitous drop in egg prices just days after reports of the investigation broke suggests that egg producers had conspired to artificially inflate prices."[15]

---

[14] *Id.*
[15] Letter to Gail Slater, Assistant Attorney General, from Senators Warrant and Banks, available at https://bit.ly/3WXMujw.

161.    In its October 1, 2025 10-Q SEC filing, Cal-Maine disclosed that it had also "received a subpoena from the State of New York requesting information and documents related to its investigation of anticompetitive conduct and high egg prices in the egg industry."[16]

### E.    Defendants' Prior Anticompetitive Actions and Unfair Business Practices

162.    The egg industry, including several Defendants, have previously been the subject of private and government actions for anticompetitive and unfair business practices.

163.    For example, in September 2008, egg producers, including Cal-Maine, Rose Acre Hillandale Farms, and Daybreak Foods, were named as defendants in numerous antitrust cases. The plaintiffs alleged in these actions that egg producers conspired to restrict egg production through a sham animal-welfare program that reduced the laying hen flock sizes in order to raise egg prices, among other things. The cases were consolidated as a multi-district litigation in the Eastern District of Pennsylvania under the name *In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002. Cal-Maine and Hillandale settled some of the claims against them for millions of dollars.

164.    In 2019, an action brought by large buyers of egg products was remanded out of the multi-district litigation to the Northern District of Illinois for trial, *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*. The case went to trial on October 17, 2023, against the defendants including Cal-Maine and Rose Acre. On December 1, 2023, the jury returned a decision finding the defendants engaged in a conspiracy to fix the prices of eggs. The jury awarded the plaintiffs $17.8 million in damages ($53.3 million when trebled).

165.    In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge "unconscionably excessive" prices, justified by UB quotes,

---

[16] https://bit.ly/44dqJQv.

which themselves were based on data supplied by the industry. In the complaint, New York alleged that "Urner Barry's indices work like a feedback loop: Egg producers such as Hillandale tell Urner Barry their 'assessments' of egg prices; Urner Barry then repeats back to the egg industry their collective assessment, distilled into indexed prices; and egg producers such as Hillandale then use Urner Barry's indexed prices as benchmarks to price their eggs."[17] In 2021, New York and Hillandale settled the case with Hillandale agreeing to donate 1.2 million eggs to local food banks throughout the State of New York.

166.    In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.[18]

### F.    Defendants' Systematic Exchange of Competitively Sensitive Information via Urner Barry Violates Antitrust Laws

167.    Defendants' exchange of competitively sensitive information amounts to an unlawful agreement in violation of Section 1 of the Sherman Act and various state antitrust and consumer protection laws.

168.    In 1996, the FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing. It has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provides an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the antitrust safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by

---

[17] Verified Petition, *New York v. Hillandale Farms Corporation, et al.*
[18] Complaint, *Alaska v. Agri Stats, Inc. et al.*, No. 3AN-21-04632CI (Sup. Ct. Alaska).

the FTC and DOJ. In subsequent years, the FTC and DOJ used the antitrust safety zone as a general guideline for the legality of information exchanges in other industries.

169.    The DOJ recently withdrew the 1996 Policy. While it was operative, to qualify for the antitrust safety zone under the 1996 Policy, an information exchange would have had to meet the following requirements:

- It must be managed by a third-party, like a trade association or government agency;

- The information provided by participants must have been relatively old (e.g. more than three months old); and

- The information must have been aggregated to protect the identity of the underlying sources, and enough sources were aggregated to prevent competitors from linking particular data to an individual source.

170.    The FTC and DOJ published the 1996 Policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

171.    The DOJ has recently shown a renewed focus on prosecuting anticompetitive information sharing. As a result, on February 3, 2023, the DOJ withdrew three antitrust policy statements, including the 1996 Policy. When announcing the withdrawal, the DOJ said that "the statements are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant . . . competition issues in today's environment."

172.    Before the DOJ withdrew the policy statements, Principal Deputy Assistant Attorney General Doha Mekki stated on February 2, 2023 that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Ms. Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

173.    After the DOJ withdrew the policy statements, Deputy Assistant Attorney General Michael Kades commented in March 2023 when asked what proper information sharing looks like without safe harbors that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

174.    Then at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."[19]

---

[19] Chris May, "Exchanges of 'years-old' labor market data still create antitrust risk, US DOJ official says," mLex (April 11, 2024), *available at* https://bit.ly/4nWXYig.

175.    Later in 2024, the DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, No. 18-cv-01776 (D. Minn.), where it again expressed its stance against anticompetitive information exchanges. The Statement was filed clarify that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[20]

176.    The DOJ's position on information sharing has not changed since the current administration took office. In March 2025, the section chief of the DOJ antitrust division's Washington Criminal Section Ryan Tansey stated at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[21]

177.    Also in March 2025, the DOJ submitted a Statement of Interest in *In re Multipan Health Insurance Provider Litigation*, No. 1:24-cv-06795 (N.D. Ill.), in which it stated that "[c]oncerted action is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, to the joint delegation of decisionmaking power to a common agent."[22]

178.    Considering the DOJ's position that information exchanges can be anticompetitive regardless of their exact form, Defendants' information exchange violates Section 1 of the

---

[20] *In Re Pork Antitrust Litigation*, No. 18-cv-01776 (D. Minn.), Dkt. 2616.
[21] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), *available at* https://bit.ly/4oPliji.
[22] *In re Multipan Health Insurance Provider Litigation*, No. 1:24-cv-06795 (N.D. Ill.), Dkt. 382 (cleaned up).

Sherman Act. Defendants' information exchange existed for the purpose of "depriv[ing] the marketplace of independent centers of decisionmaking,"[23] increasing egg prices above competitive levels, and maintaining those supracompetitive prices.

### G.    "Plus Factors" in the Egg Production Industry Provide Additional Evidence of Defendants' Conspiracy

179.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[24] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[25]

180.    There are several plus and super plus factors here to support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) a commodity product.

181.    *First*, there is a "super plus factor" in that there is reciprocal sharing of firm-specific competitively sensitive information that would normally remain private. When this is present, it

---

[23] *Id.*
[24] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).
[25] *See id.* at 396-97.

leads to a strong inference of active collusion.[26] As described above, Urner Barry compiles daily market reports by soliciting pricing information from producers, distributors, brokers, and buyers—including Egg Producer Defendants—regarding transaction prices, bids, and offers. Egg producers, such as Egg Producer Defendants, are able to maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives. The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive nature. Because an egg producer would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors. Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

182.    The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. Egg Producer Defendants could align their expectations and production plans around shared market outlooks if they jointly relying on the same projections of future supply, demand, and pricing—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

---

[26] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

183.     *Second*, Urner Barry provides participating egg producers with a means of carrying out a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[27] With the help of Urner Barry, egg producers, including Egg Producer Defendants, are able to see benchmarks based on actual transaction that measure where an egg producer stands in relation to others in their market. This type of price verification makes little sense absent collusion.

184.     *Third*, Urner Barry provides Egg Producer Defendants and other egg producers with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

185.     *Fourth*, Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.

186.     Egg Producer Defendants are members of UEP and American Egg Board ("AEB") which are national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

187.     Since 2021, the AEB and UEP have hosted an annual joint conference attended by Egg Producer Defendants.

188.     Egg Producer Defendants' employees have also been on the board of UEP. In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-

---

[27] *Id.* at 1601.

large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

189.    Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in *Kraft* was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs.[28] The UEP Certified Program is still in force today.

190.    Additionally, Urner Barry hosts an annual Executive Conference which Defendants' employees have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decisionmakers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development."[29] Defendants' employees have even been seen together at these conferences as well and in 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including at least Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.

191.    *Fifth*, the Conventional Egg Market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large egg producers, including Egg Producer Defendants, have grown exponentially through acquisitions and the market has become more concentrated. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

---

[28] *See Kraft*, 2024 WL 4346418 at *5.
[29] https://bit.ly/4o1c2Y2.

192.    *Sixth*, egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs.

193.    Potential new entrants will have to expend significant money on up-front capital expenditures, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment.

194.    Potential new entrants would also need to displace long-standing customer relationships. Thus, new entrants into the market are unlikely to disrupt or discipline Defendants' cartel pricing.

195.    *Seventh*, Conventional Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power. Government grading standards make Conventional Eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

196.    Conventional Eggs also exhibit relatively inelastic demand— i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

197.    As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."[30]

---

[30] *See* Cal-Maine 2Q 2025 Investor Presentation, *supra n.3*, at 5.

198.    Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply can yield disproportionately large increases in price and profit for egg producers, including Defendants.

## IV.    ANTICOMPETITIVE EFFECTS

199.    Defendants' anticompetitive conduct had the following effects, among others:

- Restraining or eliminating egg price competition among Egg Producer Defendants;

- Fixing, stabilizing, or maintaining the price of eggs at artificially high levels; and

- Depriving individuals of free and open competition.

200.    Defendants' violations of the antitrust laws caused Plaintiff and members of the Classes to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Classes have suffered damages in the form of overcharges paid on their Conventional Egg purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

201.    Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff defines such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

## V.    MARKET ALLEGATIONS

202.    Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged

anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services and markets need not have precise metes and bounds.

203.    The market for conventional shell eggs is a distinct submarket. Several relevant factors indicate that conventional shell eggs are a distinct product in a distinct submarket.

### A.    The Conventional Shell Egg Market is the Relevant Product Market

204.    The relevant product market in this action, to the extent it need be defined, is the market for conventional shell eggs, also known as table eggs. Shell eggs are eggs in the form most familiar to buyers: fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

205.    Conventional shell eggs are widely recognized by both industry and the public to be separate and distinct from other egg products like broken eggs or cage-free eggs.

206.    According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form).

207.    Conventional shell eggs have unique production facilities for their production as described earlier. They do not have to be pre-broken in production facilities like broken egg products. Hens which produce conventional shell eggs also are confined to small cages which prevent the hens from engaging in natural behaviors.[31] Conventional egg production reduces costs as compared to hens in cage-free , free-range, or pasture-raised egg production operations which allow the chickens more space but also cost more in overhead for the egg producers.[32]

208.    Conventional shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are

---

[31] https://bit.ly/4phFQRj.
[32] *Id.*

purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

209.    Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

210.    "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional shell eggs make up the majority of shell eggs sold in the United States. In 2024, conventional shell eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

211.    Accordingly, there are no reasonable substitutes for conventional shell eggs and they are a distinct product market.

**B.    The United States Is a Relevant Geographic Market**

212.    The United States is the relevant geographic market. This market is distinct because food safety, antitrust, and import laws and regulations are distinct within the United States.

213.    Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased egg prices nationwide. U.S. table egg production totaled 93.1 billion in 2024.[33]

---

[33] https://bit.ly/4pc5Ey7.

## LIMITATIONS AND TOLLING

214.    Plaintiff and members of the Classes are entitled to tolling of the statutes of limitations applicable to the claims asserted below, as Plaintiff and members of the Classes did not discover and could not have reasonably discovered facts constituting their claim for relief until very recently.

215.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreements, conspiracy, and actions from Plaintiff and members of the Classes.

216.    Plaintiff and members of the Classes had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

217.    Because Plaintiffs and members of the Classes could not have known—and did not actually know—about Defendants' unlawful actions, the statutes of limitations applicable to the claims they assert here are tolled until March 2025, at the earliest

218.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Classes has been tolled during the period of such fraudulent concealment.

## CLASS ACTION ALLEGATIONS

219.    Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and on behalf of the proposed classes of persons (collectively, the "Classes") defined below.

220.    Each class's claims derive directly from a course of conduct by Defendants.

221.    Defendants have engaged in uniform and standardized conduct toward each class. Defendants did not materially differentiate in their actions or inactions toward members of the

respective Classes. For each class, the objective facts on these subjects are the same for all class members.

222.    Within each Claim for Relief asserted by each class, the same legal standards govern. Accordingly, Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Fed. R. Civ. P. 23.

223.    Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, allowing for a multistate or nationwide class or classes for some or all claims.

224.    This action may be brought and properly maintained as a class action because the questions it presents are of a common or general interest, and of many persons, and also because the parties are numerous, and it is impracticable to bring them all before the court. Plaintiff may sue for the benefit of all as representative parties pursuant to Federal Rule of Civil Procedure 23.

**The Nationwide Consumer Indirect Purchaser Class**

225.    Plaintiff brings this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a Nationwide Consumer Indirect Purchaser Class defined as follows:

> All persons or entities who purchased Conventional Eggs indirectly for non-commercial use/consumption from one or more of Egg Producer Defendants, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants in the United States from January 1, 2022, until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

226.    Excluded from the Nationwide Consumer Indirect Purchaser Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly

owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Consumer Indirect Purchaser Damages Class

227.    Plaintiff also brings this action and seek to certify a subclass under Rules 23(a); (b)(2); and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a Consumer Indirect Purchaser Damages Class composed of class members seeing seeking damages pursuant to the state antitrust, unfair competition, and consumer protection laws of the states and territories listed in Count II, below (the "Indirect Purchaser States"). The Consumer Indirect Purchaser Damages Class is defined as follows:

> All persons or entities who purchased Conventional Eggs indirectly for non-commercial use/consumption from one or more of Egg Producer Defendants, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants in the Indirect Purchaser States from January 1, 2022, until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

228.    Excluded from the Consumer Indirect Purchaser Damages Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity

229.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).

230.    The members of the Classes are so numerous that a joinder of all members would be impracticable. Millions of Americans purchased Conventional Eggs on a non-commercial basis during the Class Period. Defendants have sold Conventional Eggs across the United States, including in every state that permits indirect purchasers to bring a claim for damages.

231.    The number of class members is well beyond what is required for the numerosity requirement of Rule 23.

## Ascertainability

232.    The Classes are ascertainable.

233.    The defined Classes consist of individuals who purchased Conventional Eggs indirectly from Producing Defendants. This identity of these individuals can be determined through records maintained by Defendants, resellers, and purchasers.

234.    This information can be used to provide members of the classes with direct notice pursuant to the requirements of Rule 23 and the Due Process Clause of the United States Constitution

## Typicality

235.    Plaintiffs' claims are typical of the members of the Classes.

236.    Plaintiff's claims are the same as those asserted by members of the Classes. Plaintiff, like the members of the Classes, purchased Conventional Eggs during the Class Period indirectly from Egg Producing Defendants and has been harmed by those practices in a manner typical of each of the Classes.

237.    Plaintiff alleges injuries that are not unique to him but is typical of members of each of the Classes, including measures of damages and/or nominal damages.

238.    Plaintiff alleges that his injury flows from the common course of conduct alleged as to Defendants' conduct.

239.    Plaintiff is similarly positioned as to each member of the Classes. As such, his injury can be redressed in the same manner as any redress provided to the members of the Classes (and vice versa).

**Adequate Representation**

240.    Plaintiff and his counsel will fairly and adequately protect the interests of the class members.

241.    Plaintiff is committed to putting the interest of the Classes ahead of his own and to act in the best interest of members of the Classes.

242.    Plaintiff understands his obligations to the Classes and is committed to monitoring/supervising developments in the case and class counsel.

243.    Plaintiff has retained competent counsel experienced in antitrust law and complex class action litigation.

244.    Plaintiff has retained counsel with the resources and capital to litigate the case on behalf of the Classes.

245.    Plaintiff and his counsel intend to prosecute this action vigorously and to obtain relief, including both injunctive and monetary relief, that will remedy the root problem with Defendants' practices rather than merely treat the symptoms.

**Superiority**

246.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive and/or corresponding declaratory relief appropriate with respect to each class as a whole.

247.    The class device is superior to all other available methods of adjudication, as it would make little sense for each Class member to separately prove the common conduct in which Defendants have engaged.

248.     Moreover, damages suffered by each individual member of the Class may be small, meaning that the expense or burden of individual litigation would make it very difficult or impossible for individual class members to redress their injury individually.

249.     Because damages may be small, individual members of the Classes may not have a rational economic interest in individually controlling the prosecution of a single action, and the burden imposed on the judicial system from having to individually adjudicate such claims will be significant in comparison to the value of individual claims.

250.     Class litigation is thus superior to individual litigation and is the best procedural device to vindicate the rights of the members of the Classes.

251.     In addition, class litigation will streamline the management of the litigation, such that the expense, burdens, inconsistencies, economic infeasibility, and other negative effects of individual mitigation will be lessened if not eliminated.

252.     In sum, class litigation is superior because it mitigates significant inefficiencies and barriers that would result from individual litigation. In fact, absent invocation of the class device, the classes' claims would likely not be vindicated individually, and Defendants' anticompetitive practices will persist.

**Commonality and Predominance**

253.     This action and the claims asserted by the classes satisfy the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are many questions of law and fact that are common as to all of the members of the Classes.

254.     These questions of fact and law concern Defendants' conduct, which is common as to the members of the Classes, and answers to those questions would provide answers to issues posed by claims asserted by all members of the Classes.

255.     These common issues will predominate at trial, and any individual issues that may

arise would not outweigh the predominance of common issues.

256.     Common issues that will predominate at trial include, without limitation, the

following:

- Whether Defendants exchanged competitively sensitive information;
- Whether Defendants and their unnamed co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize prices for eggs;
- The duration of the conspiracy alleged herein and the acts performed by Defendants and their unnamed co-conspirators in furtherance of the conspiracy;
- Whether such combination or conspiracy violated the federal antitrust laws;
- Whether such combination or conspiracy violated the state antitrust laws;
- Whether such combination or conspiracy violated the state consumer protection laws;
- Whether the conduct of Defendants and their unnamed co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and other members of the Classes;
- Whether Defendants caused Plaintiff and the Classes to suffer damages in the form of overcharges on eggs;
- The appropriate class-wide measure of damages; and
- The nature of appropriate injunctive relief to restore competition in the egg market.

257.     The benefits of proceeding through the class mechanism, including providing

injured Class members a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweigh any potential difficulties in management of this class

action.

258.     Plaintiff reserves the right to amend the definition of the Classes, including, without

limitation, the Class Period.

**CLAIMS FOR RELIEF**

**REALLEGATION AND INCORPORATION BY REFERENCE**

259.    Plaintiff realleges and incorporates by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the classes.

**<u>COUNT I</u>**
**Price Fixing**
**Section 1 of the Sherman Act**
**(On Behalf of the Nationwide Consumer Indirect Purchaser Class)**

260.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

261.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of eggs and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

262.    Plaintiff and members of the Nationwide Consumer Indirect Purchaser Class have been injured and will continue to be injured in the form of overcharges on eggs.

263.    Defendants' anticompetitive conduct had the following effects, among others:

- Restraining or eliminating competition with respect to egg prices among Defendants;

- Fixing, stabilizing, or maintaining the prices of eggs at artificially high levels; and

- Depriving Plaintiff and members of the Nationwide Consumer Indirect Purchaser Class of the benefits of free and open competition between and among Defendants.

264. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

265. Plaintiff and members of the Nationwide Consumer Indirect Purchaser Class are entitled to appropriate injunctive and equitable relief against Defendants to end the ongoing violations alleged here, as well as their attorneys' fees and costs.

**COUNT II**
**Conspiracy to Exchange Competitively Sensitive Information**
**Section 1 of the Sherman Act**
**(On Behalf of Nationwide Consumer Indirect Purchaser Class)**

266. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

267. The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

268. Plaintiff and members of the Nationwide Consumer Indirect Purchaser Class have been injured and will continue to be injured in the form of overcharges on eggs.

269.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

270.    Plaintiff and members of the Nationwide Class are entitled to appropriate injunctive and equitable relief against Defendants to end the ongoing violations alleged here, as well as their attorneys' fees and costs.

## COUNT III
### Violations of State Antitrust, Unfair Competition, or Consumer Protection Statutes
### (On Behalf of the Consumer Indirect Purchaser Damages Class)

271.    This Count is pleaded under the laws of each State or jurisdiction indicated below, on behalf of the multi-state Consumer Indirect Purchaser Damages Class.

272.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of the various State antitrust and other statutes set forth below.

273.    The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

274.    Plaintiff and members of the Consumer Indirect Purchaser Damages Class have been injured and will continue to be injured in the form of overcharges on eggs. This injury is of

the type the antitrust laws of the States included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

275.    This information exchange has been undertaken in furtherance of a price fixing agreement and conspiracy to exchange competitively sensitive information, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

276.    Accordingly, Plaintiff and the members of the Consumer Indirect Purchaser Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following State antitrust statutes.

277.    **Alabama.** Defendants have entered into an unlawful agreement in restraint of trade in the Conventional Shell Egg Market in violation of the Alabama's Antitrust Act, Ala. Code §§ 6-5-60, *et seq*. Defendants' conspiracies had the following effects in Alabama: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Alabama by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct

substantially affected Alabama commerce. Defendants' violations of Alabama law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Ala. Code §§ 6-5-60, *et seq*.

278.    **Arizona.** Defendants have entered into an unlawful agreement in restraint of trade in the Conventional Shell Egg Market in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects in Arizona: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Arizona by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

279.    **California's Cartwright Act.** Defendants have entered into an unlawful agreement in restraint of trade in violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of Conventional Eggs at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain,

and stabilize the prices of Conventional Eggs. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Conventional Eggs. The combination and conspiracy alleged herein has had, *inter alia*, the following effects in California: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class paid supracompetitive, artificially inflated prices for Conventional Eggs. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a). This combination and conspiracy constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of Conventional Eggs "shall be...controlled or established" (§16720(d)). Defendants' violations of California law were flagrant and willful. The Consumer Indirect Purchaser Damages Class has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

280.    **California's Unfair Competition Law.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured,

marketed, sold, or distributed Conventional Eggs in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq.*, set forth above, Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Conventional Eggs in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* Plaintiff and members of the Consumer Indirect Purchaser Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause

Plaintiff and the members of the Consumer Indirect Purchaser Damages Class to pay supracompetitive and artificially inflated prices for Conventional Eggs. Plaintiff and the members of the Consumer Indirect Purchaser Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Consumer Indirect Purchaser Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

281.    **Colorado.** Defendants have entered into an unlawful agreement in restraint of trade in violation of Colorado's Antitrust Act, Col. Rev. Stat. §§ 6-4-104, *et seq*. These price-fixing agreements unreasonably restrain competition in the relevant market for Conventional Eggs. Defendants' conspiracies had the following effects in Colorado: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Colorado by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Defendants' violations of Colorado law were flagrant and willful. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Col. Rev. Stat. §§ 6-4-104, *et seq*.

282.    **Connecticut.** Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut's Antitrust Act, Conn. Gen. Stat. Ann. § 35-24, *et seq*. Defendants' conspiracies had the following effects in Connecticut: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Connecticut by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Defendants' violations of Connecticut law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq*.

283.    **District of Columbia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Antitrust Act, D.C. Code. §§ 28-4501, *et seq*. Defendants' conspiracies had the following effects in the District of Columbia: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in District of Columbia by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. Defendants' violations of District of Columbia law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer

Indirect Purchaser Damages Class seek all forms of relief available under D.C. Code. §§ 28-4501, *et seq*.

284.    **Florida.** Defendants engaged in unfair methods of competition, entering in an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' conspiracies had the following effects in Florida: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Florida by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce. Defendants' violations of Florida law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Fla. Stat. § 501.201, *et seq*.

285.    **Hawaii.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' conspiracies had the following effects in Hawaii: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Hawaii by paying supracompetitive, artificially inflated prices for Conventional Eggs.

During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Defendants' violations of District of Columbia law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq*.

286.    **Illinois.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. Defendants' conspiracies had the following effects in Illinois: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Illinois by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Defendants' violations of Illinois law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

287.    **Iowa.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Competition Law, Iowa Code § 553.1, *et seq*. Defendants' conspiracies had the following effects in Iowa: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Iowa by

paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Defendants' violations of Iowa law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

288.    **Kansas.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq*. Defendants entered into arrangements, contracts, agreements, trust or combinations made with a view toward preventing or which tend to prevent full and free competition for the provision of Conventional Shell Eggs. Defendants' conspiracies had the following effects in Kansas: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Kansas by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Defendants' violations of Kansas law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq*.

289.    **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq*. Defendants' conspiracies had the following effects in Maine: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were

raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Maine by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Defendants' violations of Maine law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq*.

290. **Maryland.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' conspiracies had the following effects in Maryland: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Maryland by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Defendants' violations of Maryland law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Md. Code Ann., Com. Law § 11- 201, *et seq*.

291. **Massachusetts.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93a § 1, *et seq*. Defendants' conspiracies had the following effects in Massachusetts: (1) price

competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Massachusetts by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Defendants' violations of Massachusetts law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Mass. Gen. Laws. Ch. 93a § 1, *et seq*.

292.    **Michigan.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq*. Defendants' conspiracies had the following effects in Michigan: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Michigan by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Defendants' violations of Michigan law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Minn. Stat. § 325D.49, *et seq*.

293.    **Minnesota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Antitrust Law, Minn. Stat. § 325D.49, *et seq*. Defendants'

conspiracies had the following effects in Minnesota: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Minnesota by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Defendants' violations of Minnesota law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Minn. Stat. § 325D.49, *et seq.*

294.    **Mississippi.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* Defendants' conspiracies had the following effects in Mississippi: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Mississippi by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Defendants' violations of Mississippi law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Miss. Code Ann. §§ 75-21-3, *et seq.*

295.    **Montana.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101, *et seq*. Defendants' conspiracies had the following effects in Montana: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Montana by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce. Defendants' violations of Montana law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Mont. Code Ann. §§ 30-14-101, *et seq*.

296.    **Nebraska.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq*. Defendants' conspiracies had the following effects in Nebraska: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Nebraska by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Defendants' violations of Nebraska law were flagrant and willful. Accordingly,

Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Neb. Code Ann. §§ 59-801, *et seq*.

297.    **Nevada.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598a.010, *et seq*. Defendants' conspiracies had the following effects in Nevada: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Nevada by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Defendants' violations of Nevada law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 598a.010, *et seq*.

298.    **New Hampshire.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq*. Defendants' conspiracies had the following effects in New Hampshire: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in New Hampshire by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected

New Hampshire commerce. Defendants' violations of New Hampshire law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under N.H. Rev Stat. Ann. §§ 356.1, *et seq.*

299.    **New Mexico.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*. Defendants' conspiracies had the following effects in New Mexico: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in New Mexico by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Defendants' violations of New Mexico law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq.*

300.    **New York.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*. Defendants' conspiracies had the following effects in New York: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in New York by paying supracompetitive, artificially inflated prices for Conventional

Eggs. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. Defendants' violations of New York law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

301.    **North Carolina.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq*. Defendants' conspiracies had the following effects in North Carolina: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in North Carolina by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Defendants' violations of North Carolina law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under N.C. Gen. Stat. Ann. §§ 75-1, *et seq*.

302.    **North Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq*. Defendants' conspiracies had the following effects in North Dakota: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff

and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in North Dakota by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. Defendants' violations of North Dakota law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

303.    **Oregon.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq*. Defendants' conspiracies had the following effects in Oregon: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Oregon by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. Defendants' violations of Oregon law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq*.

304.    **Rhode Island.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. The Rhode Island statute allows actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' conspiracies had the following effects in Rhode Island: (1) price competition for

Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Rhode Island by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. Defendants' violations of Rhode Island law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under R.I. Gen. Laws §§ 6-36-1, *et seq.*

305.    **South Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* Defendants' conspiracies had the following effects in South Dakota: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in South Dakota by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. Defendants' violations of South Dakota law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under S.D. Codified Laws §§ 37-1-3.1, *et seq.*

306.    **Tennessee.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*

Defendants' conspiracies had the following effects in Tennessee: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Tennessee by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. Defendants' violations of Tennessee law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

307.    **Utah.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*. Defendants' conspiracies had the following effects in Utah: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Utah by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. Defendants' violations of Utah law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

308.    **Vermont.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Consumer Fraud Act, 9 Vermont Stat. Ann. §§ 2453, *et seq*. Defendants' conspiracies had the following effects in Vermont: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Vermont by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. Defendants' violations of Vermont law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under 9 Vermont Stat. Ann. §§ 2453, *et seq*.

309.    **West Virginia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. Defendants' conspiracies had the following effects in West Virginia: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in West Virginia by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. Defendants' violations of West Virginia law were flagrant and willful. Accordingly,

Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under W.Va. Code §§ 47-18-1, *et seq*.

310.    **Wisconsin.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracies had the following effects in Wisconsin: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Consumer Indirect Purchaser Damages Class were injured in their business or property in Wisconsin by paying supracompetitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. Defendants' violations of Wisconsin law were flagrant and willful. Accordingly, Plaintiff and members of the Consumer Indirect Purchaser Damages Class seek all forms of relief available under Wis. Stat. §§ 133.01, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Proposed Classes, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Classes, including appointment of Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    That the Court adjudge and decree that the Defendants' anticompetitive scheme unreasonably restrained trade and is unlawful and that each has violated Section 1

of the Sherman Act and the state antitrust, unfair competition, and consumer protection statutes;

C.     That Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

D.     That the Court permanently enjoin Defendants from facilitating the exchange of sensitive information;

E.     That Plaintiff be awarded reasonable attorneys' fees and costs of suit; and

F.     That Plaintiff and the Class be granted such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.


Dated: November 14, 2025                    Respectfully submitted,

                                           /s/ *Brian J. Dunne*

                                           Brian J. Dunne** (CA 275689)
                                           bdunne@bathaeedunne.com
                                           Edward M. Grauman* (TX 24081931)
                                           egrauman@bathaeedunne.com
                                           **BATHAEE DUNNE LLP**
                                           901 South MoPac Expressway
                                           Barton Oaks Plaza I, Suite 300
                                           Austin, TX 78746
                                           Tel.: (213) 462-2772

                                           Yavar Bathaee (*p.h.v.* to be sought)
                                           yavar@bathaeedunne.com
                                           Andrew Chan Wolinsky* (CA 345965)
                                           awolinsky@bathaeedunne.com
                                           **BATHAEE DUNNE LLP**
                                           445 Park Avenue, 9th Floor
                                           New York, NY 10022
                                           Tel.: (332) 322-8835

*Counsel for Plaintiff and the Proposed Classes*

*Admitted in the Western District of Wisconsin

** Application for Admission in the Western District of Wisconsin Pending