**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| IN RE: SHELL EGGS ANTITRUST LITIGATION | Case No. 3:26-md-03175-jdp<br>MDL No. 3175 |
| | Chief Judge James D. Peterson<br>Magistrate Judge Anita M. Boor |
| This Document Relates to: | |
| CONSUMER INDIRECT PURCHASER ACTIONS | **CONSUMER INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| | <u>**REDACTED PUBLIC VERSION OF DOCUMENT FILED UNDER SEAL**</u> |
| | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................2

JURISDICTION AND VENUE .............................................................................9

PARTIES ..............................................................................................................10

    I.      PLAINTIFFS ............................................................................10

    II.    DEFENDANTS .........................................................................23

          A.     Cal-Maine .....................................................................23

          B.     Cooper Farms ...............................................................24

          C.     Daybreak Foods ...........................................................24

          D.     Egg Clearinghouse .......................................................25

          E.     Hickman's Egg Ranch ..................................................26

          F.     Hidden Villa Ranch......................................................26

          G.     Hillandale Farms ..........................................................27

          H.     Kreider Farms ..............................................................28

          I.     MPS Egg Farms ...........................................................29

          J.     Oakdell Farms ..............................................................29

          K.     Opal Foods ...................................................................30

          L.     Pearl Valley..................................................................31

          M.     Prairie Star ...................................................................32

          N.     ProEgg..........................................................................32

          O.     Rose Acre.....................................................................33

          P.     Sparboe Farms ............................................................34

          Q.     Urner Barry ..................................................................35

          R.     Versova ........................................................................35

          S.     Weaver Brothers ..........................................................36

          T.     Unnamed Co-Conspirators and Other Non-Parties.................37

FACTUAL ALLEGATIONS COMMON TO ALL CLASSES.....................................38

    I.      The U.S. Egg Industry .............................................................38

          A.     Egg Production and Supply Dynamics ........................38

          B.     Commodity Shell Eggs Are Fungible ........................40

          C.     Consolidation in the Egg Industry .............................43

D.  How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI........46

II. Defendants Exploited Their Control and Influence Over Egg Production and Pricing to Fix and Raise Egg Prices to Supracompetitive Levels...................54

A.  Defendants Conspired to Inflate the Price of Shell Eggs..........................55

i.  Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark.......................................55

1.  Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On".............61

2.  Coordinating the Timing, Volume, and Direction of Bids to Push or Hold the Benchmark ("Bidding Early and Often")........................................................................72

3.  Directly Lobbying and Pressuring Urner Barry Personnel.......................................................................77

ii.  Defendants Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage........................................................84

B.  The Historically High Price of Commodity Shell Eggs Cannot Be Explained by Market Forces ........................................................................88

i.  The sharp rise in egg prices since 2022 cannot be explained by Avian Flu ........................................................................89

ii.  There were no material constraints to rebuilding flocks and production capacity........................................................................94

iii.  Input costs do not explain Commodity Shell Egg price increases........................................................................94

iv.  Defendants' financial records confirm price increases were not cost-driven ........................................................................96

v.  The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces .................................99

C.  Plus Factors Corroborate Defendants' Conspiracy...............................100

i.  A Government Investigation and Enforcement Action Targeting the Conduct Alleged in This Complaint.....................101

ii.  Defendants Acted Against Their Unilateral Economic Self-Interest........................................................................101

iii.  Some of the Egg Producer Defendants Are Recidivist Conspiracists........................................................................102

iv.  Defendants Have a Common Motive.........................................103

v.  Commodity Shell Eggs Are Fungible and Interchangeable.........104

vi.  Commodity Shell Eggs Have Inelastic Demand........................104

       vii.     Defendants Have Numerous Opportunities to Collude ...............105

       viii.    High Barriers to Entry Protect the Conspiracy from Competitive Discipline .................................................................107

DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS .............108

TOLLING OF STATUTE OF LIMITATIONS ........................................................109

CLASS ACTION ALLEGATIONS ......................................................................110

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT........................................114

CLAIMS FOR RELIEF ....................................................................................116

PRAYER FOR RELIEF ....................................................................................180

DEMAND FOR JURY TRIAL ...........................................................................182

Consumer Indirect Purchaser Plaintiffs Angelica Allison, Tyler Baker, Holly Barnes, Kami Bouscher, Michael Clancy, Joseph Danson, Sharon Dawson-Green, Matthew Edlin, Gloria Emery, Michelle Fendelander, Carol Goldberg, Tina Grant, Lora Grodnick, Tariq Habash, Ronda Lee Haines, Connie Harrison, Paul Hayashino, Mary Hudson, Brandon Huyler, Sarah Juracich, Jeffrey Kaplan, Reyna Kaplan, David Kenward, Derrick Koehn, Akshay Mehta, Gregory Mount, Tamotu Mulitauaopele, James O'Connor, Pete Olson, India Price, Katherine Rebich, Kassidy Schmitz, Melanie Scott, Michael Segal, Lakia Session, Victoria Shaev, Dustin Shapiro, David Show, Lisa Smith, Karen Solomon, Amy Sparrow, Sebastian Szylkowski, Robert Taylor, Scott Thompson, Jennifer Thorndyke, Casey Whalen, and Douglas Yarema bring this action individually and on behalf of all others similarly situated who purchased conventional or cage-free shell eggs ("Commodity Shell Eggs," or simply "Shell Eggs") in the United States indirectly for non-commercial use from a Defendant named in this Consolidated Class Action Complaint or co-conspirator from at least January 1, 2022, until such time as the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period"). Plaintiffs demand a trial by jury and bring this action against Cal-Maine Foods, Inc.; Cooper Farms, Inc.; Daybreak Foods, Inc.; Hickman's Egg Ranch, Inc.; Luberski Inc. d/b/a Hidden Villa Ranch; Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., and Hillandale Farms, Inc. (together, "Hillandale Farms"); Kreider Dairy Farms, Inc.; Midwest Poultry Services, L.P. d/b/a MPS Egg Farms; Oakdell Farms, LLC; Opal Foods, LLC; Pearl Valley Farms, Inc.; Prairie Star Farms, LLC; ProEgg Inc. ("ProEgg"); Rose Acre Farms, Inc.; Sparboe Farms, Inc.; Versova Holdings, LLC, Centrum Valley Holdings, LLC, and Versova Management Cooperative (together, "Versova"); and Weaver Bros., Inc. d/b/a Weaver Eggs (collectively, the "Egg Producer Defendants" or "Producer Defendants"); Urner Barry Publications, Inc. d/b/a Expana ("Urner Barry" or "Expana"); and Egg

1

Clearinghouse, Inc. ("ECI") to recover treble damages, injunctive relief, and any other relief as appropriate under the antitrust laws of the United States and various state antitrust, consumer protection, and unfair trade practices laws.

This Consolidated Complaint contains several sections—its Introduction, Defendants, Factual Allegations Common to All Classes, Defendants Are Engaged In Continuing Antitrust Violations, and Tolling of Statute of Limitations sections—that are identical to corresponding sections in the contemporaneously-filed Direct Purchaser Plaintiffs' Consolidated Complaint and Commercial Indirect Purchaser Plaintiffs' Consolidated Complaint.[1] All material filed provisionally under seal and redacted in the public version of this Consolidated Complaint is contained in either the Introduction or Factual Allegations Common to All Classes.

**INTRODUCTION**

1. For years, America's largest egg producers conspired to—and did—inflate the price of Shell Eggs across the country, raising the price of this staple commodity to artificially high levels and keeping it there. Defendants charged, and Plaintiffs paid, higher prices for Shell Eggs than they would have in a competitive market without the conspiracy.

2. The United States egg industry is uniquely susceptible to collusion. It uses a privately-set benchmark—the Urner Barry quote—to price nearly every wholesale egg transaction in the U.S. It features outsized control over supply by a small handful of vertically-integrated producers. And it is rife with commercial interconnections between and among producers and trading platforms. The conspiring producers, sued here as Defendants, exploited these structural susceptibilities to manipulate and artificially inflate the price of Shell Eggs over several years.

---

[1] The Direct Purchaser Plaintiffs' Consolidated Complaint uses the word "Class" instead of "Classes" within its Defendants section, but is otherwise identical.

3. The impact of Defendants' conspiracy has been substantial and far-reaching. By late 2022, Shell Egg prices more than tripled across the U.S.—and remained inflated throughout the Class Period. As they adjusted their budgets to account for the increased costs, Americans from all walks of life—from wholesalers, to restaurateurs, to regular consumers—asked "why?"

4. The answer, as revealed in the U.S. Department of Justice's June 29, 2026 complaint (the "DOJ Complaint") and in Urner Barry's own internal documents and data, is that Defendants colluded to inflate and maintain the price of Shell Eggs during the Class Period by manipulating the Urner Barry benchmark. This complaint sets forth details of this conspiracy based on data and communications produced by Urner Barry as well as direct evidence in the form of egg producers' interfirm communications, made public in the DOJ Complaint.

* * *

5. Eggs are one of the most popular foods in America. Used in everything from breakfast to baked goods, nearly every household buys eggs. Eggs are not readily substitutable, and as a result demand for them is highly inelastic: when egg prices go up, Americans are forced to pay the price.

6. Eggs are a commodity. Sold according to USDA-standardized grades, sizes, and colors, Shell Eggs are interchangeable commodities, and as a result nearly all competition in the sale of Shell Eggs takes place based on price.

7. But egg pricing is anything but conventional. Unlike many commodities, shell eggs are not widely priced using a public, transparent, and liquid market—nor even according to some measure of cost. Instead, nearly all shell eggs are sold by reference to a daily spot price calculated by a private company, Urner Barry. The Urner Barry daily spot price—published by grade, size, color, and region every weekday—is the benchmark for approximately 95% of all wholesale

3

commodity egg transactions in the United States. Even sales that do not expressly reference Urner Barry's quotation are priced against it as the industry's common reference point for what eggs should cost. As a result, Urner Barry's quote functions as the benchmark wholesale price for Commodity Shell Eggs in the United States, thereby influencing not only wholesale transactions but also the prices ultimately paid by retailers and consumers.

8. This key Urner Barry spot price is highly susceptible to manipulation. It is calculated from a non-scientific aggregation of transaction and bid-ask prices (which are reported by phone and email), and, crucially, Defendants' communications designed to manipulate spot prices in furtherance of their conspiracy to fix and raise them. All these sources—particularly transaction and bid-ask prices—are sent to Urner Barry by producers, who select which data points to provide to Urner Barry (and in what form), often through an illiquid, producer-dominated-and-controlled spot market called Egg Clearinghouse, Inc. (ECI). To manipulate the Urner Barry price on a given day, all that is required is for a group of egg producers to execute transactions, bids, or asks at artificially-set prices, then submit these to Urner Barry egg reporters. And for Commodity Shell Eggs, manipulating the Urner Barry price manipulates wholesale and retail prices across the United States.

9. Beginning no later than January 2022, that is exactly what a group of large U.S. egg producers did. During the Class Period, the Defendants colluded to inflate and maintain Urner Barry spot prices for, and thereby the actually-paid wholesale and retail prices of, shell eggs across the U.S.

10. They manipulated the various inputs to the Urner Barry spot price. For transactions, the conspiring producers sold eggs to one another at artificially high prices, then reported these "sales" to Urner Barry to inflate or maintain the daily spot price. These trades were often the

product of direct coordination: one producer would ask another for a trade at a premium price for the specific purpose of giving an Urner Barry reporter something "to hang her hat on"; the trade would be executed off the open market; and the resulting purchase order would promptly be forwarded to Urner Barry. This pattern of coordinated, artificially-priced producer-to-producer trades recurred throughout the Class Period, involved numerous conspiring producers, and is described in detail later in this complaint.

11. For bids and asks, the conspiring producers coordinated to submit artificially high bids on ECI, then sent the bids to Urner Barry reporters, ███████████████████████████ ███████████████████████████. For example, in December 2022, when Urner Barry appeared poised to lower the market, executives from several Defendants exchanged messages, assuring each other they were "bidding up" the market and needed to "hold" prices at existing levels. In another exchange, they emphasized that "[a]s a group we need to bid like they vote in Chicago, early and often." Such coordinated bidding, which sought to and did manipulate the Urner Barry benchmark and egg prices alongside it, occurred throughout the Class Period as described in this complaint.

12. And finally, ████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ throughout the Class Period. More details about the conspiring producers' coordinated communications to Urner Barry during the Class Period are provided in the body of this complaint.

13. At the same time Defendants were working to manipulate Urner Barry benchmark prices, they used structural aspects of the Commodity Shell Egg market and then-ongoing news stories to guard against defection and cover their tracks.

14. For example, as the public looked for answers for the shocking rise in egg prices in early 2022 and thereafter, egg producers and industry groups told the public that avian flu was to blame. However, the supply impacts from avian flu during the Class Period do not explain the price inflation American shell egg consumers witnessed (and paid), and the timing of the avian flu excuse does not match what was observed in the market. Shell egg prices rose far faster, and stayed elevated far longer, than the actual, measured decline in the size of the national egg-laying flock can explain, and prices rose by more than three times as much per lost hen during the Class Period as they did during a more severe avian influenza outbreak in 2015.

15. Rather than expanding production to capitalize on record prices, as competitors in a genuinely competitive market would race to do, the largest egg producers collectively slowed the restoration of their flocks, even as they recorded the most profitable years in the industry's history. As newly-available evidence now shows, a price-manipulation conspiracy was the true cause of the price increases. During the Class Period, America's egg producers were executing

---

[2] All typographical, spelling, or grammatical errors in quotations are *[sic]* unless otherwise stated.

sham transactions to drive up the privately-benchmarked price of Commodity Shell Eggs, and were using a well-publicized avian flu outbreak as cover for doing it. And as this complaint explains, the structure of the United States egg industry during the Class Period helped ensure its success.

16. The producer Defendants were able to impact prices market-wide through the pervasiveness and vulnerability of the Urner Barry spot price benchmark. There was no serious alternative to this benchmark—███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████

17. The supply dynamics of the U.S. egg industry ensured that any attempt to deviate from or undercut the cartel would be unsuccessful. For example, all U.S. egg producers must source layer hens from a small group of genetic producers—half of which are conspirators Cal-Maine and Rose Acre. And the vertically-integrated character of the country's largest egg producers—who can package, process, and transport eggs for and supply hens to their ostensible competitors—intertwines different-sized producers through economic interdependence and frequent opportunities to collude. As one Urner Barry reporter lamented just before the Class Period, █████████████████████████████████████

███████████████████████

18. The result of the conspiracy was that egg prices—and conspirators' profits—soared to unprecedented levels. The antitrust conspiracy set forth in this complaint netted its participants billions of dollars in unearned profits taken from the pockets of Americans. For example, Cal-Maine, the only egg producer defendant that is publicly traded, saw its net profit rise from $18 million in 2020 to $785 million in 2023, a result its own public disclosures attribute to higher

selling prices rather than higher volume or lower costs. Between the first quarter of 2025—shortly before egg prices crumpled following the public revelation of a Department of Justice investigation into price-fixing—and the first quarter of 2026, Cal-Maine's profits collapsed a staggering *90%* ($508 million in the quarter ending March 1, 2025; $50 million in the quarter ending February 28, 2026), and its net sales decreased 53% over this period ($1.418 billion for the quarter ending March 1, 2025; $667 million for the quarter ending February 28, 2026).

19. Details of the conspiracy were revealed on June 29, 2026, when the U.S. Department of Justice and seventeen state attorneys general filed a civil antitrust enforcement action against three of the producers identified in this complaint as conspirators. *See United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026). The entities named in the DOJ Complaint—Cal-Maine, Versova, and Hickman—were alleged to have conspired to manipulate Urner Barry's daily egg price quotations through bid rigging and coordinated producer-to-producer transactions between June 2022 and March 2025—the same benchmark, the same mechanism, and substantially the same period at issue here. Notably, when word of the government's investigation first broke in March 2025, the price of shell eggs collapsed, falling by more than 60% in a matter of weeks. Competitive markets do not behave that way. Cartels, once exposed, do.

20. This action is brought to recover damages for the anticompetitive overcharge caused by the Defendants' conspiracy, and to enjoin Defendants' anticompetitive conduct. Plaintiffs and the proposed Class Members purchased Commodity Shell Eggs at prices inflated by the actions of the conspirator defendants and will continue to purchase Commodity Shell Eggs in the future.

## JURISDICTION AND VENUE

21.     This action arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and the antitrust and unfair competition laws of several states. Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorneys' fees, and the state law claims seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

22.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

23.     This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, as well as under relevant state law.

24.     Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class Members.

25.     Venue is appropriate in this district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants reside or transact business in this district, are licensed to do business or are doing business in this district, and because a substantial portion of the affected interstate commerce described herein was carried out in this district.

26.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (1) transacted business throughout the United States, including in this district; (2) manufactured, sold, shipped, and/or delivered substantial quantities of Commodity Shell Eggs throughout the United States, including this district; (3) had substantial contacts with the United States, including this district; and/or (4) engaged in an antitrust conspiracy that was directed at and

had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this district.

27. Defendants' conduct alleged here occurred within the flow of interstate commerce, including in this district, and was intended to and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

28. During the period starting at least on January 1, 2022, until such time that the adverse effects of Defendants' anticompetitive conduct cease ("Class Period"), Defendants produced, manufactured, sold, and shipped Commodity Shell Eggs in a continuous and uninterrupted flow of interstate commerce, which included sales of eggs in this district, advertisement of eggs in media in this district, and employment of personnel in this district. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

29. The Judicial Panel on Multidistrict Litigation previously held in its Transfer Order dated February 10, 2026, that this district "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."[3]

### PARTIES

#### I. PLAINTIFFS

30. Plaintiff Angelica Allison is a citizen of West Virginia. During the Class Period, Plaintiff Allison purchased Commodity Shell Eggs indirectly in West Virginia for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Allison paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants'

---

[3] *In re: Shell Eggs Antitrust Litig.*, Case MDL No. 3175, Dkt. 80 at 1 (J.P.M.L. Feb. 10, 2026).

anticompetitive conduct described in this Complaint. Plaintiff Allison continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

31. Plaintiff Tyler Baker is a citizen of Vermont. During the Class Period, Plaintiff Baker purchased Commodity Shell Eggs indirectly in Vermont for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Baker paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Baker continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

32. Plaintiff Holly Barnes is a citizen of Arkansas. During the Class Period, Plaintiff Barnes purchased Commodity Shell Eggs indirectly in Arkansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Barnes paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Barnes continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

33. Plaintiff Kami Bouscher is a citizen of Arkansas. During the Class Period, Plaintiff Bouscher purchased Commodity Shell Eggs indirectly in Arkansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Bouscher paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Bouscher continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

34. Plaintiff Michael Clancy is a citizen of Rhode Island. During the Class Period, Plaintiff Clancy purchased Commodity Shell Eggs indirectly in Rhode Island for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Clancy paid prices for

Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Clancy continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

35. Plaintiff Joseph Danson is a citizen of New York. During the Class Period, Plaintiff Danson purchased Commodity Shell Eggs indirectly in New York for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Danson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Danson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

36. Plaintiff Sharon Dawson-Green is a citizen of Missouri. During the Class Period, Plaintiff Dawson-Green purchased Commodity Shell Eggs indirectly in Missouri for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Dawson-Green paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Dawson-Green continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

37. Plaintiff Matthew Edlin is a citizen of California. During the Class Period, Plaintiff Edlin purchased Commodity Shell Eggs indirectly in California for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Edlin paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Edlin continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

38. Plaintiff Gloria Emery is a citizen of Hawaii. During the Class Period, Plaintiff

Emery purchased Commodity Shell Eggs indirectly in Hawaii for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Emery paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Emery continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

39. Plaintiff Michelle Fendelander is a citizen of Nevada. During the Class Period, Plaintiff Fendelander purchased Commodity Shell Eggs indirectly in Nevada for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Fendelander paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Fendelander continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

40. Plaintiff Carol Goldberg is a resident of Denver, Colorado. During the Class Period, Plaintiff Goldberg purchased Commodity Shell Eggs indirectly in Colorado for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Goldberg paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Goldberg continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

41. Plaintiff Tina Grant is a citizen of Wisconsin. During the Class Period, Plaintiff Grant purchased Commodity Shell Eggs indirectly in Wisconsin for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Grant paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Grant continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

42. Plaintiff Lora Grodnick is a citizen of New Jersey. During the Class Period, Plaintiff Grodnick purchased Commodity Shell Eggs indirectly in New Jersey for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Grodnick paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Grodnick continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

43. Plaintiff Tariq Habash is a resident of Washington, DC. During the Class Period, Plaintiff Habash purchased Commodity Shell Eggs indirectly in Washington, DC for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Habash paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Habash continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

44. Plaintiff Ronda Lee Haines is a citizen of Massachusetts. During the Class Period, Plaintiff Haines purchased Commodity Shell Eggs indirectly in Massachusetts for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Haines paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Haines continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

45. Plaintiff Connie Harrison is a citizen of Tennessee. During the Class Period, Plaintiff Harrison purchased Commodity Shell Eggs indirectly in Tennessee for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Harrison paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Harrison continues to suffer ongoing

14

injuries from Defendants' anticompetitive conduct described in this complaint.

46. Plaintiff Paul Hayashino is a resident of South Dakota. During the Class Period, Plaintiff Hayashino purchased Commodity Shell Eggs indirectly in South Dakota for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Hayashino paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Hayashino continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

47. Plaintiff Mary Hudson is a resident of San Diego County, California. During the Class Period, Plaintiff Hudson purchased Commodity Shell Eggs indirectly in California for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Hudson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Hudson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

48. Plaintiff Brandon Huyler is a resident of Highland Park, Illinois. During the Class Period, Plaintiff Huyler purchased Commodity Shell Eggs indirectly in Illinois for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Huyler paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Huyler continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

49. Plaintiff Sarah Juracich is a citizen of Minnesota. During the Class Period, Plaintiff Juracich purchased Commodity Shell Eggs indirectly in Minnesota for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Juracich paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants'

anticompetitive conduct described in this complaint. Plaintiff Juracich continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

50. Plaintiff Jeffrey Kaplan is a citizen of Arizona. During the Class Period, Plaintiff Jeffrey Kaplan purchased Commodity Shell Eggs indirectly in Arizona for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Jeffrey Kaplan paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Jeffrey Kaplan continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

51. Plaintiff Reyna Kaplan is a citizen of Arizona. During the Class Period, Plaintiff Reyna Kaplan purchased Commodity Shell Eggs indirectly in Arizona for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Reyna Kaplan paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Reyna Kaplan continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

52. Plaintiff David Kenward is a citizen of North Carolina. During the Class Period, Plaintiff Kenward purchased Commodity Shell Eggs indirectly in North Carolina for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Kenward paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Kenward continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

53. Plaintiff Derrick Koehn is a citizen of Wisconsin. During the Class Period, Plaintiff Koehn purchased Commodity Shell Eggs indirectly in Wisconsin for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Koehn paid prices for

Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Koehn continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

54. Plaintiff Akshay Mehta is a citizen of Oregon. During the Class Period, Plaintiff Mehta purchased Commodity Shell Eggs indirectly in Oregon for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mehta paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Mehta continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

55. Plaintiff Gregory Mount is a citizen of Kansas. During the Class Period, Plaintiff Mount purchased Commodity Shell Eggs indirectly in Kansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mount paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Mount continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

56. Plaintiff Tamotu Mulitauaopele is a citizen of Montana. During the Class Period, Plaintiff Mulitauaopele purchased Commodity Shell Eggs indirectly in Montana for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mulitauaopele paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Mulitauaopele continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

57. Plaintiff James O'Connor is a citizen of Michigan. During the Class Period,

Plaintiff O'Connor purchased Commodity Shell Eggs indirectly in Michigan for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff O'Connor paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff O'Connor continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

58. Plaintiff Pete Olson is a citizen of Kansas. During the Class Period, Plaintiff Olson purchased Commodity Shell Eggs indirectly in Kansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Olson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Olson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

59. Plaintiff India Price is a resident of San Diego, California. During the Class Period, Plaintiff Price purchased Commodity Shell Eggs indirectly in California and in Arkansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Price paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Price continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

60. Plaintiff Katherine Rebich is a citizen of North Carolina. During the Class Period, Plaintiff Rebich purchased Commodity Shell Eggs indirectly in North Carolina for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Rebich paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Rebich continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

61. Plaintiff Kassidy Schmitz is a citizen of Virginia. During the Class Period, Plaintiff Schmitz purchased Commodity Shell Eggs indirectly in Virginia for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Schmitz paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Schmitz continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

62. Plaintiff Melanie Scott is a citizen of Tennessee. During the Class Period, Plaintiff Scott purchased Commodity Shell Eggs indirectly in Tennessee for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Scott paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Scott continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

63. Plaintiff Michael Segal is a citizen of Washington, DC. During the Class Period, Plaintiff Segal purchased Commodity Shell Eggs indirectly in Washington, DC for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Segal paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Segal continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

64. Plaintiff Lakia Session is a current resident of Timmonsville, South Carolina, and was a resident of New York until 2022. During the Class Period, Plaintiff Session purchased Commodity Shell Eggs indirectly in New York and South Carolina for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Session paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants'

anticompetitive conduct described in this complaint. Plaintiff Session continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

65. Plaintiff Victoria Shaev is a citizen of Florida. During the Class Period, Plaintiff Shaev purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Shaev paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Shaev continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

66. Plaintiff Dustin Shapiro is a citizen of Michigan. During the Class Period, Plaintiff Shapiro purchased Commodity Shell Eggs indirectly in Michigan for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Shapiro paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Shapiro continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

67. Plaintiff David Show is a citizen of Michigan. During the Class Period, Plaintiff Show purchased Commodity Shell Eggs indirectly in Michigan for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Show paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Show continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

68. Plaintiff Lisa Smith is a citizen of Massachusetts. During the Class Period, Plaintiff Smith purchased Commodity Shell Eggs indirectly in Massachusetts for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Smith paid prices for

Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Smith continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

69. Plaintiff Karen Solomon is a resident of Rockford, Illinois. During the Class Period, Plaintiff Solomon purchased Commodity Shell Eggs indirectly in Illinois for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Solomon paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Solomon continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

70. Plaintiff Amy Sparrow is a citizen of Maricopa County, Arizona. During the Class Period, Plaintiff Sparrow purchased Commodity Shell Eggs indirectly in Arizona for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Sparrow paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Sparrow continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

71. Plaintiff Sebastian Szylkowski is a citizen of Florida. During the Class Period, Plaintiff Szylkowski purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Szylkowski paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Szylkowski continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

72. Plaintiff Robert Taylor is a citizen of Connecticut. During the Class Period, Plaintiff Taylor purchased Commodity Shell Eggs indirectly in Connecticut for non-commercial

use/consumption from Defendants or their co-conspirators. Plaintiff Taylor paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Taylor continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

73. Plaintiff Scott Thompson is a citizen of Florida. During the Class Period, Plaintiff Thompson purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Thompson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Thompson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

74. Plaintiff Jennifer Thorndyke is a citizen of Iowa. During the Class Period, Plaintiff Thorndyke purchased Commodity Shell Eggs indirectly in Iowa for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Thorndyke paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Thorndyke continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

75. Plaintiff Casey Whalen is a citizen of Rockingham County, New Hampshire. During the Class Period, Plaintiff Whalen purchased Commodity Shell Eggs indirectly in New Hampshire for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Whalen paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Whalen continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

76. Plaintiff Douglas Yarema is a citizen of New York. During the Class Period, Plaintiff Yarema purchased Commodity Shell Eggs indirectly in New York for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Yarema paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this complaint. Plaintiff Yarema continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this complaint.

## II. DEFENDANTS

### A. Cal-Maine

77. Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation with its principal place of business in Ridgeland, Mississippi. Cal-Maine is publicly traded under the ticker symbol CALM.

78. Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

79. Cal-Maine is the largest producer of eggs in the United States. In 2024, Cal-Maine had over 50 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is a fully integrated company with its operations consisting of hatching chicks, growing and maintaining chicken flocks, manufacturing feed, and producing, processing, packaging, and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozen eggs sold.

80. Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi,

Ohio, Oklahoma, South Carolina, Texas, and Utah.

81. During the Class Period, Cal-Maine subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

82. During the Class Period, Cal-Maine sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**B.     Cooper Farms**

83. Defendant Cooper Farms, Inc. ("Cooper Farms") is an Ohio corporation with its principal place of business in Oakwood, Ohio.

84. Cooper Farms produces over 180 million dozen shell eggs each year. As of 2024, Cooper Farms was the sixteenth largest producer of shell eggs, with a flock size of 7.24 million.

85. During the Class Period, Cooper Farms subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

86. During the Class Period, Cooper Farms sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**C.     Daybreak Foods**

87. Defendant Daybreak Foods, Inc. ("Daybreak Foods," or simply "Daybreak") is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin.

88. Daybreak Foods is one of the largest egg producers in the United States. In 2025, Daybreak acquired S&R Egg Farm (which itself had 4.85 million egg-laying hens in 2024). It produces approximately 16 million eggs per day. In 2025, it had approximately 24 million egg-

laying hens.

89. Daybreak operates several egg production and processing facilities in the United States, including in Wisconsin, Iowa, Illinois, Ohio, Minnesota, and Michigan.

90. During the Class Period, Daybreak Foods subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

91. During the Class Period, Daybreak Foods sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**D. Egg Clearinghouse**

92. Defendant Egg Clearinghouse, Inc. ("ECI") is a Delaware corporation with its principal place of business located in Dover, New Hampshire.

93. During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

94. Only ECI members (i.e., farmers and egg buyers) are allowed to trade on the ECI marketplace.

95. In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

96. ECI represents just 5% of the shell egg market, but plays an outsized role in how eggs are priced nationwide, including through its direct impact on Urner Barry benchmark prices.

97. ECI was a key tool used by conspirators to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices. ECI's structural vulnerabilities—designed into the market by its creators and managers, the nation's largest egg producers—assisted the conspirators in carrying out their anticompetitive scheme.

**E. Hickman's Egg Ranch**

98. Defendant Hickman's Egg Ranch, Inc. ("Hickman") is an Arizona corporation with its principal place of business located in Buckeye, Arizona. Hickman produces, processes, sells, and distributes shell eggs, including Commodity Shell Eggs.

99. During the Class Period, Hickman was one of the country's largest shell egg producers. In 2024, it had 6 million egg-laying hens, making it one of the twenty largest egg producers in the United States.

100. In 2020, Hickman acquired full control of Central Valley Eggs, a Delaware limited liability company headquartered in Wasco, California that itself had 2.3 million egg-laying hens as of 2024.

101. Hickman and Central Valley Eggs are both founding members of Defendant ProEgg Cooperative.

102. In December 2025, Mantiqueira USA, operating as a joint venture with meat processor JBS, acquired Hickman.

103. During the Class Period, Hickman subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

104. During the Class Period, Hickman sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**F. Hidden Villa Ranch**

105. Defendant Luberski Inc. d/b/a Hidden Villa Ranch ("Hidden Villa Ranch" or "Hidden Villa") is a California corporation with its principal place of business in Fullerton, California. Hidden Villa Ranch produces, processes, and sells eggs, including Commodity Shell

Eggs, under multiple brands, including NestFresh Eggs and Horizon Organic, and operates through affiliated entities, including Villa Rose LLC d/b/a Waiaula Egg Farm.

106. Hidden Villa Ranch operates production, processing, and distribution facilities in multiple states, including California, Texas, Colorado, and Hawaii.

107. Hidden Villa Ranch is one of the country's largest egg producers. In 2024, it had 4 million egg-laying hens.

108. During the Class Period, Hidden Villa Ranch subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

109. During the Class Period, Hidden Villa Ranch sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**G.     Hillandale Farms**

110. Defendant Hillandale Farms, Inc. is an Ohio corporation with its principal place of business in Gettysburg, Pennsylvania.

111. Defendant Hillandale Farms of Pa., Inc. is a Pennsylvania corporation with its principal place of business in Gettysburg, Pennsylvania.

112. Defendant Hillandale-Gettysburg, LLC is a Pennsylvania limited liability company with its principal place of business in Gettysburg, Pennsylvania.

113. Defendant Hillandale Farms East, Inc. is a Pennsylvania corporation with its principal place of business in Gettysburg, Pennsylvania.

114. Hillandale Farms, Inc., Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, and Hillandale Farms East, Inc. are all related entities, and this complaint refers to them collectively as "Hillandale Farms" or simply "Hillandale."

115. Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. In 2025, it had approximately 21 million egg-laying hens.

116. Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

117. Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

118. During the Class Period, Hillandale Farms subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

119. During the Class Period, Hillandale Farms sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**H.      Kreider Farms**

120. Kreider Dairy Farms, Inc. ("Kreider Farms" or "Kreider") is a Pennsylvania corporation with its principal place of business in Manheim, Lancaster County, Pennsylvania.

121. Kreider Farms is the largest egg producer in Pennsylvania. In 2024, it had approximately 8.4 million egg-laying hens.

122. During the Class Period, Kreider Farms subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

123. During the Class Period, Kreider Farms sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**I.      MPS Egg Farms**

124.    Midwest Poultry Services, L.P., which does business as MPS Egg Farms ("MPS"), is an Indiana limited partnership with its principal place of business in North Manchester, Indiana.

125.    MPS Egg Farms is the sixth largest egg producer in the United States, with facilities in Indiana, Illinois, Texas and Georgia.

126.    In February 2023, MPS acquired Country Charm Eggs LLC ("Country Charm"), a private company with its office and principal place of business located at 277 Cargill Dr., Gillsville, GA. The purchase added nearly two million birds to MPS' flock. In 2024, MPS' flock was approximately 13.3 million hens.

127.    During the Class Period, MPS (and, prior to its acquisition, Country Charm) subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

128.    During the Class Period, MPS (and, prior to its acquisition, Country Charm) sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**J.      Oakdell Farms**

129.    Oakdell Farms, LLC ("Oakdell") is a Delaware limited liability company with its principal place of business in North Salt Lake, Utah.

130.    Oakdell is one of the thirty largest egg producers in the United States, with more than 3.4 million egg-laying hens as of 2024.

131.    Oakdell is part of the Versova Management Cooperative and a founding member of the ProEgg Cooperative.

132.    During the Class Period, Oakdell subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in

this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

133. During the Class Period, Oakdell sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**K.     Opal Foods**

134. Defendant Opal Foods, LLC ("Opal Foods" or "Opal") is a Delaware limited liability company with its principal place of business in Neosho, Missouri.

135. Opal Foods' operational history, with roots in Missouri, traces back to 1957, when Hollis Osborne founded MOARK Eggs, which ultimately became the third-largest producer of specialty and Commodity Shell Eggs in the United States. In 2000, Osborne merged the MOARK Eggs business with Land O'Lakes, and later sold his remaining ownership interest in 2005. In May 2014, MOARK's Midwest egg-production assets were sold to a newly formed entity known as Opal Foods, LLC.

136. Opal Foods, LLC was formed by the agricultural investment firm AGR Partners, in strategic partnership with two established egg producers: Rose Acre Farms, Inc., based in Indiana, and Weaver Brothers, also known as Weaver Eggs, based in Ohio.

137. In October 2020, Rose Acre Farms and Weaver Eggs acquired AGR Partners' full ownership interest, resulting in Opal being jointly owned by only Rose Acre and Weaver Eggs.

138. Opal produces Commodity Shell Eggs. It is a franchisee of Eggland's Best, supplies Land O'Lakes All-Natural Brown Eggs, and was one of the eight original producer-members of ProEgg, an egg-farmer cooperative serving thirteen western states.

139. Rose Acre and Weaver board designees jointly oversee Opal while both continue to produce and market eggs themselves. In fact, when Rose Acre and Weaver combined to purchase AGR Partners' interest in the business, Opal's board chair publicly framed the transaction

as an alignment of Opal's culture "with the family business philosophy of its owners"—the Rust family (Rose Acre) and the Weaver family. Since then, Opal has been operated as a quasi-independent company with its own management team, while representatives of Rose Acre and Weaver "continue to serve on the Board and provide governance and oversight for the business."

140. In March 2024, Opal Foods acquired the egg operations of Sparboe Farms. The merger united Opal's laying farms, pullet farms, feed mills, and processing operations in Missouri, Colorado, and Iowa with Sparboe's shell-egg farms in Minnesota, Iowa, and Colorado.

141. The merger combined Opal's flock of 7 million hens with Sparboe's 5 million hens for a total approximate flock size of 12 million.

142. During the Class Period, Opal subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

143. During the Class Period, Opal sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**L. Pearl Valley**

144. Pearl Valley Farms, Inc. ("Pearl Valley") is an Illinois corporation with its principal place of business in Pearl City, Illinois.

145. Pearl Valley is one of the largest egg producers in the United States, with nearly 2 million egg-laying hens as of 2024.

146. During the Class Period, Pearl Valley subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

147. During the Class Period, Pearl Valley sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**M. Prairie Star**

148. Prairie Star Farms, LLC ("Prairie Star") is an Ohio limited liability company with its principal place of business in St. Henry, Ohio.

149. Prairie Star is the twelfth largest egg producer in the United States. Prairie Star had more than 7.9 million egg-laying hens as of 2024.

150. During the Class Period, Prairie Star subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

151. During the Class Period, Prairie Star sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**N. ProEgg**

152. ProEgg Inc., which does business as ProEgg Cooperative ("ProEgg"), is a Delaware corporation headquartered in Aurora, Colorado. ProEgg is an egg-producer collective founded in late 2022 by Defendants Cal-Maine, Hickman, Oakdell, and Opal, along with Central Valley Eggs (controlled by Hickman), Willamette Egg Farms, LLC (owned by Versova), and two additional entities: Colorado Egg, LLC and Ritewood, Inc.

153. ProEgg distributes eggs in thirteen western states, including Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

154. On information and belief, ProEgg is the entity named by the Department of Justice and seventeen state attorneys general as "Co-Conspirator Cooperative A" in *United States, et al.*

*v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1 ("DOJ Complaint"). The government alleged that Co-Conspirator Cooperative A is a Delaware corporation headquartered in Aurora, Colorado, DOJ Complaint ¶ 9, and that "[f]or most of the relevant time period, Defendants [the defendants in the DOJ case, which were Cal-Maine, Versova, and Hickman], or farms that they managed, were members of Cooperative A," *id.*

155.    The Department of Justice alleged that "Co-Conspirator Cooperative A"—*i.e.*, ProEgg—was a co-conspirator that colluded with Cal-Maine, Versova, and Hickman to maintain artificially high egg prices by manipulating Urner Barry benchmark pricing. *See* DOJ Complaint ¶¶ 20, 22, 28, 34.

156.    As of the filing of this complaint, the only member logos on ProEgg's website are those of Central Valley Eggs (controlled by Hickman), and three Versova-owned entities— Morning Fresh Farms, Oakdell Egg Farms, and Willamette Egg Farms.

157.    During the Class Period, representatives of ProEgg directly, as well as its members, conspired to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

**O.    Rose Acre**

158.    Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation with its principal place of business in Seymour, Indiana.

159.    Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

160.    Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

161.    During the Class Period, Rose Acre subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in

this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

162. During the Class Period, Rose Acre sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**P.     Sparboe Farms**

163. Defendant Sparboe Farms, Inc. ("Sparboe") is a Minnesota corporation with its principal place of business in Litchfield, Minnesota.

164. Sparboe was founded in 1954 by Robert "Bob" Sparboe. The company expanded to become one of the largest producers and marketers of fresh shell eggs in the United States.

165. Sparboe described itself as an integrated egg producer and marketer that sold fresh shell eggs and egg products nationally to the food service and grocery industries.

166. In 2022, Sparboe ranked as the twentieth-largest U.S. egg producer with 5.48 million hens.

167. In March 2024, Sparboe Farms' egg operations were acquired by Defendant Opal Foods. In 2023 both Opal Foods and Sparboe Farms ranked among the twenty-five largest egg producers in the United States by production volume. Following the transaction, the combined company ranked approximately eighth nationally.

168. During the Class Period, Sparboe subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

169. During the Class Period, Sparboe sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**Q.    Urner Barry**

170.    Defendant Urner Barry Publications, Inc. is a New Jersey corporation with its principal place of business in Toms River, New Jersey. Urner Barry published egg prices to industry participants, including the Egg Producer Defendants, during the Class Period.

171.    Since 1976, Urner Barry has hosted an annual "Executive Conference" (originally in New Jersey, more recently in locales like Las Vegas), which is today the most widely attended and recognized marketing event in the poultry and egg industries.

172.    Urner Barry publishes its benchmark egg prices through an online database called Comtell On-Line ("Comtell"). Urner Barry claims that Comtell is "the most reliable source of market prices" in the meat, poultry, pork, veal, seafood, and egg industries. With respect to eggs, "Urner Barry's egg quotations have been the industry's benchmark for over a century." Comtell subscribers "are updated several times a day on the most impactful market conditions."

173.    Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

**R.    Versova**

174.    Defendant Versova Holdings, LLC is a Delaware limited liability company with its principal place of business in Sioux Center, Iowa. Versova Holdings wholly or partially owns Trillium Farms, whose day-to-day operations are managed by Defendant Versova Management Cooperative.

175.    Defendant Centrum Valley Holdings, LLC is a Delaware limited liability company with its principal place of business in Sioux Center, Iowa. Centrum wholly or partially owns several farms whose day-to-day operations are managed by Defendant Versova Management

Cooperative, including Centrum Valley Farms, Oakdell Farms, and Willamette Egg Farms.

176. Defendant Versova Management Cooperative is a Minnesota cooperative association with its principal place of business in Sioux Center, Iowa.

177. This complaint refers to Versova Holdings, Centrum Valley Holdings, and Versova Management Cooperative collectively as "Versova."

178. Versova is one of the largest egg producers in the United States. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon. Versova farms include, among others, Center Fresh Group, Trillium Farms, Centrum Valley Farms, and Willamette Egg Farms. In 2024, Versova and its family farms had over 35 million egg-laying hens.

179. During the Class Period, Versova subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

180. During the Class Period, Versova sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**S. Weaver Brothers**

181. Weaver Bros., Inc. d/b/a Weaver Eggs ("Weaver") is an Ohio corporation with its principal place of business in Versailles, Ohio.

182. Weaver is one of the twenty-five largest egg producers in the United States, with more than 4.4 million egg-laying hens as of 2024. Weaver also co-owns Defendant Opal Foods with Defendant Rose Acre.

183. During the Class Period, Weaver subscribed to Urner Barry, its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in

this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail Shell Egg prices.

184. During the Class Period, Weaver sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**T.      Unnamed Co-Conspirators and Other Non-Parties**

185. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this complaint. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

186. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

187. Whenever reference is made in this complaint to any act of any corporation, company, association, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

188. Each entity Defendant's agent operated under the authority and apparent authority of its respective principals.

189. Each entity Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

190. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

191. When this complaint refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant entities within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices of Commodity Shell Eggs.

192. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

**FACTUAL ALLEGATIONS COMMON TO ALL CLASSES[4]**

## I. The U.S. Egg Industry

### A. Egg Production and Supply Dynamics

193. Eggs are a fundamental staple in U.S. kitchens. The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." Similarly, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins" that supports healthy metabolism, liver function, and fetal brain development.

194. Thanks to their high nutritional value and versatility in cooking, eggs remain an essential part of U.S. households. Both overall and per capita egg consumption have steadily risen over the past decades, with the average American estimated to consume approximately 273.6 eggs

---

[4] The allegations set forth in this Section are the same as those set forth in the "Factual Allegations Common to All Classes" section of the Indirect Commercial Purchasers' and Direct Purchasers' respective Consolidated Complaints.

in 2026.

195. The U.S. egg industry produces over 100 billion eggs each year. According to an industry analyst, the egg market in the United States is worth approximately $10 billion annually. The overwhelming majority of eggs produced—about 70%—are sold as whole "shell eggs" or "table eggs" at retail or food-service outlets; the remainder are broken and sold as liquid, frozen, or dried "egg products."

196. Approximately 88% of shell eggs sold in the United States are either conventional or cage-free eggs—referred to in this complaint as "Commodity Shell Eggs" or simply "Shell Eggs"—sold at prices benchmarked by a single, private firm, Urner Barry. These types of eggs, labeled with defined USDA sizes, grades, and colors, are sold as commodities and are priced daily by region by Urner Barry, in distinction to free-range and pasture-raised eggs, which are not indexed by Urner Barry. In some parts of the country, most notably California, all shell eggs must be "cage-free" by law, and Urner Barry's benchmark prices—which track California as a separate "cage-free" region—reflect this.

197. In Shell Egg markets, the chicken comes before the egg—a supply of specialized hens, and related poultry production facilities, is required for egg production. Poultry production starts with primary breeder flocks, whose eggs hatch into male and female chicks. Female chicks will grow into egg-laying hens (layers). Male chicks, unable to lay eggs, are culled. Each year in the United States, the egg industry kills over 300 million day-old male chicks. Hens begin life on pullet farms before moving to egg production facilities (pullets are young female chickens less than one year old).

198. The egg production cycle is stable and predictable, which allows large producers to precisely calibrate future supply. Once a pullet is placed, her productive output follows a fixed

biological trajectory: a flock begins producing eggs at 18 to 22 weeks of age, reaches peak production of approximately 90%[5] at 30 to 32 weeks, and declines to around 50% by 60 to 70 weeks. The majority of hens are removed from production between 100 and 130 weeks and replaced immediately by mature pullets, creating a continual cycle of renewal. Because this biological cycle is predictable, producers can forecast their future supply months in advance: reducing the number of pullets placed today predictably shrinks supply six to eight months later.

199. Producers also control the timing of supply through two additional levers. First, induced molting allows a producer to halt a flock's egg production for approximately 10 weeks at will, by withdrawing feed and controlling light exposure, after which the flock returns to production. Second, cold storage allows producers to hold packaged eggs for up to 45 days before shipment, allowing producers to withhold supply from the market when prices are low and release it when prices rise.

200. Eggs are produced nationwide. The three largest egg-producing states are in the Midwest, but states across the U.S. contribute significant egg production. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented approximately 42% of all laying hens in 2024.

**B.      Commodity Shell Eggs Are Fungible**

201. The overwhelming majority of shell eggs produced in the United States are either conventional or cage-free, sold as fungible commodities through retail or food service channels. These types of eggs—referred to as "Commodity Shell Eggs" or "Shell Eggs" in this complaint— account for approximately 88% of all shell eggs sold in the United States. They consist of standard white or brown eggs produced in non-specialty systems that comply with applicable hen housing

---

[5] That is, on any given day, approximately 90 out of 100 hens in the flock will lay an egg.

requirements (conventional systems in most states or cage-free in states such as California). These eggs are sized and graded according to USDA-defined standards, are sold as baseline Shell Eggs in retail and foodservice channels for a particular region, are priced by Urner Barry, and are overwhelmingly sold at prices based on an Urner Barry benchmark.

202.    In contrast, a smaller share of United States shell eggs consists of more specialized or "quality-differentiated types," including organic, free-range, and pasture-raised egg products. These non-commodity eggs represent a minority of total production but command higher prices due to their animal-welfare, environmental, or certification attributes. Commodity Shell Eggs remain the industry's core product and account for most U.S. egg sales.

203.    According to egg industry trade group United Egg Producers ("UEP"), in 2025, over half of the eggs produced in the United States were sold as shell eggs through retail outlets, about 31% were processed into egg products, and almost 12% were sold through food service channels such as restaurants. Less than 2% of United States eggs produced in 2025 were exported.



**Figure 1**

204. Shell Eggs function as a classic commodity product because they are highly interchangeable. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a uniform grading and sizing system. USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer. Similarly, regional cage-free standards— principally California's—establish a standardized animal welfare baseline with which all eggs sold in the state must comply.

205. As sellers of interchangeable commodity products subject to government-standardized size, grade, and color guidelines, Commodity Shell Egg producers compete almost entirely on price. Because government standards eliminate meaningful differences in quality or characteristics, producers have historically operated in a low-margin, volume-driven market. For decades, the industry followed a predictable pattern: thin but stable profits, with little opportunity for any producer to command a premium.

206. However, in recent years, the United States egg market has undergone a structural overhaul. Producer consolidation, vertical integration of the largest producers, and economic interdependence through co-branding, joint ventures, and producer-to-producer trading have created a modern egg industry ripe for collusion. And the fact that nearly every Commodity Shell Egg sold in the United States is priced by a single, private entity with a vulnerable pricing methodology created the means for such collusion to inflate egg prices nationwide.

207. That is what happened during the Class Period, which saw an abrupt and significant

break from the traditional low-margin model as egg producers' profits skyrocketed alongside inflated prices—an outcome inconsistent with how a truly competitive commodity market should behave.

### C. Consolidation in the Egg Industry

208. Throughout most of the twentieth century the United States egg industry was highly fragmented, with thousands of independent farms. Since the 1980s, however, the industry has undergone aggressive consolidation. Between 1986 and 2002 the number of United States shell egg producers fell from 2,500 to just 700, and consequently the size of egg producing farms grew. In 1982 half of all egg-laying hens lived on farms with 62,000 hens or less, but by 2012 half of all egg-laying hens lived on farms with 925,000 hens or more. Then between 2012 and 2017, the egg industry consolidated even further as the number of egg farms fell by another 17%. More recently, and in 2023 alone, Cal-Maine acquired Fassio Egg Farms, Daybreak acquired Hen Haven LLC and Schipper Eggs LLC, and MPS Egg Farms (the sixth largest egg producer) acquired Country Charm.

209. Today, Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (referred to in the industry as the "Big Five") collectively control approximately half of all U.S. laying hens, while the Egg Producer Defendants collectively control approximately 73% of all egg-laying hens.[6] Defendant Cal-Maine alone had over 50 million egg-laying hens in 2025, and it controlled approximately 20% of national egg sales. Industry analysts expect consolidation to continue. Indeed, in its investor presentations and earnings calls, Cal-Maine has boasted of pursuing more acquisition strategies.

---

[6] Per USDA estimates, there were approximately 375 million egg-laying hens in the United States in 2025, of which approximately 310 million were dedicated to egg production (as opposed to breeding). The flock proportion figures in this complaint use the 310 million figure, as the flock sizes for Egg Producer Defendants appear to be for egg-producing layers, not breeders.

210.     The larger Egg Producer Defendants also benefit from vertical integration—they own breeder flocks, multiplier and pullet farms; they manufacture feed; and they maintain in-house grading, breaking, packaging, and processing facilities as well as dedicated trucking fleets.

211.     In addition to its 50 million layers and forty-nine egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Cal-Maine prepares its table-eggs and egg products to be picked up by customers or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

212.     Cal-Maine's vertical reach extends even further: it maintains its own 10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour." Defendant Rose Acre similarly maintains its own breeder flock. This vertical integration into pullet breeding means that decisions by producers such as Cal-Maine and Rose Acre to slow-walk flock restoration during the Class Period as detailed below were not constrained by pullet availability. Defendants had the physical capacity and the biological infrastructure to replenish their flocks at a competitive rate. Their failure to do so was a choice, not a structural limitation.

213.     Independent producers without breeder flocks must source replacement pullets from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW

Group. As a result, smaller companies do not have the ability to rebuild their flocks as quickly as the largest firms, and when they do seek to rebuild their flocks, they may depend on Cal-Maine and Rose Acre for new additions. This structure gives the Defendants an added layer of interdependence and incentive to collude on supply and prices.

214.  Vertical integration at the top of the U.S. egg industry creates economic reliance and interdependence among small producers in other ways as well. Because vertically-integrated producers maintain large processing, packaging, transportation, storage, and trading components, smaller egg producers may rely on the largest producers to process their eggs, bring them to market, or even purchase them for resale to large wholesalers. Similarly, producers engage in co-branding and form joint ventures and producer cooperatives with smaller producers across the country. As a result, an egg-producing cartel with a 73% national market share (as in this case) has outsized influence against would-be mavericks or price-cutters even beyond the near-uniform dominance of the Urner Barry pricing benchmark.

215.  Producer Defendants also opportunistically control egg supply within layer egg stocks, including through induced molting.[7]

216.  North Carolina State University Extension has explained the practice:

> Induced molting can be an effective management tool, enabling you to match egg production with demand and reduce bird cost per dozen eggs by distributing the bird cost across a greater number of dozens produced. Induced molting can also extend the productive life of a flock to an economically viable age of up to 110 weeks. Producers can adjust the timing of a molt as part of the cost analysis of a total profit plan that maximizes egg production over the life span of the hens and matches periods of highest egg production to periods of highest egg demand, which increases egg prices.

---

[7] The process of molting in layer hens consumes protein and thereby reduces or even halts egg production during the molting process. Major egg producers are able to—and do—deploy a process called "induced molting" to control supply among their commercial layers.

217. The Egg Industry Center, using USDA NASS Chicken and Eggs data, tracks induced molt percentage across the industry, including an "In a Molt" figure that roughly correlates to producers' decisions to affirmatively induce a molt in their flocks in a given calendar month.

218. During the Class Period, the USDA NASS "In a Molt" figure for United States egg production held stable—and frequently increased—during periods of alleged supply shock from Highly Pathogenic Avian Influenza ("HPAI"), suggesting that egg producers were intentionally removing commercial layers from supply at a stable or even higher rate than in previous years. ███ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ When egg prices were doubling due to an alleged supply crunch, egg producers were nevertheless removing layer hens from production through voluntary molting at a rate at or above their historical norm—the opposite of what would be expected if producers were straining to preserve every bird against a genuine, involuntary supply shock.

**D.     How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI**

219. Because eggs are a commodity without a public, regulated exchange, virtually all wholesale pricing in the industry is anchored to a single source: the daily price quotations published by Defendant Urner Barry. As one Urner Barry reporter explained it, contrasting with other protein markets: ███████████████████████████████████████ ████

220. ███████████████████████████████████████████████ ██████████████████████████████████████████████ ████████ Urner Barry's own website states that "Urner Barry's egg quotations have been the

46

industry's benchmark for over a century."

221.    Egg producers, including the Egg Producer Defendants, sell the substantial majority of their Commodity Shell Eggs to retailers, restaurants, and food service distributors under contracts that price eggs by reference to Urner Barry's daily quotations—either as the quotation itself or as the quotation plus or minus a fixed adjustment. Cal-Maine's SEC filings state that most conventional and cage-free shell eggs in U.S. retail and food service channels are priced based on quoted wholesale market prices like these.

222.    Because these formula-priced contracts govern approximately 95% of the shell eggs sold in the United States, Urner Barry's daily quotations are, as the U.S. Department of Justice has put it, "an inseparable part of the price" that most retailers and other buyers pay for eggs. Therefore, even small movements in the daily Urner Barry quotation reprice billions of eggs already committed under existing contracts. During the Class Period, ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

223.    During the Class Period this egg pricing practice extended beyond contracts that expressly incorporated the Urner Barry benchmark into a pricing formula. Because Urner Barry served as the industry's principal benchmark for the value of Commodity Shell Eggs, egg producers relied on its quotations as the common baseline for setting, negotiating, and adjusting the prices at which they sold Commodity Shell Eggs to wholesale purchasers, regardless of whether a particular contract explicitly referenced Urner Barry or an Urner Barry quote.

224.    Urner Barry is a price reporting agency that analyzes, aggregates, and anonymizes market information to publish daily price quotations for the egg industry. Urner Barry publishes these quotations across six U.S. regions—the Northeast, Southeast, Midwest, Northwest,

California, and South Central—and across egg sizes such as Extra Large, Large, and Medium. Although published separately, Urner Barry's regional quotations are highly correlated, such that a change affecting one region typically affects the others.





230.    ECI supplies most of the trades, bids, and offers that occupy the first two, most

heavily weighted, tiers of the Urner Barry hierarchy. ECI is the sole organized spot market for shell eggs in the United States—a members-only electronic platform on which producers and buyers post offers, place (purportedly) blind bids, and execute trades, activity that ECI itself describes as the market's trading levels. Although ECI accounts for less than 5% of national shell egg transactions by volume, it is not a peripheral data point: Urner Barry explicitly incorporates ECI trade, bid, and offer data into its daily quotations, and ECI represents that its "trading levels . . . help determine prices on the wholesale level." A producer's bid, offer, or trade on ECI is therefore not simply a transaction between private parties; it is, by design, a direct input into the benchmark that governs nearly every other shell egg contract in the country.

231. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

232. Besides ECI transactions and bid/asks, the other quantitative input into the Urner Barry benchmark egg price over the Class Period was directly reported transaction, bid, and ask information. During the Class Period, egg companies—principally the Egg Producer Defendants— routinely traded with one another on and off ECI, buying and selling millions of eggs to and from one another at "negotiated" prices. These producer-to-producer transactions, bids, and offers were sent to Urner Barry as a means to manipulate the Urner Barry price, and thereby wholesale and retail egg prices.

233. Producers submitted transaction and bid/ask information to Urner Barry through a variety of means. ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████

███    ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████





238.  These producer-to-producer trades were often at privately-negotiated, off-exchange prices, and were regularly submitted to Urner Barry (frequently alongside aggressive communications). Defendants exploited their producer-to-producer trades to manipulate the Urner Barry benchmark. Several of the largest egg companies, including the Egg Producer Defendants, operate under a "net short" business model, meaning that they do not produce enough eggs in-house to satisfy their own existing customer demand. To cover that shortfall, these Egg Producer Defendants routinely procure eggs from other egg producers or brokers, including their co-conspirators—either through direct purchases or by submitting bids and offers on ECI. Because a substantial volume of the trading activity on ECI consists of one Defendant buying eggs from another to cover a net-short position, inter-Defendant trades carry a built-in appearance of ordinary commercial activity. However, as described below, Defendants exploited that appearance directly, arranging trades among themselves at artificially premium prices for the specific purpose of manipulating Urner Barry's quotation, secure in the knowledge that such trades would appear to be nothing more than routine net-short procurement.

239.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

## II. Defendants Exploited Their Control and Influence Over Egg Production and Pricing to Fix and Raise Egg Prices to Supracompetitive Levels

240. For many years, the U.S. egg market had stable prices with mild fluctuations. During the Class Period, however, egg prices aggressively increased to record highs, reaching $6.23 per dozen ($8 for some grades) in March 2025 before collapsing after the DOJ revealed its price-fixing investigation.

241. The Defendants' conspiracy operated on at least two reinforcing tracks. The first track—coordinated manipulation of the Urner Barry benchmark through self-reporting and influence over ECI—was the primary engine of the price spike. Because Urner Barry functions as the benchmark wholesale price for Commodity Shell Eggs in the United States, even modest artificial increases in reported prices cascade immediately and automatically into higher prices for nearly every downstream transaction.[9]

242. Egg Producer Defendants claim HPAI outbreaks since late 2021 caused egg price increases, but the price inflation over the Class Period exceeds—in both magnitude and stability—what bird flu losses alone would explain. The evidence revealed in the DOJ Complaint and in Urner Barry's files makes clear that the Class Period price increases were the result of collusion,

---

[8] As used by egg reporters and sellers, "DOD" refers to the date of delivery of a batch of eggs.

[9] The existence of a benchmark pricing system does not immunize coordinated price fixing especially where, as here, competitors join efforts to influence the benchmark, raise prices in lockstep, and simultaneously take action to ensure the benchmark remains elevated. The Urner Barry Price Report itself was the mechanism for Defendants' collusion, allowing Defendants to jointly target supracompetitive prices. Courts have noted that benchmarks reliant on submission by industry participants are susceptible to coordinated influence and can be vehicles for price-fixing. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016). That is precisely what occurred among the Egg Producer Defendants during the Class Period.

not bird flu. The HPAI outbreak did not cause those inflated reports; Defendants used the outbreak as a pretext to justify benchmark prices that far exceeded what any genuine supply disruption could explain.

243. The second track—coordinated output restriction—allowed Defendants to manipulate supply, which impacts prices and served as a justification and enforcement mechanism for manipulation of the Urner Barry benchmark. In a competitive market, artificially elevated prices would attract new entry and additional supply, driving prices back toward competitive levels. The Egg Producer Defendants short-circuited that corrective force by collectively refraining from rebuilding flocks at the rate that competitive incentives and their own financial self-interest would otherwise demand. The supply restriction was not large enough to explain the price spike on its own. But it was large enough, and sustained long enough, to prevent prices from self-correcting. In short: Defendants manufactured a story of scarcity to inflate the benchmark, then made just enough of that scarcity real to keep prices from collapsing.

A. **Defendants Conspired to Inflate the Price of Shell Eggs**

    i. **Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark**

244. As described above, the Urner Barry benchmark heavily relies on a small number of dominant producers' self-reported bids, trades, and market "assessments," filtered through the subjective judgment of a handful of Urner Barry reporters and editors and anchored day-to-day to the prior day's quotation. This structure gave the Egg Producer Defendants both the means and the opportunity to move the national egg benchmark using a common and repeated playbook: agreeing that multiple producers would bid so that a diverse set of market participants appeared to be driving the market; agreeing to submit large numbers of bids in the hours before Urner Barry's daily publication; submitting bids that were never intended to result in an executed trade; executing off-

exchange transactions at above-market prices for the specific purpose of giving Urner Barry a transaction "to hang its hat on"; and directly lobbying Urner Barry's reporters—including by citing the Defendants' own artificially inflated bids and trades—to secure a higher published quotation.

245. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

246. This methodology, while facially neutral, is structurally vulnerable to coordinated manipulation by a small number of dominant producers such as Egg Producer Defendants, for at least six reasons.

247. First, because Urner Barry's hierarchy places bids, offers, and mere "assessments" on the same continuum as completed trades, a producer can move the published quotation without ever completing a sale. An uncompleted bid on ECI, or a producer's own subjective assessment of where the market is headed, can push the quotation upward in the complete absence of any executed transaction. And upward is the only direction such bids can push the quote—Urner Barry's own methodology states that ████████████████████████████████ ██████████████████████████████████ Further, while this aspect of the methodology appears on its face to target attempted manipulation, its details actually make the Urner Barry

quote more susceptible to upward manipulation when participants collude. That is, while Urner Barry's methodology theoretically exposes a lone actor bidding above the market to a financial risk (buying eggs at unprofitable prices if someone accepts the inflated bid), the provision works the opposite way in the presence of collusion, leaving the overall benchmark uniquely susceptible to upward manipulation by a producer cartel. In the presence of collusion, producers wishing to inflate the benchmark need only submit aggressive bids on ECI, safe in the knowledge that potential offerors (who must have eggs to sell) are confederates who will not take the bid or that a collusive counterparty who actually transacts will later unwind or otherwise make good the loss. The high bidder with collusive partners is free to bid above the market and impact the benchmark, whether or not eggs are transacted at that price, and bids *below* the current quote are rejected out of hand based on Urner Barry's own methodology. This is exactly what was observed across the Class Period.

248. Second, the absence of any minimum volume requirement means that a small number of dominant participants can set the market. ████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████ In practice, this means that a small group of Urner Barry personnel exercise concentrated, subjective editorial judgment over a benchmark governing almost all of the nation's egg sales, based substantially on information self-reported by the same handful of producers who stand to profit from a higher number.

249. Third, because Urner Barry depends on data that egg producers choose to submit, the largest producers, like the Egg Producer Defendants, can selectively report the trades that support their preferred price direction while withholding those that do not. Urner Barry has no

subpoena power and no independent means of learning about a trade that a producer elects not to disclose. Senator Jack Reed identified exactly this vulnerability in a February 2023 statement urging the U.S. Department of Justice and Federal Trade Commission to investigate egg pricing, observing that "[w]hile the wholesale price of eggs is tied to the Urner-Barry index, the dozen largest egg producers have the ability to feed data into the index that could result in beneficial pricing for the industry."

250. Fourth, because each day's quotation is anchored to the prior day's quotation rather than independently derived, a single day's successful manipulation does not merely produce a one-day price spike—it resets the floor from which every subsequent day's quotation is calculated, carrying the effect of that manipulation forward indefinitely, unless and until a contrary signal is strong enough to move Urner Barry's reporters off the inherited, inflated number. And because Urner Barry's egg reporters affirmatively reach out to representatives of the largest producers, including the Producer Defendants, each day to discuss where the reporters think the market is going, the Producer Defendants are given a heads-up when Urner Barry is considering adjusting the market downward—and are as a result able to affirmatively and in coordination work to "hold" or even further inflate prices.

251. Fifth, Urner Barry does not require documentary verification of the information submitted to it and does not publicly disclose the identities of submitters or the substance of their submissions. Because these direct, non-public communications occur between Urner Barry's reporters and the same producers whose bids and trades are simultaneously shaping the quotation, the Egg Producer Defendants possess substantial, largely unchecked influence over the benchmark that governs their own prices. This vulnerability is not a new discovery: a 1984 study published in the Cornell Agricultural Economics Staff Paper series, "Urner Barry Shell Egg Quotes: How Good

Are They?", found that Urner Barry's quotes were "based principally on verbal descriptions of market conditions rather than on actual transaction prices," and that Urner Barry reporters were routinely led by egg producers toward price stability, producing prices that "drift above actual exchange prices" and "adjust upward more rapidly than downward." Senator Reed's above-quoted observation concerning major egg producers' input into Urner Barry index—that these producers "have the ability to feed data into the [Urner Barry] index that could result in beneficial pricing for the industry"—is instructive.

252. Sixth, ECI, the marketplace generating a substantial portion of the completed trade data as well as all bid-and-offer data, is itself controlled by the largest egg producers, including several Egg Producer Defendants. ECI was founded in 1971 by Fred Rogers Adams, Jr., the founder and longtime CEO of Cal-Maine, and its governance has been dominated by the largest egg producers ever since; current ECI directors include representatives of Cal-Maine, Hillandale Farms, and Versova. A 1978 study of ECI found that its membership—primarily producers and processors sharing an interest in achieving the "highest possible quotation"—could "bid higher on ECI than current market conditions would warrant," including "when there are no eggs offered without fear of receiving a load," allowing benchmark-moving bids to be placed at zero cost or risk. Because ECI's trading volume remains thin today, even modest, coordinated bidding by a handful of dominant producers—who collectively account for approximately half of national production—is sufficient to move the bona fide trades and bids that feed directly into Urner Barry's quotation, without any need to coordinate with the hundreds of smaller, independent producers who also participate in the market.

253. Defendants were aware of these long-documented structural vulnerabilities. █████

██████████████████████████████████████████████████████



A short time later, the industry's largest producers, including Rose Acre, began coordinating to manipulate the Urner Barry benchmark price through both ECI trading and private, Defendant-to-Defendant trades.

255. In short, a Defendant-controlled stream of market information from ECI and from Egg Producer Defendants' own private trades feeds directly into, and in practice dominates, Urner Barry's benchmark-setting process, and Defendants know it. Given Urner Barry's hierarchical reliance on limited data inputs, lack of independent verification, concentration of editorial discretion, and practice of anchoring daily assessments to prior quotations, the benchmark-setting mechanism is particularly vulnerable to sustained and coordinated manipulation by the industry's largest participants—and they have in fact manipulated that benchmark, injuring competition and raising egg prices, as explained below.

256. The record reflects that the Egg Producer Defendants employed this playbook repeatedly, through the recurring categories of conduct described below. The examples set forth below are drawn from presently available sources, including the complaint filed by the DOJ, and

the limited document production obtained from Urner Barry, and they are not exhaustive.

1. Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On"

257. As described above, Urner Barry's hierarchy places completed, bona fide trades at the top of the information it considers, and net-short Defendants' routine need to purchase eggs from their competitors gives inter-Defendant trades a built-in appearance of ordinary commercial activity. Defendants exploited both features, arranging trades with one another and placing trades on- or off-ECI at inflated prices for the specific purpose of giving Urner Barry's reporters completed transactions to point to in justifying a higher quotation.

258. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

██ ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

260.

263. Then, beginning in mid-October 2022, just as Glenn Hickman and a Cal-Maine executive exchanged text messages coordinating their bidding activity to "hold it today," ████████

265. On December 15, 2022—just five days before Hickman emailed senior executives from Cal-Maine, Versova, and others, stating "[p]lease consider posting strong bids, early and often" and coordinated the submission of dozens of bids onto ECI to push the Urner Barry benchmark—





273. On August 7, 2023, a Cal-Maine executive sent a text message to a Versova executive asking, "[a]ny more eggs?" and noting that Urner Barry's market reporter "needs premium trades to hang her hat on." The Cal-Maine executive then proposed to buy eggs at premium prices, and the two negotiated the delivery date of the trade. Cal-Maine and Versova went on to execute three private trades—*i.e.*, trades not executed on ECI or a similar platform—at premium prices, and Cal-Maine shared the resulting purchase orders directly with Urner Barry. Urner Barry had kept its price quotations for white, large, shell eggs unchanged across all regions except California since May 26, 2023; it then increased those quotations across all regions except

California on each day between August 9 and August 11, 2023. On August 9, 2023, the CEO of ProEgg forwarded Urner Barry reports to Cal-Maine and wrote, "[f]inally!!!!" The ProEgg CEO's celebratory email suggests his knowledge of and participation in the collusion that led to this result.



280. The Egg Producer Defendants' pattern of coordinated trading, paired with coordinated Urner Barry communications, continued into late 2024 and at least through March

2025, when the Department of Justice publicly announced that it had begun a price-fixing investigation targeting U.S. egg producers. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████  ████████████████████████████████████████

████████████████████████████████████████████████



[redacted] The inter-Defendant trades, however, were only one of the tactics deployed within the Defendants' conspiracy to manipulate Urner Barry benchmarks and ultimately, wholesale and retail Shell Egg prices during the Class Period.

2. <u>Coordinating the Timing, Volume, and Direction of Bids to Push or Hold the Benchmark ("Bidding Early and Often")</u>

287. Defendants also coordinated the timing and volume of the bids they placed on ECI, submitting large numbers of bids in a short window—including bids that were never intended to

result in an executed trade—so that Urner Barry's reporters would observe what appeared to be broad-based, diverse bidding activity and adjust benchmark prices accordingly. Defendants used this same coordinated bidding both to push the benchmark upward and, at other times, to hold it steady against a decline. █████████████████████████

███████████████████████████████████████████

████████████████████████████

288. On the morning of October 14, 2022, a Cal-Maine executive texted Hickman's CEO: "We are bidding up. Let's hold it today." Later that day, Hickman's CEO called a then-Cal-Maine executive by phone. By the end of the day, Hickman's and Cal-Maine's bids on ECI accounted for over half of all bids submitted that day, and Urner Barry kept its price quotations for white, large, shell eggs unchanged across all regions. A Cal-Maine executive then texted Hickman's CEO, "[n]o change," acknowledging that, as they had intended, Urner Barry had kept its quotations the same.

289. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

290. In December 2022, ██████████████████████████████ egg producers coordinated to push them up yet further. For example, on December 19, 2022, following a regularly scheduled weekly call among Cal-Maine, Versova, and Hickman, Hickman's CEO emailed the group: "[n]eed to push the spread into the northwest…." A senior Versova executive replied a few hours later that "[o]ur team will be bidding for additional loads again tomorrow." Hickman's CEO responded, "[i]f we all bid in our respective areas for the 3-5 loads minimum we are short . . . the

market reporters will have to address," and the group continued discussing the plan by phone throughout the day. That same day, Urner Barry increased its price quotations for white, large, shell eggs across all regions.

291. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

292. Hickman's CEO repeated his request to push up egg prices by coordinated bidding on December 20, 2022 emailing senior executives at Cal-Maine, Versova, and others: "[p]lease consider posting strong bids, early and often. The market reporters don't get in for another hour, so it will be good for them to see diverse bidding upon logging on." He followed up shortly after: "[h]urry[.] There are only 16 bids on ECI right now and 15 of them are ours." Within minutes, Cal-Maine, Versova, and Hickman collectively submitted dozens of bids, most at premium prices; Hickman's CEO then had several phone calls with executives at Versova and Cal-Maine. Urner Barry again increased its quotations for white, large, shell eggs across all regions on December 20.

293. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

294. On December 21, 2022 Hickman's CEO emailed senior executives at Cal-Maine, Versova, and ProEgg warning that Urner Barry's market reporter was "trying to set the stage for [market prices] to retrace" and instructing the group to "bid openly for eggs, especially mediums and eggs into the northwest." Consistent with that instruction, Cal-Maine, Versova, and Hickman

collectively submitted dozens of bids that morning, and Urner Barry increased its quotations for white, large, shell eggs across all regions that day as well.

295. The same day, when Urner Barry's own report later noted that bidding volume had declined from the prior day, the CEO of ProEgg wrote that Urner Barry was "prepared to pull the market down," and joined Hickman's CEO in urging the group: "[a]s a group we need to bid like they vote in Chicago, early and often." Hickman's CEO called a now-former Cal-Maine executive three times throughout the day. Hickman's CEO repeated the instruction the next morning, emailing senior executives from Cal-Maine, Versova, ProEgg, and others, under the subject line "bids," stating "[t]here is only a 2 cent premium for NW [Northwest] large over SC [South Central] large" eggs; "[b]id early and often today."

296. Following that directive, on December 22, 2022 a senior Versova executive instructed another Versova executive to "light up the northwest bids please, .02 over"—*i.e.*, two cents above Urner Barry's then-current Northwest quotation—and that executive placed bids accordingly. When one Versova executive later noted that the "NW bids are getting hit" (meaning a seller was offering to sell eggs to meet the bid), the other stated that he should delete the bids, indicating Versova did not actually need the eggs.

297. That same day, Cal-Maine, Versova, and Hickman collectively submitted dozens of bids on ECI, and Urner Barry increased its quotations across all regions, including the Northwest. Hickman's CEO circulated the resulting Urner Barry report to the group, noting that "[e]gg prices [were] hitting records," and adding, "great job in the northwest today!"

298. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

299. This pattern continued across the Class Period, including in late 2024. In the afternoon on December 3, 2024, Hickman's CEO spoke by phone with executives from Cal-Maine and Versova. Early the next morning, December 4, 2024 a former Cal-Maine CEO texted Hickman's CEO: "[l]et it rip." After that, Defendants significantly changed their bidding behavior: they submitted more bids per day, and a greater percentage of their bids were at premium prices and went unfilled.

300. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

### 3. Directly Lobbying and Pressuring Urner Barry Personnel

304. Beyond bidding and trading activity, Defendants also exerted direct pressure on Urner Barry reporters and editors—by phone, voicemail, and in personal communications—urging them to adopt higher quotations and to incorporate Defendants' inflated or otherwise manipulative transactions in the daily spot price. Urner Barry's own internal communications show that its personnel felt this pressure and, at times, accommodated it. These communications, in both content and timing, indicate that Defendants' pressure on Urner Barry was coordinated, and timed to coincide with producers' collusive submission of inflated transactions and bids.





**Figure 8**











[black redaction bars]

324. These examples are illustrative and not exhaustive of the coordinated bidding, trading, and reporting conduct alleged in this Complaint. Defendants and their co-conspirators discussed Urner Barry and ECI bidding, trading, and reporting in numerous other emails, texts, chats, and phone calls during the Class Period.

### ii. Defendants Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage

325. Defendants publicly blamed unprecedented egg price increases on the 2022 outbreak of HPAI. While the outbreak itself was real, Defendants exploited it as a pretext to create the false appearance of a nationwide egg shortage. The magnitude, duration, and pattern of the price spikes during the Class Period cannot be explained by the actual impact of HPAI. Instead, USDA data, industry filings, and contemporaneous reporting show that Defendants used the

outbreak as cover to impose prices far above what any genuine supply disruption could justify—and then collectively slowed the restoration of their flocks to prevent prices from naturally correcting.

326.  The actual impact of HPAI on egg production was far more limited than Defendants claimed. USDA data shows that the monthly U.S. egg-laying flock in 2022 never fell more than 6.7% from its five-year average, and monthly egg production never fell more than 5.6%. In the month preceding the first detection of HPAI in commercial flocks, national retail egg inventories were 22% above the four-year average. And crucially, per capita egg production in the United States has not fallen below per capita egg consumption in any year between 2022 and 2025—meaning there was no actual nationwide shortage of eggs during the Class Period.

327.  Nevertheless, Defendants invoked the avian flu outbreak as a pretext to manufacture a false sense of scarcity. They portrayed the effects of avian flu as cataclysmic, fostering the perception of a severe supply crisis. An Urner Barry analyst hinted that the real reason for high prices was that egg producers were relying on the "psychology" and the public's awareness of the flu outbreak, rather than simply economics, and were "confident about the value they can offer to the market."

328.  To maintain their manufactured false sense of scarcity and sustain artificially inflated egg prices, Egg Producer Defendants slowed the restoration of the flocks lost to avian influenza in a concerted fashion, despite having both the capability and the economic incentive to replenish production quickly.

329.  In a competitive market, when prices surge, producers have a strong incentive to ramp up production quickly. They want to capitalize on high prices before supply rebounds and drives prices back down. This rapid response mechanism helps stabilize markets over time, as

higher profits encourage more output, which eventually balances supply and demand.

330. The U.S. egg industry is particularly well-positioned to respond rapidly to avian influenza outbreaks. Over decades, producers have developed a standardized, efficient protocol for depopulation, disposal, cleaning, disinfection, and repopulation. Once an outbreak is confirmed, the affected facility is quarantined and the response begins immediately. A recent example from a 1.33 million-hen commercial egg-laying facility in Weld County, Colorado illustrates the speed of this process:

- January 28, 2026 – Mortality event identified to state authorities

- January 30, 2026 – Infection officially confirmed

- February 6, 2026 – Depopulation and disposal completed

- March 4, 2026 – Cleaning and disinfection completed, Control Area for facility released

- March 17, 2026 – Premises quarantine lifted

331. Less than sixty days passed between the initial mortality event and the lifting of quarantine, for a relatively large commercial egg farm—and state agriculture reports suggest the above timetable is standard, not an outlier. In short, rapid recovery from an avian flu outbreak is not only possible, but routine.

332. Historical experience confirms this pattern. During the 2014–2015 HPAI epidemic, producers lost more than 35 million hens. Yet the industry fully replenished its flocks within eight months. Prices initially spiked due to the supply shock, but as producers rebuilt their flocks, egg production rebounded sharply. By 2016, prices had fallen to levels even lower than before the outbreak.

333. Egg producers themselves acknowledge this dynamic. As Cal-Maine has stated, "in the past, during periods of high profitability, shell egg producers have tended to increase the

number of layers in production . . . which generally has caused a drop in shell egg prices until supply and demand return to balance."

334. During the Class Period, however, Defendants did the opposite. Rather than restoring production as competitive market forces required, Defendants collectively slowed it. Their coordinated restriction on output prevented the national egg-laying flock from returning to its pre-outbreak level of roughly 330 million hens, even as prices remained historically high.

335. The sluggish recovery was not the result of increased culling during the HPAI outbreak. Instead, it stemmed from Defendants' collective refusal to expand the placement of fertilized eggs into incubators and to increase the hatching of chicks. By holding back on these essential steps, Defendants choked off the supply of new layers and ensured that flock growth remained stagnant.

336. The data affirms that this was abnormal behavior. Since 2022, the monthly decline in the egg-laying flock has mirrored the losses seen in 2015—when the HPAI outbreak wiped out 43 million hens. Yet despite similar flock reductions, prices since 2022 have risen more than three times more per hen lost than during the earlier epidemic. The only meaningful difference is Defendants' concerted effort to manipulate market pricing, as detailed above, and their coordinated refusal to rebuild supply at the pace the market would ordinarily dictate.

337. During the Class Period, instead of increasing pullet placements to capitalize on record-high prices, Defendants added roughly 20 million fewer pullets—even though breeders and hatcheries were producing more fertilized eggs and production costs had fallen significantly since 2022. This deliberate slowdown ran directly counter to each producer's individual economic incentives. By collectively restraining the rebuilding of their flocks, Defendants manufactured the appearance of an ongoing egg shortage and insulated their artificially inflated prices from the

normal corrective pressure of increased supply.

**B.    The Historically High Price of Commodity Shell Eggs Cannot Be Explained by Market Forces**

338.    Defendants' conspiracy caused egg prices to rise to unprecedented heights. The wholesale price of Grade A Large White Shell Eggs—as reported by the Federal Reserve and mirrored in the Urner Barry Egg Index—jumped from roughly $0.50–$1.30 per dozen in 2021 to $1.50–$5.00 per dozen in 2022. This represented an extraordinary increase of approximately 200 to 285% in a single year. Although prices briefly moderated in 2023, they began climbing again by August 2024, reaching $3.00–$6.00 per dozen by the end of that year. By March 2025, the national weekly average egg price index hit an all-time high of approximately $6.23 per dozen, with some grades reaching $8.00.



**Figure 9**

339.    Defendants and other industry participants have claimed that the market forces of consumer demand, increasing input costs, and bird flu are what caused price inflation across the Class Period. But publicly available data, including data from Defendants, confirms that these market forces, taken together, do not explain the dramatic rise in Commodity Shell Egg prices during the Class Period.

340.    Rather, during the Class Period the price of Commodity Shell Eggs rose much more

sharply than competitive market forces would otherwise sustain. This divergence between observed Commodity Shell Egg prices and market fundamentals during the Class Period is more consistent with a coordinated effort to artificially inflate benchmark pricing and restrict supply than it is with independent, self-interested business decision making. And previously non-public information, including direct evidence of coordinated bid-rigging and benchmark manipulation by the Egg Producer Defendants, makes pellucid that price inflation in the Class Period was artificial—driven by an anticompetitive conspiracy—rather than natural.

i.    **The sharp rise in egg prices since 2022 cannot be explained by Avian Flu**

341.    Defendants have blamed the spread of HPAI for higher egg prices. In reality, however, HPAI does not explain the unprecedented surge in egg prices.

342.    The pretextual nature of the avian flu excuse is evident, as this was not the first time the egg industry had been hit by a large bird flu outbreak. The Class Period reduction in egg-laying flock size of 43.3 million was similar to that in 2015, when avian flu killed 43 million egg-laying hens.

343.    Nevertheless, prices over the Class Period rose approximately ***three times*** more per lost hen than they did during the earlier outbreak.

344.    Data from the USDA National Agricultural Statistics Service (NASS) and U.S. Bureau of Labor Statistics (BLS) Consumer Price Index Average Data for a dozen large eggs, as shown in the figure below, demonstrates the staggering price differences between the 2015 and 2022 outbreaks, and shows that the dramatic price hikes that began at the onset of the 2022 HPAI outbreak occurred in the face of relatively stable egg production compared to the more severe and prolonged shortage in 2015.



**Figure 10**

345. Average wholesale egg prices compared to egg-laying hen inventory lend further support to the conclusion that Defendants used HPAI as a pretext to justify their coordinated pricing activity during the Class Period as, despite relatively stable inventory, wholesale egg prices have soared compared to those in 2015.



**Figure 11**

346. Indeed, the actual decline in domestic supply from HPAI during the Class Period was even smaller than flock reductions indicated, as egg exports decreased and the egg-per-hen rate increased due to genetic improvements. Adjusting for these factors, the effective reduction in supply in 2022 was about 3.5 million hens, or about a 1% decrease in the national flock against 2021. The figure below shows table egg production versus table egg-laying hen population in the United States before and during the Class Period.



**Figure 12**

347.    As shown in the above figure, at no point in the first three years of the Class Period did the supply of egg-laying hens or Shell Eggs fall below 2015 levels.

348.    Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes during the Class Period. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply—and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.

349.    Indeed, from 2022 through 2024, price increases per unit of supply loss were several times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes. In 2015, egg prices rose only 7.16% for each 1% decline in flock size, and prices normalized within a year as supply recovered. By contrast, in 2022 prices jumped 33% per 1% flock reduction, followed by 17% in 2023 and 25% in 2024—multipliers inconsistent with normal market behavior.



**Figure 13**

350. The data suggests that claims of an unprecedented shortage due to Class Period-HPAI were (and are) overstated. One advocacy group, analyzing USDA data, reported that losses in the total size of the U.S. egg-laying flock as a result of Class Period-bird flu were actually quite modest. In a month-to-month comparison to 2021, the egg-laying flock was, on average, only 3.82% smaller in each month of 2022, 3.16% smaller in each month of 2023, and 5.18% smaller in each month of 2024. These small declines cannot plausibly account for the extreme and sustained price spikes observed during the Class Period.

351. The spike in U.S. egg prices becomes even more perplexing when contrasted with Europe, which experienced a severe supply shortage in 2022 after the depopulation of 50 million layers—compared to 43 million in the U.S. Despite this, European egg prices increased by only about 30% from January 2022 to January 2023, whereas U.S. prices more than doubled over the same period.

352.  As shown in graphs earlier in this complaint, the price of shell eggs began to crest $4.00 per dozen in or around December 2022.

354.

### ii. There were no material constraints to rebuilding flocks and production capacity

355. The industry's ability to rebuild flocks with over 35 million hens within 8 months following the 2015 HPAI outbreak demonstrates the absence of structural barriers to restoring supply.

356. As to the avian flu during the Class Period, however, the active commercial egg-laying flock has not yet recovered to its pre-outbreak size of roughly 330 million hens. Between 2023 and 2025, flock size fluctuated between 295 and 320 million, ranging from 305-316 million in 2024 and 295-313 million in 2025.

357. In reality, as explained earlier in this complaint (e.g., supra at §§ I.A, I.C, II.A.ii and II.B.i), the Egg Producer Defendants could have restored supply of Commodity Shell Eggs more quickly than they did—and their slow pace in doing so indicates a deliberate decision, one inconsistent with recent prior industry behavior and which cannot be explained by physical or logistical constraints.

### iii. Input costs do not explain Commodity Shell Egg price increases

358. Chicken feed is a significant marginal cost of Commodity Shell Egg production. Feed, primarily corn and soybean meal, is therefore also a primary cost component in shell egg

production and accounts for more than half of production costs. Other sources have indicated feed costs could represent as much as 60 to 70% of egg farm production costs.

359. According to one study, between 2021 and 2022, processing costs increased by approximately 20%. Cal-Maine's 2022 financial statement reported that egg farm production and feed costs rose by 22% compared to 2021.

360. Yet, according to the Urner Barry Midwest Price Report, between December 20, 2021, and December 19, 2022, the wholesale price for a dozen large Grade A Commodity Shell Eggs jumped from approximately $1.76 to approximately $5.43—an increase of 208%.

361. The significant divergence between feed input costs and the price of Commodity Shell Eggs is economically significant and indicates that prices were not being established by competitive market forces. Rather, the fissure between feed costs and the dramatic and sustained price increases, in the absence of similarly elevated and sustained input costs, is indicative of and consistent with coordinated efforts to raise and fix prices at supra-competitive levels.

362. The same dynamic occurred in other input costs for egg production. As one executive at a pasture-raised egg producer—a producer that does not sell Commodity Shell Eggs priced by Urner Barry—explained: "I don't see anything in my cost structure that would have led me to raise our prices by as much as you're reporting. . . . I can't explain why prices have gone as high as they have."

363. As shown below, energy costs appear wholly detached from Commodity Shell Egg prices during the Class Period, as prices rose dramatically in the face of declining energy costs.



**Figure 14**

364. According to public sources and industry disclosures, other input costs, such as grower compensation and pay, have also remained flat or experienced modest increases during the Class Period. Indeed, over a six-year period overlapping the Class Period, industry giant Cal-Maine's per-egg supply costs appear to have barely increased at all. Documentation obtained by Farm Action from a farming family with a long-standing Cal-Maine supply contract reveals that contract farmers received only a $0.0125 per dozen increase over a six-year period—a total payment of $0.2675 per dozen—even as Cal-Maine's benchmark-driven wholesale prices increased threefold.

365. Increases in production costs simply do not explain the steep price increases exhibited during the Class Period for Commodity Shell Eggs. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case for Commodity Shell Eggs in the United States during the Class Period. Instead, prices and costs have diverged, to the profit of Commodity Shell Egg producers, and in particular, the Egg Producer Defendants.

iv. **Defendants' financial records confirm price increases were not cost-driven**

366. Compelling evidence that cost increases cannot explain Class Period egg prices also comes from Defendant Cal-Maine's own financial statements. In a competitive commodity market, producers facing higher input costs can, at most, pass those increases through to customers on a roughly one-to-one basis. Revenues may rise, but profit margins remain flat—or more commonly, shrink—because competitive pressure prevents firms from fully passing on cost increases without losing customers to lower-priced rivals. Margin expansion—profits growing dramatically faster than costs, without a corresponding increase in demand—is the opposite of what competitive markets produce. And the egg industry's own publications indicate no massive expansion in marketwide demand over the Class Period. Given this context, any increase in the cost of shell egg production over the Class Period cannot explain the several-fold increase in profits over the same time frame. Instead, these profits are an unmistakable economic signature of supracompetitive pricing power.

367. Cal-Maine's financial results during the Class Period reflect exactly that pattern. Reports show that while Cal-Maine's sales volume remained stable, its profit margins exploded, with multiple quarters of gross profit exceeding the company's prior full-year totals. Before the avian flu outbreak, Cal-Maine reported gross profits of $179.6 million in FY20 (June 2019–June 2020) and $160.7 million in FY21 (June 2020–June 2021), while annual egg production held steady at approximately 1.1 billion dozen eggs.

368. After the 2022 avian flu outbreak, however, Cal-Maine's profits skyrocketed. The company reported $1.2 billion in gross profit in FY23 (June 2022–June 2023) and $541.6 million in FY24 (June 2023–June 2024), again with sales volume essentially unchanged at roughly 1.1 billion dozen eggs per year. The trend continued into FY25, with Q1 and Q2 gross profits of $247.2 million and $356.0 million, respectively. On average, Cal-Maine's annual profits increased seven-

fold in the first full year of the Class Period (FY23), stayed elevated for another two years, then collapsed upon the announcement of a DOJ price-fixing investigation. These results are not reflective of a competitive market responding to higher costs.

369. Moreover, Cal-Maine insiders reaped huge profits from the anticompetitive scheme. Just after the DOJ investigation was announced in March 2025, members of late Cal-Maine founder Fred R. Adams Jr.'s family sold 3 million shares of stock totaling $320 million. At the same time, Adams's son-in-law, Cal-Maine Board Chair (and prior CEO) Adolphus Baker, sold a staggering 43% of his Cal-Maine stock holdings for a profit of $116 million on April 17, 2025.

370. Since the announcement of a price-fixing investigation by the DOJ in March 2025, Cal-Maine's revenues and profits have cratered. According to Cal-Maine's February 28, 2026 10-Q, the company's year-over-year net sales decreased *53%* between the quarter ending March 1, 2025 ($1.418 billion), and the quarter ending February 28, 2026 ($667 million). The company's net income—its profits—decreased a staggering *90%* over the same time frame ($508 million in the quarter ending March 1, 2025; $50 million in the quarter ending February 28, 2026). Taking into account the thirty-nine weeks preceding these two dates, Cal-Maine's net sales decreased year-over-year by more than 25% ($3.158 to $2.359 billion), and its net income by 60% ($876 to $353 million).

371. Cal-Maine itself attributed its extraordinary profits over the Class Period to higher selling prices, and its post-March 2025 revenues and profits cratered alongside market prices upon disclosure of the DOJ price-fixing investigation. Although the other Egg Producer Defendants are privately held, the unprecedented pricing conditions during the Class Period—conditions wholly disconnected from production costs or genuine supply constraints—support the reasonable

inference that they too reaped profits far above historical norms.

> **v.** **The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces**

372. On March 6, 2025, various news outlets, including The Capitol Forum and The Wall Street Journal, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry.

373. In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing, it stated that it received a civil investigative demand from DOJ in March 2025.

374. After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public, those same eggs cost $3.03—a 62.7% decrease. Egg prices at retail also dropped around this time.

375. This did not go unnoticed. On May 8, 2025, in a letter supporting the DOJ's investigation, Senators Elizabeth Warren and Jim Banks expressed "concern[] that record high egg prices reflect noncompetitive behavior among large producers."

376. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

█████████████████████████████

███   ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ This sort of market response is well-recognized evidence of conspiratorial conduct.

378. On April 17, 2026, the Wall Street Journal reported that the DOJ was preparing to file an antitrust lawsuit against some of the largest U.S. egg producers, including Cal-Maine and Versova.

379. On June 29, 2026, the DOJ and seventeen states indeed filed such a lawsuit, as described in more detail below.

### C. Plus Factors Corroborate Defendants' Conspiracy

380. Plus factors are economic actions and outcomes, above and beyond parallel conduct among oligopolists, that are largely inconsistent with unilateral conduct but consistent with coordinated action, and that support an inference of conspiracy. Detecting a cartel is much like diagnosing a disease: no single symptom is dispositive, but taken together, the plus factors described below make the diagnosis of an unlawful conspiracy far more reliable than parallel conduct alone.

381. The plus factors that corroborate the conspiracy alleged in this Complaint include:

(1) a government investigation and enforcement action targeting the same benchmark-manipulation scheme; (2) Defendants' actions against their unilateral economic self-interest; (3) Defendants' history as recidivist antitrust violators; (4) Defendants' common motive; (5) the fungible, interchangeable nature of Commodity Shell Eggs; (6) inelastic demand for Commodity Shell Eggs; (7) Defendants' numerous opportunities to collude; and (8) high barriers to entry.

      i.      **A Government Investigation and Enforcement Action Targeting the Conduct Alleged in This Complaint**

382.    On June 29, 2026, the U.S. Department of Justice and seventeen state attorneys general filed a civil antitrust enforcement action in the U.S. District Court for the Northern District of Iowa against Cal-Maine, Versova, and Hickman's Egg Ranch, Inc., alleging that those companies violated Section 1 of the Sherman Act by conspiring to submit coordinated bids designed to artificially inflate Urner Barry's daily egg price quotations between 2022 and 2025—the same benchmark, the same mechanism, and substantially the same period at issue in this Complaint. *United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa, filed June 29, 2026). That action followed a lengthy federal investigation, publicly reported to have begun in March 2025.

383.    While the government's civil action names only three of the entities alleged to have participated in the conspiracy described in this Complaint, its detailed factual allegations—summarized above—corroborate that the mechanism by which Defendants are alleged to have manipulated the Urner Barry benchmark is not a theoretical vulnerability, but one that has already been investigated and pursued by federal and state enforcers. The existence of a parallel government enforcement action targeting the same benchmark, the same conduct, and overlapping Defendants is itself a powerful corroboration of the conspiracy alleged here.

      ii.      **Defendants Acted Against Their Unilateral Economic Self-Interest**

384. No individual Egg Producer Defendant, acting alone, could meaningfully move the Urner Barry benchmark through unilateral bidding or reporting. As described above, Urner Barry's quotations are built from aggregated market data, and a producer who unilaterally reported prices detached from prevailing conditions would risk both damaging its credibility with Urner Barry's reporters and losing access to a pricing tool on which the producer's own contracts depend. Further, because Urner Barry's methodology states that ███████████████ █████████████████████████████ unilaterally submitting inflated bids carries risks for the bidder. Unilateral manipulation is accordingly self-defeating; coordinated manipulation, in which multiple producers reinforce one another's bids and reports and mitigate the financial risk of inflated ECI bidding, is not.

385. Likewise, in a competitive market, a producer that sees prices and margins surge has every incentive to expand output as quickly as possible to capture the elevated prices before competitors respond—a dynamic that, in previous avian-influenza episodes, produced swift production recoveries. As described above, however, Defendants collectively slowed the restoration of their flocks during the Class Period despite favorable conditions and declining costs. That restraint yields sustained supracompetitive prices only if all major producers refrain from expanding output at the same time—an outcome that requires mutual assurance that no competitor will break ranks to capture market share, and that is difficult to explain as the product of independent, unilateral decision-making.

### iii. Some of the Egg Producer Defendants Are Recidivist Conspiracists

386. The egg industry, including several of the Defendants named here, has previously been targeted by private litigants for anticompetitive and unfair business practices.

387. In 2008, direct purchasers of processed egg product sued Egg Producer Defendants Cal-Maine, Daybreak, Hillandale, and Rose Acre alleging that these producers, along with trade

groups and other egg producers, conspired to limit the supply of eggs in order to raise prices by enforcing supply restrictions. The alleged anticompetitive conduct included jointly developing and implementing an egg certification program, exporting eggs, and restricting supply by reducing hatch, early molting, and hen disposal. *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020).

388. All defendants but one settled with the direct purchasers for a total recovery of approximately $136 million. *See In re Processed Egg Prod. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.).

389. In 2011, Kraft Foods Global, Inc., the Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. sued Cal-Maine, Rose Acre, and trade group United Egg Producers, among others, in the Northern District of Illinois on antitrust allegations similar to those brought in the E.D. Pa. MDL, but including allegations about the unusually cozy nature of the egg industry. *See Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.). After a seven-week jury trial, a jury found that Cal-Maine and Rose Acre conspired with each other and returned a $17.8 million verdict (before trebling) on Kraft's and Kellogg's price fixing claim. On November 6, 2024, the court rendered Final Judgment against Cal-Maine, Rose Acre, United Egg Producers, and United States Egg Marketers, Inc. in the amount of $53.3 million, plus reasonable attorney's fees. *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.), Dkt. 720 (Nov. 6, 2024).

### iv. Defendants Have a Common Motive

390. Further, the Egg Producer Defendants had a common motive to manipulate Urner Barry benchmark prices during the Class Period—inflating that single benchmark would have the effect of inflating actually-paid wholesale and retail egg prices nationwide, thereby greatly increasing the Producer Defendants' revenues and profits given the highly inelastic nature of

Commodity Shell Egg demand in the United States. And indeed, this is exactly what happened, with not just egg prices but egg producer profits—as seen in SEC filings by Cal-Maine, the only publicly-traded Producer Defendant—doubling, tripling, and even quadrupling over the Class Period (and immediately collapsing upon revelation of a DOJ price-fixing inquiry).

### v. Commodity Shell Eggs Are Fungible and Interchangeable

391. Conventional and cage-free shell eggs are fungible commodities with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. It also lessens the incentive to defect from a collusive agreement as cheaters can be easily spotted, in contrast to differentiated product markets where price differences may be attributable (or at least facially attributed) to product differentiation. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

392. Government grading standards make Commodity Shell Eggs functionally identical within regions, eliminating non-price competition and simplifying the detection of price deviations.

### vi. Commodity Shell Eggs Have Inelastic Demand

393. Commodity Shell Eggs also exhibit relatively inelastic demand—*i.e.*, consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period. A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise prices without suffering a significant decrease in sales or profit.

394. The inelasticity of demand for eggs is widely acknowledged within the industry.

UEP president Gene Gregory told Egg Industry magazine in February 2007 that "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same." Agricultural economist Jada Thompson has similarly explained that egg buyers, including processors who use eggs as an input in other food products, have no substitute for what they need: "We demand eggs . . . in order to make the bread, they need eggs. In order to buy those eggs, there's a low supply, so they're going to keep bidding until they get those eggs." As Dr. Thompson observed, this dynamic—paired with high barriers to entry and expansion, as detailed *supra* at § I.A-C and *infra* at § II.C.viii—means that "Cal-Maine or any other company that is able to sell eggs during periods of high price [is] going to basically win out" by capturing additional profit from the only available supply.

395. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter."

396. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Defendants can elevate prices to artificially high levels with little concern that higher prices will materially reduce sales volume or diminish profits.

### vii. Defendants Have Numerous Opportunities to Collude

397. Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. The Egg Producer Defendants are members of UEP and the American Egg Board ("AEB"), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination. These opportunities to collude are simply additive to direct evidence of actual collusion, including email, text message, and phone call correspondence between and among

Defendants in which they conspired to fix prices, including through sham transactions and bid-rigging (as detailed elsewhere in this complaint).

398. For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

399. Moreover, employees of the Egg Producer Defendants have been on the board of UEP. Rose Acre's participation in UEP is revealing. For over thirty years, Rose Acre declined to join UEP. Then, in 2002, Rose Acre not only joined but immediately placed its then-CEO, David Rust, on the UEP Board—at the precise moment when the supply-restriction conduct that the jury later found unlawful in *Kraft Foods Global, Inc. v. United Egg Producers, Inc.* was taking hold. Rust explained that he wanted to serve on the board of directors so that he could get "a vote at the table." Rose Acre's sudden commitment to UEP governance coincided with its adoption of the UEP Certified supply-restriction program. In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

400. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in the *Kraft Foods* case was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs. UEP Certified is still in force today.

401. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre,

Daybreak, ███████████████████████████████████████████████. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development." Employees of Defendants have even been seen together at these conferences. Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a scheduled guest speaker at the conference. Finally, Defendants, including Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.

402. In addition to UEP and the Urner Barry Executive Conference, the World Egg Organization ("WEO") hosts an annual Global Leadership Conference that brings together the senior leadership of the world's largest egg producers. Marcus Rust, CEO of Defendant Rose Acre, was named WEO's International Egg Person of the Year at its September 2025 conference. These international forums provide Defendants with additional opportunities to communicate outside of domestic channels and to align on production and pricing strategy.

### viii. High Barriers to Entry Protect the Conspiracy from Competitive Discipline

403. Egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment. One industry source estimated that between permitting (one year or more), construction (approximately six months after building contracts have been issued), and stocking (roughly four months to raise a pullet flock), it can take up to two years before production of shell eggs can be expected from new housing. Potential new entrants would also need to displace longstanding customer relationships. Further, because of the

vertically-integrated nature of the largest egg producers, including with respect to breeding, packaging, processing, transportation, and sale to the largest retailers, reliance on or economic interdependence with one or more of the Egg Producer Defendants is a de facto requirement for a new or smaller producer of Commodity Shell Eggs. As a result, new entrants into the market are unlikely to discipline cartel pricing.

404. These figures are not hypothetical. A 2013 USDA report estimated that a typical Midwest multi-age, inline egg production facility housing 1.5 to 4.0 million laying hens requires a capital investment ranging from approximately $24 million (for a 1-million-hen operation) to $80 million (for a 4-million-bird complex). Consistent with those figures, Rose Acre broke ground in May 2023 on a new Arizona facility projected to cost $100 million, and Cal-Maine spent an estimated $54 to $67 million in 2023 to acquire Fassio Egg Farms and $110 million in 2024 to acquire the operations of ISE America. Further, scale economies among larger and more established producers cause smaller entrants to incur higher variable costs, even beyond the high capital costs of entry. When a market is protected by barriers to entry of this magnitude, conspirators can fix supracompetitive prices with little concern that new entrants will bid the price back down.

**DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS**

405. During the Class Period, Defendants continued to sell Commodity Shell Eggs to Plaintiffs and other putative Class Members at prices artificially inflated by Defendants' conspiracy. The artificial increases to the pricing of Commodity Shell Eggs set forth in this complaint had long-lasting and continuing effects that resulted in Class Members continuing to pay artificially inflated prices for Commodity Shell Eggs through the present. Furthermore, Class Members purchased Commodity Shell Eggs frequently and consistently throughout the Class

108

Period.

406. Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their conspiratorial agreement. This resulted in multiple coordinated effective price increases throughout the Class Period, as described in this complaint. Moreover, each of these activities resulted in new, overt acts that injured Plaintiffs and Class Members, thus creating a new cause of action for purposes of the statute of limitations.

407. In addition, each sale of Commodity Shell Eggs made to Plaintiffs or the putative Classes that was artificially inflated as a result of the conspiracy constituted a new, overt act that restarted the statute of limitations.

408. These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiffs and the other members of the proposed Classes.

409. As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- or estoppel-related arguments, Plaintiffs' claims and those of the putative Classes are not time-barred.

## TOLLING OF STATUTE OF LIMITATIONS

410. Plaintiffs and members of the proposed Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this action. Indeed, key evidence of the conspiracy and its members was only made public in late June 2026, when the Department of Justice and several state attorneys general filed suit against certain egg producers for antitrust

violations in United States, et al. v. Cal-Maine Foods, Inc., et al., No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), or provided to Plaintiffs through discovery in this litigation. And Plaintiffs and the Class Members had no knowledge at all of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when it was publicly revealed that the Department of Justice was investigating U.S. egg prices.

411. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the proposed Classes, including by coordinating in secret through text messages, phone calls, and emails between high-level executives of conspirators, see United States, et al. v. Cal-Maine Foods, Inc., et al., No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1, and by maintaining as confidential their trading and other activities meant to influence Urner Barry egg price benchmarks.

412. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs and members of the proposed Classes has been equitably tolled during the period of such fraudulent concealment, at least until March 2025 if not shortly prior to the filing of this consolidated complaint.

## CLASS ACTION ALLEGATIONS

413. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of consumer indirect purchasers seeking injunctive relief (the "Nationwide Consumer Indirect Purchaser Class" or "Nationwide Class") defined as follows:

> All persons and entities in the United States and Puerto Rico who indirectly purchased Commodity Shell Eggs from the Egg Producer Defendants or their co-conspirators for non-commercial purposes from January 1, 2022, until such time that the adverse effects of

Defendants' anticompetitive conduct cease.

414. Plaintiffs also bring this action on behalf of themselves, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Consumer Indirect Purchaser Class" or "State Law Class"):

> All persons and entities who indirectly purchased Commodity Shell Eggs from the Egg Producer Defendants or their co-conspirators for non-commercial purposes in Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and/or Puerto Rico from January 1, 2022 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

415. Specifically excluded from the Nationwide Consumer Indirect Purchaser Class and State Law Consumer Indirect Purchaser Class (collectively "Classes") are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; and any government entity. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

416. Plaintiffs reserve the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

417. **Numerosity**: The members of the Consumer Indirect Purchaser Classes are so numerous that joinder of all members would be impracticable. The exact number of class members in the Consumer Indirect Purchaser Classes is unknown to Plaintiffs at this time, but it is estimated to be in the millions. The members of the Consumer Indirect Purchaser Classes should be readily

identifiable from existing records.

418. **Typicality**: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Commodity Shell Eggs indirectly from one or more of the Defendants for non-commercial purposes, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes. Plaintiffs allege injuries that are not unique to them but are typical of members of each of the Classes, including measures of damages and/or nominal damages.

419. **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

a. Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of Commodity Shell Eggs in the United States;

b. Whether such combination or conspiracy constituted violations of the Sherman Antitrust Act;

c. Whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

d. Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Consumer Indirect Purchaser Classes;

e. Whether Defendants caused Plaintiffs and the members of the Consumer Indirect Purchaser Classes to suffer damages in the form of overcharges on Commodity Shell Eggs indirectly purchased from the Defendants or their producing co-conspirators;

f. The effect of Defendants' conspiracy on Commodity Shell Eggs sold in the United States during the Class Period;

g. The identity of the participants of the alleged conspiracy;

h. The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

i. Whether Defendants fraudulently concealed their misconduct;

j. Whether Defendants' anticompetitive scheme inflated prices of Commodity Shell Eggs above competitive levels;

k. The appropriate measure of classwide damages for the Consumer Indirect Purchaser Classes; and

l. The nature and scope of injunctive relief necessary to restore competition in the Commodity Shell Eggs market.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

420. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes who indirectly purchased Commodity Shell Eggs for non-commercial purposes during the Class Period and Plaintiffs have retained competent counsel experienced in the prosecution of class actions and antitrust litigation to represent them and the Classes.

421. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons with a method for obtaining redress on claims that could not practicably be pursued individually. Moreover, the prosecution of separate actions by individual members of the Consumer Indirect Purchaser Classes would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants. Plaintiffs know of no manageability or other issues that would preclude maintenance of this case as a class action.

422. **Common Grounds for Injunctive Relief:** Defendants have taken actions that generally impact the Classes in a consistent manner so that final injunctive relief is appropriate for the Classes collectively under Fed. R. Civ. P. 23(b)(2).

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

423. Defendants' anticompetitive conduct, including their conspiracy and overt acts in furtherance of the conspiracy, had the following effects, among others:

    A.    Competition, including price competition, was restrained or eliminated with respect to Commodity Shell Eggs;

    B.    The prices of Commodity Shell Eggs were fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.    Consumer Indirect Purchasers of Commodity Shell Eggs, including Plaintiffs and the Class Members, were deprived of free and open competition; and

    D.    Consumer Indirect Purchasers of Commodity Shell Eggs, including Plaintiffs and the Class Members, paid artificially inflated prices.

424. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of Commodity Shell Eggs. As a direct and foreseeable result, Plaintiffs and the Class Members paid supracompetitive prices for Commodity Shell Eggs during the Class Period.

425. Defendants' violations of the antitrust laws caused Plaintiffs and the Class Members to pay artificially inflated prices for Commodity Shell Eggs that exceeded the prices that would have prevailed in a competitive market, absent Defendants' conspiracy.

426. The price effects of Defendants' conduct particularly impacted the Consumer

Indirect Purchaser Class Members in this case, who had no choice but to pay higher prices for Commodity Shell Eggs they were unable to purchase or acquire elsewhere.

427. Egg prices have risen sharply since early 2022. Wholesale prices for Grade-A, Large, White Shell Eggs, which generally ranged from about $0.50 to $1.30 per dozen in 2021, climbed to roughly $1.50 to $5.00 per dozen in 2022. Although prices eased somewhat in 2023, that decline was temporary. By August 2024, prices began increasing again, reaching approximately $3.00 to $6.00 per dozen by the end of the year. By January 2025, the national weekly price index for Grade-A, Large eggs had climbed even higher, reaching about $6.00 to $8.00 per dozen.

428. At the same time, retail prices also surged. For much of the 2010s, retail egg prices remained relatively stable, typically averaging between $1.50 and $2.00 per dozen. That stability began to break down in early 2022. By December 2022, the average retail price had climbed to $4.25 per dozen, then rose further to $4.83 per dozen in January 2023. Prices eased during parts of 2023, but the decline did not last. By December 2024, the average retail price had increased again to $4.15 per dozen, reinforcing the broader upward pressure on egg prices.

429. Stew Leonard, Jr., owner of the Stew Leonard's grocery store chain, explained that in December of 2024, his stores were selling a dozen eggs for $10.

430. In February of 2025, a Florida news outlet quoted one grocery store shopper exclaiming, "I just bought eggs and it's crazy. The prices are ridiculous, you can't afford it going up."

431. The conspiracy alleged in this complaint, and the actions of the members of that conspiracy, including Defendants, directly and proximately caused an overcharge in Commodity Shell Egg Prices during the Class Period, which overcharge was paid by Plaintiffs and the

Consumer Indirect Class Members, who were thereby injured in their property due to Defendants' unlawful conduct.

432. By reason of Defendants' violations of the antitrust laws as alleged in this complaint, Plaintiffs and the Consumer Indirect Purchaser Class Members sustained injury to their property, having paid higher prices for Commodity Shell Eggs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy.

433. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

434. Defendants' price fixing conspiracy is per se unlawful, and its anticompetitive effects are therefore presumed without regard to any procompetitive justification that may be offered by Defendants.

## CLAIMS FOR RELIEF

### COUNT 1
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

435. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

436. Egg Producing Defendants are direct competitors in the Commodity Shell Eggs market throughout the United States.

437. Beginning as early as January 1, 2022, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, and until such time that the adverse effects of Defendants' anticompetitive conduct cease, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy to unlawfully and unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, by artificially reducing or eliminating competition for the pricing of Commodity Shell Eggs. The

agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices of Commodity Shell Eggs in the United States. Pursuant to the agreement, Defendants agreed to—and did— manipulate the egg industry pricing indices in a manner that distorted and suppressed competition, knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Commodity Shell Eggs sold to Plaintiffs and Consumer Indirect Purchaser Class Members.

438. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

439. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Commodity Shell Eggs throughout the United States to be higher than they otherwise would have been in a competitive market.

440. Defendants' conspiratorial acts caused unreasonable restraints in the market for Commodity Shell Eggs.

441. As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Nationwide Class were harmed by being forced to pay inflated, supracompetitive prices for Commodity Shell Eggs.

442. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition for Commodity Shell Eggs was restrained, suppressed, and/or eliminated in the United States;

117

B. Prices for Commodity Shell Eggs sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs and members of the Nationwide Class were deprived of the benefits of free and open competition in the purchase of Commodity Shell Eggs.

443. Defendants took all the actions alleged in this complaint with the knowledge and intended effect that their actions would proximately cause the price of Commodity Shell Eggs to be higher than it would be, but for Defendants' conduct.

444. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Nationwide Class were injured in their business or property and will continue to be injured in their business and property by paying more for Commodity Shell Eggs than they would have paid and will pay in the absence of the conspiracy. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS

445. Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein, excluding the causes of action, into each of the state-specific causes of action described below.

446. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

447. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including

agreeing to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs which injured Plaintiffs and members of the State Law Class.

448. Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize Commodity Shell Eggs prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the State Law Class were deprived of free and open competition and paid more to purchase Commodity Shell Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

449. In addition, Defendants profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the State Law Class.

450. Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunctive relief (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

451. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust and consumer protection statutes.

**COUNT 2: ARIZONA**
**VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. §§ 44-1401, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Arizona)**

452. Plaintiffs incorporate by reference the allegations in the preceding paragraphs,

excluding causes of action.

453. Plaintiffs purchased Commodity Shell Eggs within the State of Arizona during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

454. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Egg Market, a substantial part of which occurred within Arizona, in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq*.

455. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Egg Market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Egg market.

456. Defendants' conspiracies had the following effects in Arizona: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Arizona by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

457. During the Class Period, Defendants' illegal conduct substantially affected Arizona trade and commerce. Defendants' violations of Arizona law were flagrant and willful. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the State Law Class have been injured in their business or property and are threatened with further injury.

120

Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

**COUNT 3: ARKANSAS**
**VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT,**
**ARK. CODE ANN. §§ 4-88-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Arkansas)**

458.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

459.    Plaintiffs purchased Commodity Shell Eggs within the State of Arkansas during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

460.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Arkansas, in violation of the Arkansas Deceptive Trade Practices Act, ARK. CODE ANN. §§ 4-88-101, *et seq*.

461.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs market.

462.    Defendants' conspiracy had the following effects in Arkansas: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of Commodity Shell Eggs in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce.

463. Defendants' conduct was willful.

464. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs have been injured in their business or property and are threatened with further injury.

465. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until shortly before the filing of this complaint, and March 2025 at the earliest, Plaintiffs did not discover, and could not in the exercise of reasonable diligence have discovered, their injury or that Defendants' unlawful conduct likely caused such injury.

466. Defendants' conspiracy unlawfully misleads consumers into believing the price of Commodity Shell Eggs sold in Arkansas was the result of a free market and Defendants' conduct is substantively unfair, unconscionable, or deceptive because it unfairly benefits Defendants at the expense of Plaintiffs and members of the Class. ARK. CODE ANN. § 4-88-107.

467. Accordingly, Plaintiffs and members of the State Law Class seek all available relief under ARK. CODE ANN. §§ 4-88-101, *et seq*., resulting from Defendants' deceptive and unconscionable trade practices, including actual damages plus reasonable attorney's fees under Ark. Code Ann. § 4-88-113.

**COUNT 4: CALIFORNIA**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16700, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in California)**

468. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

469. The California Business & Professions Code generally governs conduct of corporate entities. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

470. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

471. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. Cal. Bus. & Prof. Code § 16750(a).

472. Plaintiffs purchased Commodity Shell Eggs within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

473. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720.

474. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*.

475. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of Commodity Shell Eggs at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Commodity Shell Eggs.

476. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts,

practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Commodity Shell Eggs.

477. The combination and conspiracy alleged herein has had, *inter alia*, the following effects in California: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class paid supracompetitive, artificially inflated prices for Commodity Shell Eggs.

478. This combination and conspiracy constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§ 16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of Commodity Shell Eggs "shall be...controlled or established" (§ 16720(d)). Defendants' violations of California law were flagrant and willful. The State Law Class has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

479. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the State Law Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

## COUNT 5: CALIFORNIA
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in California)

480. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

481. The violations of federal antitrust law set forth above also constitute violations of §§ 17200, *et seq.* of California Business and Professions Code.

482. Plaintiffs purchased Commodity Shell Eggs within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

483. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

484. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200.

485. During the Class Period, Defendants manufactured, marketed, sold, or distributed Commodity Shell Eggs in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.*, by engaging in the acts and practices specified above.

486. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, set forth above; (3) Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and whether or not concerted or

independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (4) Defendants' acts or practices that were or are unfair to purchasers of Commodity Shell Eggs in the State of California within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (4) Defendants' acts and practices that were or are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

487.    Plaintiffs and members of the State Law Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the State Law Class to pay supracompetitive and artificially inflated prices for Commodity Shell Eggs. Plaintiffs and the members of the State Law Class suffered injury in fact and lost money or property as a result of such unfair competition.

488.    As alleged in this complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the State Law Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code §§ 17203 and 17204.

489.    With respect to the equitable remedies available under Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Plaintiffs and the Class Members lack adequate remedies at law such that these remedies are available to them in equity under California and United States law, including under

Article III of the United States Constitution and the Judiciary Act of 1789.

**COUNT 6: COLORADO**
**VIOLATION OF THE COLORADO ANTITRUST ACT,**
**COLO. REV. STAT. §§ 6-4-101,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in**
**Colorado)**

490. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

491. Plaintiffs purchased Commodity Shell Eggs within the State of Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

492. As a direct and proximate result of Defendants' continuing violations of the Colorado Antitrust Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the Colorado Antitrust Act was designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful.

493. Defendants have conspired in violation of C.R.S. § 6-4-104, including by conspiring to fix prices of Commodity Shell Eggs. This offense is likely to continue to recur unless the relief requested is granted.

494. Defendants have further conspired to rig a bid for the provision of a commodity or service within the meaning of C.R.S. § 6-4-106.

495. Defendants have entered into an unlawful agreement in restraint of trade in the Commodity Shell Eggs Market in violation of the Colorado Antitrust Act, COLO. REV. STAT. §§ 6-4-101, *et seq.* Defendants' conspiracy had the following effects in Colorado: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Colorado; (2) prices of Commodity Shell Eggs in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and

open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

496. Plaintiffs and members of the State Law Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the State Law Class to pay supracompetitive and artificially inflated prices for Commodity Shell Eggs.

497. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Col. Rev. Stat. §§ 6-4-104, *et seq.*

**COUNT 7: COLORADO**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,**
**COLO. REV. STAT. §§ 6-1-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Colorado)**

498. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

499. Plaintiffs purchased Commodity Shell Eggs within the State of Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

500. The Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq.*, prohibits knowingly engaging in any "unfair," "unconscionable," or "deceptive" practice. Colo. Rev. Stat. § 6-1-105(rr).

501. Under Colorado law, indirect purchasers have standing to maintain an action under the Consumer Protection Act based on the facts alleged in this complaint. Colo. Rev. Stat. § 6-1-

113 ("An action under this section shall be available to any person who . . . (a) [i]s an actual or potential consumer of the defendant's goods . . . [or] (c) [i]n the course of the person's business or occupation, is injured as a result of such deceptive trade practice").

502. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs Market. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market for the purpose of excluding competition or controlling, fixing, or maintaining prices in Colorado at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

503. Accordingly, Defendants' conduct was an unconscionable, unfair, and deceptive practice that affected commerce within the State of Colorado.

504. As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the State Law Class have been injured in their business or property by virtue of overcharges for Commodity Shell Eggs and are threatened with further injury.

505. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Revised Statutes §§ 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 8: CONNECTICUT**
**VIOLATION OF THE CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. §§ 35-24, *et seq.* and CONNECTICUT UNFAIR TRADE**
**PRACTICES ACT, CONN. GEN. STAT. §§ 42-110b, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in**
**Connecticut)**

506. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

507.     Plaintiffs purchased Commodity Shell Eggs within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

508.     Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.*, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

509.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut's Antitrust Act, Conn. Gen. Stat. Ann. §§ 35-24, *et seq*. Defendants' conspiracies had the following effects in Connecticut: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Connecticut by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Defendants' violations of Connecticut law were flagrant and willful.

510.     Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well-being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.

511.     Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-24, *et seq*.

512.     Further, Defendants' acts and practices as alleged herein constitute unfair

methods of competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

513. The conduct complained-of here by Defendants represents unfair methods of competition under CUTPA, which injured Plaintiffs and members of the State Law Class in that they suffered a measurable financial loss through the overcharge on Commodity Shell Eggs caused by Defendants' unlawful and unfair competition.

514. Plaintiffs and members of the State Law Class seek all forms of relief available under CUTPA, Conn. Gen. Stat. § 42-110b, including actual damages, punitive damages (to the extent available), attorneys' fees, and injunctive relief to halt illegal market behavior.

**COUNT 9: DISTRICT OF COLUMBIA**
**VIOLATION OF DISTRICT OF COLUMBIA CODE §§ 28-4501, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in the District of Columbia)**

515. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

516. The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

517. Plaintiffs purchased Commodity Shell Eggs within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

518. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

519. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for Commodity Shell Eggs within the District of Columbia, in violation of D.C. Code §§ 28-4501, *et seq*.

520. Defendants have entered into an unlawful agreement in restraint of trade within the District of Columbia in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq*. Defendants' conspiracies had the following effects in the District of Columbia: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in the District of Columbia by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

521. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. Defendants' violations of District of Columbia law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq*.

### COUNT 10: DISTRICT OF COLUMBIA
### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT, D.C. CODE §§ 28-3901, *et seq*.
#### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in the District of Columbia)

522. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

523. Plaintiffs purchased Commodity Shell Eggs within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

132

524. Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

525. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within the District of Columbia.

526. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs Market.

527. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

528. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

529. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the State Law Class have been injured in their business or property and are threatened with further injury.

530. Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct by the affirmative actions described herein which were designed to prevent the discovery of such unlawful conduct and the Plaintiffs in the District of Columbia did not discover and could not discover the unlawful conduct prior to January 1, 2022.

531. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §§ 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 11: FLORIDA**
**VIOLATION OF**
**THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. §§ 501.201, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Florida)**

532.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

533.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

534.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2). The members of the State Law Class are covered by this statute.

535.     A claim for damages under the FDUTPA has three elements:(1) a prohibited practice; (2) causation; and (3) actual damages.

536.     Plaintiffs purchased Commodity Shell Eggs within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

537.     Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Florida.

538.     Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Commodity Shell Eggs, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than

the competitive market level, beginning at least as early as 2022 and continuing through the date of this filing.

539. Defendants engaged in unfair methods of competition, entering into an unlawful agreement in restraint of trade in violation of the FDUTPA, Fla. Stat. §§ 501.201, *et seq*. Defendants' conspiracies had the following effects in Florida: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Florida by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce.

540. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the State Law Class have been injured in their business or property by virtue of overcharges for Commodity Shell Eggs and are threatened with further injury.

541. Defendants' violations of Florida law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Fla. Stat. §§ 501.201, *et seq*.

**COUNT 12: HAWAII**
**VIOLATION OF HAWAII ANTITRUST LAW,**
**HAW. REV. STAT. ANN. §§ 480-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Hawaii)**

542. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

543. Plaintiffs purchased Commodity Shell Eggs within the State of Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs

would have been lower, in an amount to be determined at trial.

544. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

545. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. Ann. §§ 480-1, *et seq*. Defendants' conspiracies had the following effects in Hawaii: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Hawaii by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Defendants' violations of Hawaii law were flagrant and willful.

546. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the State Law Class have been injured and are threatened with further injury.

547. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Haw. Rev. Stat. Ann. §§ 480-1, *et seq*.

**COUNT 13: ILLINOIS**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. §§ 10/1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Illinois)**

548. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

549. The Illinois Antitrust Act, 740 ILCS §§ 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of

trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS § 10/2.

550. Plaintiffs purchased Commodity Shell Eggs within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

551. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILCS § 10/7(2).

552. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS §§ 10/1, *et seq*. Defendants' conspiracies had the following effects in Illinois: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Illinois by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

553. Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for Commodity Shell Eggs sold, and/or for allocating customers or markets for Commodity Shell Eggs within the intrastate commerce of Illinois.

554. Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for Commodity Shell Eggs in Illinois for the purpose of excluding competition, in violation of 740 ILCS §§ 10/1, *et seq*.

555. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Defendants' violations of Illinois law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under 740 ILCS §§ 10/1, *et seq*.

**COUNT 14: ILLINOIS**
**VIOLATION OF**
**THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,**
**815 ILL. COMP. STAT. ANN. §§ 505/1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Illinois)**

556. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

557. Plaintiffs purchased Commodity Shell Eggs within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

558. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Illinois.

559. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs Market.

560. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the State Law Class.

561. Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

562. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

563.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the State Law Class have been injured in their business or property and are threatened with further injury. The members of the State Law Class are within the scope of the Illinois statute.

564.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. §§ 505/1, *et seq.*, and 720 Ill. Comp. Stat. §§ 295/1a, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under these statutes.

<u>**COUNT 15: IOWA**</u>
**VIOLATION OF THE IOWA COMPETITION LAW, IOWA CODE §§ 553.1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Iowa)**

565.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

566.    Plaintiffs purchased Commodity Shell Eggs within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

567.    Defendants contracted, combined or conspired to restrain or monopolize trade in the market for Commodity Shell Eggs, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for Commodity Shell Eggs, in violation of Iowa Code §§ 553.1, *et seq*.

568.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq*. Defendants' conspiracies had the following effects in Iowa: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were

139

injured in their business or property in Iowa by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

569. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Defendants' violations of Iowa law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

## COUNT 16: KANSAS
## VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,
## KAN. STAT. ANN. §§ 50-101, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Kansas)

570. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

571. The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

572. Plaintiffs purchased Commodity Shell Eggs within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

573. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. Kan. Stat. Ann. § 50-161(b).

574. Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of Commodity Shell Eggs, increasing the price of Commodity Shell Eggs, preventing competition in the sale of Commodity Shell Eggs, or binding themselves not to sell Commodity Shell Eggs, in a manner that established the price of Commodity Shell Eggs and precluded free and unrestricted competition among themselves in the sale of Commodity Shell

Eggs, in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*

575. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* Defendants entered into arrangements, contracts, agreements, trusts, or combinations made with a view toward preventing or which tend to prevent full and free competition for the provision of Commodity Shell Eggs. Defendants' conspiracies had the following effects in Kansas: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commmodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Kansas by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

576. Defendants' violations of Kansas law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq.*

**COUNT 17: MAINE**
**VIOLATION OF THE MAINE ANTITRUST STATUTE,**
**ME. STAT. TIT. 10, §§ 1101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Maine)**

577. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

578. Plaintiffs purchased Commodity Shell Eggs within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

579. Under Maine law, indirect purchasers have standing to maintain an action based on

the facts alleged in this complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

580. Defendants contracted, combined, or conspired in restraint of trade or commerce of Commodity Shell Eggs within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of Commodity Shell Eggs within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*

581. Defendants' conspiracies had the following effects in Maine: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Maine by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

582. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Defendants' violations of Maine law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

**COUNT 18: MARYLAND**
**VIOLATION OF THE MARYLAND ANTITRUST ACT,**
**MD. CODE §§ 11-209(a), *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Maryland)**

583. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

584. Plaintiffs purchased Commodity Shell Eggs within the State of Maryland during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

585. Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

586.    Defendants' conspiracies had the following effects in Maryland: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Maryland by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

587.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Defendants' violations of Maryland law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Md. Code Ann., Com. Law §§ 11-201, *et seq*.

**COUNT 19: MASSACHUSETTS**
**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW,**
**MASS. GEN. LAWS ANN. Ch. 93A §§ 1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Massachusetts)**

588.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

589.    Plaintiffs purchased Commodity Shell Eggs within the State of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

590.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Commodity Shell Eggs, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs market.

591. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts.

592. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

593. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A §§ 1, *et seq*. Defendants' conspiracies had the following effects in Massachusetts: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Massachusetts by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Defendants' violations of Massachusetts law were flagrant and willful.

594. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Mass. Gen. Laws Ch. 93A §§ 1, *et seq*.

### COUNT 20: MICHIGAN
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS §§ 445.771, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Michigan)

595. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

596. Plaintiffs purchased Commodity Shell Eggs within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs

would have been lower, in an amount to be determined at trial.

597. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws § 445.778(2).

598. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq*. Defendants' conspiracies had the following effects in Michigan: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Michigan by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

599. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Defendants' violations of Michigan law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Mich. Comp. Laws §§ 445.771, et seq.

**COUNT 21: MICHIGAN**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT,**
**MICH. COMP. LAWS §§ 445.903, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Michigan)**

600. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

601. Plaintiffs purchased Commodity Shell Eggs within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

602. Defendants engaged in unfair, unconscionable, and deceptive acts that had the goal,

purpose, and effect of maintaining supracompetitive prices for Commodity Shell Eggs.

603. Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Michigan in violation of Michigan Compiled Laws §§ 445.903, *et seq*. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under the relevant statute.

### COUNT 22: MINNESOTA
### VIOLATION OF THE MINNESOTA ANTITRUST LAW,
### MINN. STAT. §§ 325D.49, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Minnesota)

604. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

605. Plaintiffs purchased Commodity Shell Eggs within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

606. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. Minn. Stat. § 325D.56.

607. Defendants have entered into an unlawful agreement in restraint of trade or commerce in the market for Commodity Shell Eggs within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Commodity Shell Eggs within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Commodity Shell Eggs within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. §§ 325D.49, *et seq*.

608. Defendants' conspiracies had the following effects in Minnesota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2)

Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Minnesota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

609. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Defendants' violations of Minnesota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Minn. Stat. §§ 325D.49, *et seq*.

**COUNT 23: MINNESOTA**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT,**
**MINN. STAT. §§ 325D.43,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Minnesota)**

610. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

611. Plaintiffs purchased Commodity Shell Eggs within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

612. Defendants' actions were willful.

613. By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein. Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

614. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Minnesota Statutes §§ 325D.43-48, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 24: MISSISSIPPI**
**VIOLATION OF THE MISSISSIPPI ANTITRUST LAW,**
**MISS. CODE ANN. §§ 75-21-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in**
**Mississippi)**

615. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

616. Plaintiffs purchased Commodity Shell Eggs within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

617. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this complaint. Miss. Code Ann. § 75-21-9.

618. Defendants combined, contracted, understood and agreed in the market for Commodity Shell Eggs, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Commodity Shell Eggs and hindering competition in the sale of Commodity Shell Eggs, in violation of Miss. Code Ann. §§ 75-21-1(a), *et seq*.

619. Defendants monopolized or attempted to monopolize the production, control or sale of Commodity Shell Eggs, in violation of Miss. Code Ann. §§ 75-21-3, *et seq*.

620. Defendants' conspiracies had the following effects in Mississippi: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Mississippi by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

621. During the Class Period, Defendants' illegal conduct substantially affected

Mississippi commerce. Defendants' violations of Mississippi law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Miss. Code Ann. §§ 75-21-3, *et seq*.

**COUNT 25: MISSOURI**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,**
**Mo. Ann. Stat. §§ 407.010, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Missouri)**

622. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

623. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

624. Plaintiffs and State Law Class members purchased Commodity Shell Eggs within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of these Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

625. Under Missouri law, indirect purchasers have standing to maintain an action under MMPA based on the facts alleged in this complaint.

626. Defendants contracted, combined, or conspired in restraint of trade or commerce of Commodity Shell Eggs within the intrastate commerce of Missouri, including through agreements to fix prices, allocate markets, or otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq*.

627. Plaintiffs and members of the State Law Class were injured with respect to purchases of Commodity Shell Eggs in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount that bears a reasonable relation to the actual

damages which have been sustained, as well as reasonable attorney's fees, costs, and injunctive relief.

**COUNT 26: MONTANA**
**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,**
**MONT. CODE §§ 30-14-101,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in**
**Montana)**

628. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

629. Plaintiffs purchased Commodity Shell Eggs within the State of Montana during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

630. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101, *et seq*. Defendants' conspiracies had the following effects in Montana: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Montana by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

631. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce. Defendants' violations of Montana law were flagrant and willful.

632. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the State Law Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et seq.* Accordingly, Plaintiffs and

150

members of the State Law Class seek all forms of relief available under Mont. Code Ann. §§ 30-14-101, *et seq*.

**COUNT 27: NEBRASKA**
**VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. §§ 59-801,** *et seq*.
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Nebraska)**

633. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

634. Plaintiffs purchased Commodity Shell Eggs within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

635. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this complaint. Neb. Rev. Stat. § 59-821.

636. Defendants contracted, combined or conspired in restraint of trade or commerce of Commodity Shell Eggs within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Commodity Shell Eggs within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. §§ 59-801, *et seq*.

637. Defendants' conspiracies had the following effects in Nebraska: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Nebraska by paying supracompetitive, artificially inflated prices for Commodity

151

Shell Eggs.

638. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Defendants' violations of Nebraska law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class were injured with respect to purchases of Commodity Shell Eggs in Nebraska and seek all forms of relief available under Neb. Rev. Stat. §§ 59-801, *et seq*.

<u>**COUNT 28: NEBRASKA**</u>
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. §§ 59-1601, *et seq*.**
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in Nebraska)**

639. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

640. Plaintiffs purchased Commodity Shell Eggs within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

641. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*.

642. Defendants' unlawful conduct had the following effects: (1) Commodity Shell Eggs price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska.

643. During the Class Period, Defendants marketed, sold, or distributed Commodity Shell Eggs in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and Commodity Shell Eggs purchasers. Defendants have engaged in unfair competition

or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

<u>COUNT 29: NEVADA</u><br>
<b>VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,<br>
NEV. REV. STAT. §§ 598A, <i>et seq.</i><br>
(On Behalf of Class Members that Purchased Commodity Shell Eggs in Nevada)</b>

644. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

645. Plaintiffs purchased Commodity Shell Eggs within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

646. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

647. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* Defendants' conspiracies had the following effects in Nevada: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Nevada by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

648. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Defendants' violations of Nevada law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available

under Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

649. In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.

**COUNT 30: NEVADA**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. §§ 598.0903, *et seq*.**
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in Nevada)**

650. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

651. Plaintiffs purchased Commodity Shell Eggs within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

652. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nevada Revised Statutes Annotated §§ 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

653. Defendants fixed prices by agreeing to establish prices for Commodity Shell Eggs in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of Commodity Shell Eggs within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598.0903, *et seq*.

654. Plaintiffs and members of the Class were injured with respect to purchases of Commodity Shell Eggs in Nevada in that at least thousands of sales of Defendants' Commodity Shell Eggs took place in Nevada, purchased by Nevada purchasers at supracompetitive prices caused by Defendants' conduct.

655. Accordingly, Plaintiffs and members of the State Law Class are entitled to all forms

of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

<strong><u>COUNT 31: NEW HAMPSHIRE</u><br>VIOLATION OF THE NEW HAMPSHIRE ANTITRUST LAW,<br>N.H. REV. STAT. ANN. §§ 356:1, <em>et seq.</em><br>(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Hampshire)</strong>

656. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

657. Plaintiffs purchased Commodity Shell Eggs within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

658. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. N.H. Rev. Stat. Ann. § 356:11(II).

659. Defendants fixed, controlled, or maintained prices for Commodity Shell Eggs, allocated customers or markets for Commodity Shell Eggs, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. §§ 356:1, *et seq.* Defendants' conspiracies had the following effects in New Hampshire: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New Hampshire by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

660. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Defendants' violations of New Hampshire law were flagrant and willful.

Plaintiffs and members of the State Law Class were injured with respect to purchases of Commodity Shell Eggs in New Hampshire. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.H. Rev Stat. Ann. §§ 356:1, *et seq.*

**COUNT 32: NEW HAMPSHIRE**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. §§ 358-A:1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Hampshire)**

661. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

662. Plaintiffs purchased Commodity Shell Eggs within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

663. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within New Hampshire.

664. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

665. Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

666. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

667. Defendants' conduct was willful and knowing.

668. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members of the State Law Class's ability to protect themselves.

669. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

670. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

671. Accordingly, Plaintiffs and members of the State Law Class seek all relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

<u>**COUNT 33: NEW JERSEY**</u>
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT,**
**N.J. STAT. ANN. §§ 56:9-3, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Jersey)**

672. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

673. Plaintiffs purchased Commodity Shell Eggs within the State of New Jersey during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

674. Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. §§ 56:9-1, *et seq*., in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. 56:9-3.

675. Defendants' conspiracy detrimentally affected the price competition for Commodity Shell Eggs purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Commodity Shell Eggs prices in the State of New Jersey at artificially high levels.

During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

676. Defendants engaged in a conspiracy in restraint of the trading of Commodity Shell Eggs in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3. Accordingly, Plaintiffs and members of the State Law Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. Stat. Ann. § 56:9-12.

**COUNT 34: NEW JERSEY**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. STAT. ANN. §§ 56:8-2,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Jersey)**

677. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

678. Plaintiffs purchased Commodity Shell Eggs within the State of New Jersey during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

679. Defendants' actions as alleged herein violate the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*, in that Defendants made misleading statements, omitted material facts and engaged in unconscionable commercial practices in connection with the advertising, offering for sale, and sale of Commodity Shell Eggs. N.J.S.A. 56:8-2.

680. Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of New Jersey in violation of N.J. Stat. Ann. §§ 56:8-2, *et seq*. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under the relevant statute.

158

**VIOLATION OF THE NEW MEXICO ANTITRUST LAW,
N.M. STAT. ANN. §§ 57-1-1, *et seq*.
(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New
Mexico)**

681. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

682. Plaintiffs purchased Commodity Shell Eggs within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

683. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. N.M. Stat. Ann. § 57-1-3.

684. Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for Commodity Shell Eggs within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq*.

685. Defendants' conspiracies had the following effects in New Mexico: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New Mexico by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

686. Defendants' violations of New Mexico law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Mexico)**

687. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

688. Plaintiffs purchased Commodity Shell Eggs within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

689. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within New Mexico.

690. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs Market.

691. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

692. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the State Law Class.

693. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

694. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by the New Mexico class members and the price paid by them for Commodity Shell Eggs as set forth in N.M. Stat.

160

Ann. § 57-12-2E.

695. Defendants' conduct was willful.

696. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

697. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes Annotated §§ 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 37: NEW YORK**
**VIOLATION OF THE DONNELLY ACT, N.Y. GEN. BUS. LAW §§ 340, *et seq.***
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in New York)**

698. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

699. Plaintiffs purchased Commodity Shell Eggs within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

700. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. N.Y. Gen. Bus. Law § 340(6).

701. Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Commodity Shell Eggs and restrained competition in the free exercise of the conduct of the business of Commodity Shell Eggs within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*. Defendants' conspiracies had the following effects in New York: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State

Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New York by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

702. The conduct set forth above is a *per se* violation of the Donnelly Act, §§ 340, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. Defendants' violations of New York law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

**COUNT 38: NORTH CAROLINA**
**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. §§ 75-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in North Carolina)**

703. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

704. Plaintiffs purchased Commodity Shell Eggs within the State of North Carolina during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

705. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

706. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

707. Defendants have entered into an unlawful agreement in restraint of trade in violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq*.

Defendants' conspiracies had the following effects in North Carolina: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in North Carolina by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

708. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury. Defendants' violations of North Carolina law were flagrant and willful.

709. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.C. Gen. Stat. Ann. §§ 75-1, *et seq*.

**COUNT 39: NORTH DAKOTA**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE §§ 51-08.1 *et seq.*, and NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE §§ 51-10 *et seq.*
(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in North Dakota)**

710. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

711. Plaintiffs purchased Commodity Shell Eggs within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

712. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. N.D. Cent. Code § 51-08.1-08.

713. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the Commodity Shell Eggs market.

714. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

715. Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

716. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

717. Defendants' conduct was willful.

718. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

719. Defendants' conspiracies had the following effects in North Dakota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in North Dakota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

720. In accordance with the above, Defendants violated the North Dakota Uniform State Antitrust Act, N.D. Cent. Code. §§ 51-08.1 *et seq.*

721. Defendants' violations of North Dakota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.D. Cent. Code §§ 51-08.1-01 *et seq.*

722. In engaging in the conspiracy alleged herein, Defendants engaged in unfair and deceptive trade practices with the intent to injure competitors and consumers and obtain supracompetitive profits, in violation of the North Dakota Unfair Trade Practices Law, N.D. Cent. Code §§ 51-10, *et seq.*

723. Plaintiffs and members of the State Law Class were injured by this conduct within the meaning of the N.D. Unfair Trade Practices Law, and seek all remedies available to them under N.D. Cent. Code §§ 51-10, *et seq.*

**<u>COUNT 40: OREGON</u>**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. §§ 646.725 *et seq.***
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in Oregon)**

724. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

725. Plaintiffs purchased Commodity Shell Eggs within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

726. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this complaint. Or. Rev. Stat. § 646.780(1)(a).

727. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.725 *et seq.* Defendants' conspiracies had the following effects in Oregon: (1) price competition for Commodity Shell Eggs was

restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Oregon by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

728. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. Defendants' violations of Oregon law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.725, *et seq*.

**COUNT 41: OREGON**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. §§ 646.605, *et seq*.**
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in Oregon)**

729. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

730. Plaintiffs purchased Commodity Shell Eggs within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

731. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within Oregon.

732. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

733. Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce. The members of the State Law Class are within the scope of the Oregon statute.

734. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

735. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members of the State Law Class's ability to protect themselves.

736. Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

737. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

738. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Revised Statutes §§ 646.605, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

739. Pursuant to § 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this complaint is being served upon the Attorney General of Oregon.

**COUNT 42: PUERTO RICO**
**VIOLATION OF THE PUERTO RICO ANTITRUST ACT,**
**PR. LAWS ANN. TIT. 10, CH. 13, §§ 257, *et seq*.**
**(On Behalf of Class Members that Purchased Commodity Shell Eggs in Puerto Rico)**

740. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

741. Plaintiffs purchased Commodity Shell Eggs within the State of Puerto Rico during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs

would have been lower, in an amount to be determined at trial.

742. Defendants' actions violated P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq.*, through their anticompetitive actions. Through their actions and the actions of co-conspirators, Commodity Shell Eggs prices in Puerto Rico were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and members of the State Law Class. Throughout the Class Period, price competition in the market for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Puerto Rico. Plaintiffs and members of the State Law Class, including those who resided in Puerto Rico and purchased Commodity Shell Eggs there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in Puerto Rico.

743. Each Defendant contracted, combined, and conspired in restraint of trade of Commodity Shell Eggs within Puerto Rico, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly in the trade of Commodity Shell Eggs for the purpose of excluding competition or controlling, fixing, or maintaining prices within Puerto Rico, in violation of 10 L.P.R.A. §§ 257, *et seq*.

744. Defendants entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10, ch. 13, § 258. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq*.

**COUNT 43: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND ANTITRUST LAW,**
**R.I. GEN. LAWS §§ 6-36-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Rhode Island)**

745. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

746. Plaintiffs purchased Commodity Shell Eggs within the State of Rhode Island during

the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

747. Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. R.I. Gen. Laws § 6-36-11(a).

748. Defendants contracted, combined and conspired in restraint of trade of Commodity Shell Eggs within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of Commodity Shell Eggs for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws §§ 6-36-1, *et seq*.

749. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. The Rhode Island statute allows actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' conspiracies had the following effects in Rhode Island: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Rhode Island by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

750. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. Defendants' violations of Rhode Island law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under R.I. Gen. Laws §§ 6-36-1, *et seq*.

**COUNT 44: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION ACT, R.I. GEN. LAWS §§ 6-13.1-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Rhode Island)**

751. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

752. Plaintiffs purchased Commodity Shell Eggs within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

753. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

754. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the Commodity Shell Eggs Market.

755. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

756. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island General Laws § 6-13.1-1, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 45: SOUTH DAKOTA**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST LAW,**
**S.D. COD. LAWS §§ 37-1-3.1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in South Dakota)**

757. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

758. Plaintiffs purchased Commodity Shell Eggs within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

759. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this complaint. S.D. Codified Laws § 37-1-33.

760. Defendants contracted, combined or conspired in restraint of trade or commerce of Commodity Shell Eggs within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of Commodity Shell Eggs within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws §§ 37-1, *et seq*.

761. Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq*. Defendants' conspiracies had the following effects in South Dakota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in South Dakota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

762. During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. Defendants' violations of South Dakota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under S.D. Codified Laws §§ 37-1-3.1, *et seq*.

171

## COUNT 46: SOUTH DAKOTA
### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. COD. LAWS §§ 37-24-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in South Dakota)

763. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

764. Plaintiffs purchased Commodity Shell Eggs within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

765. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supracompetitive profits.

766. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs Market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the Commodity Shell Eggs Market.

767. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

768. Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

769. Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

770. Defendants' conduct was willful.

771. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

772. Defendants acted affirmatively to wrongfully conceal facts alleged herein giving rise to their unlawful conduct.

773. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

<u>**COUNT 47: TENNESSEE**</u>
**VIOLATION OF TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE ANN. §§ 47-25-101 *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Tennessee)**

774. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

775. Plaintiffs purchased Commodity Shell Eggs within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

776. Under Tennessee law, indirect purchasers (such as Plaintiffs and the State Law Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this complaint.

777. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

778. Defendants' conduct violated the Tennessee Trade Practices Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Defendants' conspiracies had the following effects in Tennessee: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised,

fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Tennessee by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

779. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. Defendants' violations of Tennessee law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq.*

**COUNT 48: UTAH**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-3101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Utah)**

780. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

781. Plaintiffs purchased Commodity Shell Eggs within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

782. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this complaint. Utah Code Ann. § 76-10-3109(1)(a).

783. Defendants contracted, combined or conspired in restraint of trade or commerce of Commodity Shell Eggs, and monopolized or attempted to monopolize trade or commerce of Commodity Shell Eggs, in violation of Utah Code Ann. §§ 76-10-3101, *et seq*.

784. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*. Defendants'

conspiracies had the following effects in Utah: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Utah by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

785. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. Defendants' violations of Utah law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

**COUNT 49: VERMONT**
**VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT,**
**9 V.S.A. §§ 2451, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Vermont)**

786. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

787. Plaintiffs purchased Commodity Shell Eggs within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

788. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. Vt. Stat. Ann. Tit. 9, § 2465(b).

789. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Vt. Stat. Ann. Tit. 9, §§ 2453, et seq.

790. Defendants' conspiracies had the following effects in Vermont: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Vermont by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

791. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. Defendants' violations of Vermont law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under 9 Vermont Stat. Ann. §§ 2453, *et seq*.

<u>COUNT 50: VIRGINIA</u>
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT,**
**Va. Code Ann. §§ 59.1-196, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Virginia)**

792. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

793. Plaintiffs purchased Commodity Shell Eggs within the State of Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

794. By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. §§ 59.1-196, *et seq*.

795. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Virginia.

796. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs market.

797. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

798. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

799. Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

800. Defendants' conduct was willful.

801. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

802. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until shortly before the filing of this complaint and no later than March 2025, Defendants concealed the existence of their unlawful conduct through their affirmative acts of misrepresentation with the intent to debar and deter the Plaintiffs and State Law Class from discovering the facts alleged giving rise to Defendants' unlawful conduct. The unlawful nature of Defendants' conduct is of a character that involves moral turpitude. As a result, the time of Defendants' obstruction should not be counted as any part of the period within which the action must be brought.

803. By reason of the foregoing, the Plaintiffs and the members of the State Law Class

are entitled to seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. §§ 59.1-204(A), *et seq.*

**COUNT 51: WEST VIRGINIA**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE §§ 47-18-1,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in West Virginia)**

804. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

805. The violations of federal antitrust law set forth above also constitute violations of § 47-18-1 of the West Virginia Code.

806. Plaintiffs purchased Commodity Shell Eggs within the State of West Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

807. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code §§ 47-18-1, et seq.

808. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

809. Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.* Defendants' conspiracies had the following effects in West Virginia: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in West Virginia by paying supracompetitive,

178

artificially inflated prices for Commodity Shell Eggs.

810. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. Defendants' violations of West Virginia law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under W.Va. Code §§ 47-18-1, *et seq*.

**COUNT 52: WISCONSIN**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. § 133.03**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Wisconsin)**

811. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

812. Plaintiffs purchased Commodity Shell Eggs within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

813. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this complaint. Wis. Stat. 133.18(a).

814. Defendants contracted, combined or conspired in restraint of trade or commerce of Commodity Shell Eggs, and monopolized or attempted to monopolize the trade or commerce of Commodity Shell Eggs, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracies had the following effects in Wisconsin: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their

business or property in Wisconsin by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

815. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. Defendants' violations of Wisconsin law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Wis. Stat. §§ 133.01, *et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray that the Court enter judgment against Defendants and grant the following relief:

1) Certify that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as the Class Representatives and their counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes;

2) Order that Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

3) Adjudge that the Defendants, and each of them, violated Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and each of the state law statutes alleged herein;

4) Adjudge that the unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Sections 1 and 3 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

5) Adjudge that Plaintiffs and the Class Members suffered injury and damages to their business or property by reason of Defendants' violations of the Sherman Antitrust Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and suffered injury by reason of Defendants' violations of the state law statutes alleged herein, within the meaning and dictates of those statutes.

6) Award Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, including where applicable multiple damages according to law against Defendants, jointly and severally;

7) Award Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages to the full extent available under the aforementioned state laws;

8) Order Defendants to disgorge their profits earned as a result of their wrongful conduct and order them to make restitution to Plaintiffs and Class Members;

9) Award Plaintiffs and the Class Members pre- and post-judgment interest as provided by law, with such interest awarded at the highest legal rate from and after the date of service of this Complaint;

10) Award Plaintiffs and the Class Members their costs of suit, including reasonable attorneys' fees, as provided by law;

10) Grant Plaintiffs and the Class Members such other and further relief as the Court deems just and proper; and

11) Enter final judgment in favor of Plaintiffs and the Class Members.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: July 31, 2026

 /s/ Bobby Pouya
Bobby Pouya (*pro hac vice*)
Daniel L. Warshaw (*pro hac vice*)
Naveed Abaie (*pro hac vice*)
Adrian J. Buonanoce (*pro hac vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel. (818) 788-8300
bpouya@pwfirm.com
dwarshaw@pwfirm.com
nabaie@pwfirm.com
abuonanoce@pwfirm.com

Neil Swartzberg (*pro hac vice*)
555 Montgomery St., Suite 1205
San Francisco, CA 94111
**PEARSON WARSHAW, LLP**
Tel. (415) 433-9000
nswartzberg@pwfirm.com

Brian S. Pafundi (*pro hac vice*)
**PEARSON WARSHAW, LLP**
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
Tel. (612) 389-0600
bpafundi@pwfirm.com

 /s/ Thomas H. Burt
Thomas H. Burt
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
burt@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Betsy C. Manifold
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Tel: (619) 239-4599
Fax: (619) 234-4599
*manifold@whafh.com*

*Co-Lead Counsel for Indirect Consumer Purchasers*

 /s/ Brian J. Dunne
Brian J. Dunne
Edward M. Grauman
Kaki J. Johnson
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel. (213) 462-4772
bdunne@bathaeedunne.com
egrauman@bathaeedunne.com
kjohnson@bathaeedunne.com

Yavar Bathaee
Andrew Wolinsky
**BATHAEE DUNNE LLP**
445 Park Ave, 9th Floor
New York, NY 10022
Phone: 332-208-7337
yavar@bathaeedunne.com
awolinsky@bathaeedunne.com

*Coordinating and Liaison Counsel for Indirect Consumer Purchasers*

Jesse J. Bair
Nathan M. Kuenzi
**BURNS BAIR LLP**
610 E. Doty Street, Suite 600
Madison, WI 53703
(608) 286-2302
jbair@burnsbair.com
nkuenzi@burnsbair.com

*Local Counsel for Indirect Consumer
Purchasers*

Robert J. Wozniak (*pro hac vice*)
Douglas A. Millen (*pro hac vice*)
**JUSTICE JAGHER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
Fax: (224) 632-4521
Email: rwozniak@jjlmlaw.com
Email: dmillen@jjlmlaw.com

Kimberly A. Justice (*pro hac vice*)
**JUSTICE JAGHER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (484) 243-6335
Fax: (224) 632-4521
Email: kjustice@jjlmlaw.com

Rex A. Sharp (*p.h.v. forthcoming*)
Hammons P. Hepner (*pro hac vice*)
Isaac L. Diel (*p.h.v. forthcoming*)
Sarah T. Bradshaw
Hans D. Hodes
**SHARP LAW, LLP**
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
hhepner@midwest-law.com
idiel@midwest-law.com
sbradshaw@midwest-law.com
hhodes@midwest-law.com

Blake Hunter Yagman
YAGMAN PLLC
1050 30th St. N.W.
Washington, D.C. 20007
Tel.: (929) 709-1493
Email: blake.yagman@yagmanpllc.com

*Steering Committee for Indirect Consumer
Purchasers*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2026, a true and correct copy of the foregoing, with redactions for information designated as confidential, was filed with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record. In addition, a true and correct copy of the sealed version was service upon counsel of record for Defendants via email.


_/s/ Jesse J. Bair_                              Dated: July 31, 2026
Jesse J. Bair